USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: May 16, 2012

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
                                          :
CHRISTOPHER HEDGES, DANIEL ELLSBERG,      :
JENNIFER BOLEN, NOAM CHOMSKY, ALEXA       :
O'BRIEN, US DAY OF RAGE, KAI WARG         :      12 Civ. 331 (KBF)
ALLA, HON. BRIGITTA JONSDOTTIR M.P.,      :
                                          :      OPINION AND ORDER
                     Plaintiffs,          :
                                          :
                                          :
          -v-                             :
                                          :
BARACK OBAMA, individually and as         :
representative of the UNITED STATES OF    :
AMERICA; LEON PANETTA, individually       :
and in his capacity as the executive and :
representative of the DEPARTMENT          :
OF DEFENSE, JOHN MCCAIN, JOHN BOEHNER,    :
HARRY REID, NANCY PELOSI, MITCH           :
MCCONNELL, ERIC CANTOR as                 :
representatives of the UNITED STATES      :
OF AMERICA,                               :
                                          :
                     Defendants.          :
-----------------------------------------X

KATHERINE B. FORREST, District Judge:

     On December 31, 2011, President Obama signed into law the

National Defense Authorization Act for Fiscal Year 2012, Pub. L.

112-81, 125 Stat. 1298 (Dec. 31, 2011) (the "NDAA").  Plaintiffs,

a group of writers and activists, brought a lawsuit on January 13,

2012, seeking preliminary and permanent injunctive relief with

respect to one section (indeed, one page) of that voluminous

legislation:  § 1021.  Plaintiffs assert that Section 1021 is

constitutionally infirm, violating both their free speech and

associational rights guaranteed by the First Amendment as well as

1

due process rights guaranteed by the Fifth Amendment of the United States Constitution.  On February 27, 2012, plaintiffs filed a motion for a temporary restraining order (which they subsequently converted to a motion for preliminary injunction in a conference with the Court), seeking to enjoin enforcement of § 1021.  In support of their motion, plaintiffs assert that § 1021 already has impacted their associational and expressive activities--and would continue to impact them, and that § 1021 is vague to such an extent that it provokes fear that certain of their associational and expressive activities could subject them to indefinite or prolonged military detention.

On March 30, 2012, after expedited discovery, this Court held an evidentiary hearing on plaintiffs' motion.  At the hearing, three plaintiffs testified live and, pursuant to stipulation, another by sworn declaration.  The Government did not call any witnesses, submit any documentary evidence, or file any declarations in connection with its opposition to plaintiffs' motion.[1]  The parties filed post-hearing memoranda; and the motion was fully submitted on May 4, 2012.

As mentioned, plaintiffs' challenge § 1021 as vague and thus, violative of their First and Fifth Amendment rights.  The Government opposes plaintiffs' request for preliminary injunctive relief on three bases:  first, that plaintiffs lack standing;

---

[1] "The Government" refers to all defendants in this action.

2

second, that even if they have standing, they have failed to demonstrate an imminent threat requiring preliminary relief; and finally, through a series of arguments that counter plaintiffs' substantive constitutional challenges, that Section 1021 of the NDAA is simply an "affirmation" or "reaffirmation" of the authority conferred by the 2001 Authorization for Use of Military Force, Pub. L. 107-40, 115 Stat. 224 (Sept. 18, 2011) (the "AUMF"), passed in the wake of September 11, 2001.

In essence, the Government argues that as an "affirmation" of the AUMF, § 1021 of the NDAA does nothing new; and therefore, since the type of activities in which plaintiffs are engaged were not subject to legal action under the AUMF, there is no reasonable basis for plaintiffs to assert that § 1021 could suddenly subject them to governmental action now. According to the Government, as an affirmation of the AUMF, the NDAA must be "read against the backdrop of Executive practice and court decisions"--a backdrop which clarifies the scope of § 1021. (See Gov't's Supplemental Mem. of Law in Opp'n to Pls.' Mot. for a Prelim. Inj. ("Gov't Supp. Mem.") (Dkt. No. 33) at 1.)

For the reasons set forth below, this Court finds that § 1021 is not merely an "affirmation" of the AUMF. To so hold would be contrary to basic principles of legislative interpretation that require Congressional enactments to be given independent meaning. To find that § 1021 is merely an "affirmation" of the AUMF would

3

require this Court to find that § 1021 is a mere redundancy--that is, that it has no independent meaning and adds absolutely nothing to the Government's enforcement powers.

In addition to rendering § 1021 meaningless, the Government's position ignores the differences between the two statutes. Section 1021 lacks what are standard definitional aspects of similar legislation that define scope with specificity.  It also lacks the critical component of requiring that one found to be in violation of its provisions must have acted with some amount of scienter--i.e., that an alleged violator's conduct must have been, in some fashion, "knowing."  Section 1021 tries to do too much with too little--it lacks the minimal requirements of definition and scienter that could easily have been added, or could be added, to allow it to pass Constitutional muster.

This Court finds that plaintiffs (who, as discussed below, have a reasonable fear of future government action sufficient to confer standing) have carried their burden with respect to the necessary elements for issuance of preliminary injunctive relief. They have demonstrated a likelihood of success on the merits with respect to their constitutional challenges; they have put forward specific evidence of actual and threatened irreparable harm; the balance of the equities and the public interest favors issuance of preliminary relief (particularly, but not only, in light of the fact that the Government's entire position is premised on the

4

assertion that §1021 does nothing new--that it simply reaffirms the AUMF; in which case, preliminarily enjoining enforcement should not remove any enforcement tools from those the Government currently assumes are within its arsenal).  Accordingly, this Court preliminarily enjoins enforcement of §1021 pending further proceedings in this Court or remedial action by Congress mooting the need for such further proceedings.

BACKGROUND

I.   THE STATUTES

The Government's central argument with respect to both standing and the merits is that the NDAA is nothing more than an affirmation of the AUMF.  Thus, the Court sets forth the relevant portions of both statutes as well as the relevant enforcement history relating to the AUMF.  The Court also discusses a similar statute recently examined by the Supreme Court of the United States, which has informed some of its thinking on the merits of the instant motion.

A.   <u>The AUMF</u>

The AUMF was passed in direct response to the terrorist event of September 11, 2001.  The AUMF provides:

> [t]hat the President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future

acts of international terrorism against the United
States by such nations, organizations or persons.

Pub. L. 107-40, 115 Stat. 224 (Sept. 18, 2001) § 2(a).

President Bush utilized the authorization granted under the
AUMF to send U.S. armed forces into Afghanistan "with a mission to
subdue al Qaeda and quell the Taliban regime that was known to
support it." Hamdi v. Rumsfeld, 542 U.S. 507, 510
(2004)(plurality); accord Rasul v. Bush, 542 U.S. 466, 470 (2004).
The hostilities that commenced in 2001 remain ongoing today. The
Government has captured and detained a number of individuals
pursuant to the authority in the AUMF. See generally, e.g.,
Hamdi, 542 U.S. 507.

In Hamdi, the Supreme Court recognized the authority granted
by the AUMF to detain the individuals captured: "detention of
individuals . . . for the duration of the particular conflict in
which they were captured, is so fundamental and accepted an
incident to war as to be an exercise of the 'necessary and
appropriate force' Congress has authorized the President to use".
Id. at 518. A number of subsequent cases, many of which arose in
the context of habeas proceedings relating to those captured
pursuant to the AUMF and detained at Guantanamo Bay, have
similarly upheld the detention authority granted under the AUMF.
See, e.g., Barhoumi v. Obama, 609 F.3d 416, 432 (D.C. Cir. 2010);
In re Petitioners Seeking Habeas Corpus Relief, 700 F. Supp. 2d

119, 135 (D.D.C. 2010); see also Hamdan v. Rumsfeld, 548 U.S. 557, 603-04 (2006).

In March 2009, the Government submitted a memorandum in an action relating to Guantanamo Bay detainees, In re Guantanamo Bay Detainee Litigation, Misc. No. 08-442 (D.D.C.), in which it set forth its views on the President's AUMF detention authority ("March 2009 Mem.").[2]  That memorandum, upon which the Government relies in the instant matter regarding certain interpretative principles and the scope of § 1021 of the NDAA, states:

> The President has the authority to detain persons that the President determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, and persons who harbored those responsible for those attacks.  The President also has the authority to detain persons who were part of or substantially supported, Taliban or al-Qaida forces or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act, or has directly supported hostilities, in the aid of such enemy forces.

March 2009 Mem. at 1-2.

At oral argument, the Government conceded that the March 2009 Memorandum simply states the Government's litigation position in the Guantanamo Bay Detainee Litigation, and that it does not have the effect of law.  Tr. 216-17.[3]

---

[2] In re Guantanamo Bay Detainee Litigation, Misc. No. 08-442, Resps.' Mem. Re: the Gov't's Detention Authority Relative to Detainees Held at Guantanamo Bay (D.D.C. Mar. 13, 2009).  (Filed in this litigation at Dkt. No. 24-1.)

[3] References to "Tr." are to the transcript of the March 30, 2012 hearing on plaintiffs' motion for preliminary injunction.

B.   The NDAA

Section 1021 of the NDAA--entitled "Affirmation of Authority of the Armed Forces of the United States to Detain Covered Persons Pursuant to the Authorization for Use of Military Force"--provides

> (a)   In General.   Congress affirms that the authority of the President to use all necessary and appropriate force pursuant to the [AUMF] includes the authority of the Armed Forces of the United States to detain covered persons (as defined in subsection (b)) pending disposition under the law of war.
>
> (b)   Covered Persons.   A covered person under this section is any person as follows
>
> . . .
>
> (2) A person who was part of or substantially supported al-Qaeda, the Taliban, or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act or has directly supported such hostilities in aid of such enemy forces.
>
> (c)   Disposition Under the Law of War.   The disposition of a person under the law of war as described un subsection (a) may include the following:
>
> (1) Detention under the law of war without trial until the end of hostilities authorized by the [AUMF].
>
> . . .
>
> (4) Transfer to the custody or control of the person's country of origin, any other foreign country or any other foreign entity.
>
> (d)   Construction.   Nothing in this section is intended to limit or expand the authority of the President or the scope of the [AUMF].
>
> (e)   Authorities.   Nothing in this section shall be construed to affect existing law or authorities

8

relating to the detention of United States citizens . . . .

Pub. L. 112-81, 125 Stat. 1298 § 1021.

When he signed the NDAA into law on December 31, 2011, President Obama simultaneously issued a "signing statement." A portion of that statement referred explicitly to § 1021:

> Section 1021 affirms the executive branch's authority to detain persons covered by the [AUMF]. This section breaks no new ground and is unnecessary. The authority it describes was included in the 2001 AUMF, as recognized by the Supreme Court and confirmed through lower court decisions since then . . . . Moreover, I want to clarify that my Administration will not authorize the indefinite military detention without trial of American citizens . . . . My Administration will interpret section 1021 in a manner that ensures that any detention it authorizes complies with the law.

Statement on Signing the National Defense Authorization Act for Fiscal Year 2012, 2011 DAILY COMP. PRES. DOC. 978 (Dec. 31, 2011) at 1-2 (hereinafter "Signing Statement"), available at http://www.gpo.gov/fdsys/pkg/DCPD-201100978/pdf/DCPD-201100978.pdf.

As stated above, the NDAA is a broad package of legislation that includes both authorizations for military spending as well as additional, non-spending legislation (such as § 1021). Pub. L. 112-81, 125 Stat. 1298 at Preamble ("An Act"); see also generally Pub. L. 112-81, 125 Stat. 1298 § 2. In addition to § 1021, the NDAA includes § 1022 which separately authorizes "Military Custody for Foreign Al-Qaeda Terrorists." See Pub. L. 112-81, 125 Stat.

1298 § 1022.   That statute authorizes "Custody Pending Disposition

Under Law of War."   Id.   Section 1022(a)(2) defines who

constitutes a "Covered Person[]" under that prong of the statute,

id. § 1022(a)(2), and contains a specific provision that states

that, "The requirement to detain a person in military custody

under this section does not extend to citizens of the United

States . . . ," id. § 1022(b)(1).

Section 1022 further provides, in pertinent part:

> (c)(1) Not later than 60 days after the date of the
> enactment of this Act, the President shall issue, and submit
> to Congress, procedures for implementing this section.
>
> (2) Elements.  The procedures for implementing this
> section shall include, but not be limited to, procedures as
> follows:
> > (A) Procedures designating the persons authorized
> > to make determinations under (a)(2) and the process by which
> > such determinations are to be made . . . .

Pub. L. 112-81, 125 Stat. 1298 § 1022(c)(1)-(2)(A).

On February 28, 2012, the White House issued a Presidential

Policy Directive (PPD-14) entitled, "Requirements of the National

Defense Authorization Act" regarding the procedures for

implementing § 1022 of the NDAA (but not § 1021).  "Directive on

Procedures Implementing Section 1022 of the National Defense

Authorization Act for Fiscal Year 2012," 2012 Daily Comp. Pres. Doc.

136 (Feb. 28, 2012), available at

http://www.gpo.gov/fdsys/pkg/DCPD-201200136/pdf/DCPD-

201200136.pdf.  That directive provides specific guidance as to

the "Scope of Procedures and Standard for Covered Persons
Determinations."  Specifically, it states that "covered persons"
applies only to a person who is not a citizen of the United States
and who is a member or part of al-Qaeda or an associated force
that acts in coordination with or pursuant to the direction of
al-Qaeda; and "who participated in the course of planning or
carrying out an attack or attempted attack against the United
States or its coalition partners."  Id. at 1-2.  The directive
consists of 11 pages of specific implementation procedures
including defining scope and limitations.

        As mentioned, no such directive was issued with respect to
section 1021 of the NDAA.

        C.    18 U.S.C. § 2339B and *Holder v. Humanitarian Law Project*

        In Holder v. Humanitarian Law Project, 130 S. Ct. 2705
(2010), the Supreme Court considered whether a criminal statute
prohibiting the provision of material support to terrorists, or
providing resources to foreign terrorist organizations, was
constitutionally infirm under either the First or Fifth
Amendments.  Id. at 2712-13.  There, the relevant statutory
provision stated, in pertinent part:

> Whoever provides material support or resources or
> conceals or disguises the nature, location, source or
> ownership of material support or resources, knowing or
> intending that they are to be used in preparation for,
> or in carrying out, a violation of [various criminal
> statutes] . . . shall be . . . imprisoned for not more
> than 15 years.

18 U.S.C. § 2339A(a).

The term "material support," as well as the types of activities encompassed by "material support"--<u>e.g.</u>, "expert advice or assistance"--are defined within the statute itself.  <u>See</u> 18 U.S.C. § 2339A(b)(1)-(3).

The following section of that statute, § 2339B, sets forth the penalties associated with violating 18 U.S.C. § 2339A, and in doing so, relies upon the definitions supplied in § 2339A.  <u>See</u> 18 U.S.C. § 2339B.  The penalties to be imposed are for, as § 2339B states, the "prohibited activit[y]" of "[p]roviding material support or resources to a foreign terrorist organization, or attempts or conspires to do so . . . ."  18 U.S.C. § 2339B(a)(1). The penalties set forth in § 2339B are imposed only upon a showing that the person "ha[d] knowledge that the organization is a designated terrorist organization . . . , or that the organization has engaged or engages in terrorism . . . ."  <u>Id.</u>

In finding that § 2339B did not violate either the First or Fifth Amendments, the Supreme Court pointed specifically to the definitional sections and the requirement for "knowing" conduct. <u>Holder</u>, 130 S. Ct. at 2720.  The Supreme Court found,

> Applying the statutory terms in this action
> 'training,' 'expert advice or assistance,' 'service,'
> and 'personnel'--does not require similarly
> untethered, subjective judgments . . . Congress took
> care to add narrowing definitions to the
> material-support statute over time.   These definitions

> increased the clarity of the statute's terms . . . and
> the knowledge requirement of the statute further
> reduces any potential for vagueness, as we have held
> with respect to other statutes containing a similar
> requirement.

Id. (citations omitted).

II.  THE PARTIES

    A.  <u>Plaintiffs</u>

Plaintiffs are a group of writers and political activists.

Of the seven named plaintiffs, only five submitted any evidence in

connection with this motion:  Jennifer Ann Bolen, Christopher

Hedges, Alexa O'Brien, Kai Wargalla, and Hon. Brigitta Jonsdottir.

(Dkt. Nos. 10, 11, 14, 17, 18.)  Two of the plaintiffs, Daniel

Ellsberg and Noam Chomsky, are listed in the caption and referred

in the text of the verified amended complaint (<u>see</u> Dkt. No. 4-1),

but did not submit either affidavits in support of the motion or

appear live to provide testimony at the evidentiary hearing.[4]

Bolen, who, as mentioned, submitted a declaration in support of

the motion, did not testify at the evidentiary hearing and was not

deposed.  Thus, her statements were not cross-examined and this

Court has not relied upon them for purposes of deciding the

---

[4] This action was commenced by filing a verified complaint.  While procedurally
the factual statements relating to a plaintiff in a "verified" complaint may be
taken as having the weight of a declaration or other statement under penalty of
perjury, <u>see</u> <u>Colon v. Coughlin</u>, 58 F.3d 865, 872 (2d Cir. 1995), this Court
required that any plaintiff asserting standing for preliminary relief put
forward a specific, separate declaration and make him or herself available for
deposition (<u>see</u> Dkt. No. 16).  Accordingly, the Court has not based its
determination herein on the allegations in the verified amended complaint.

instant motion.[5]  Plaintiffs Hedges, O'Brien, Wargalla, and Jonsdottir testified at the hearing (Jonsdottir by declaration as agreed by the parties).[6]

> 1.   Christopher Hedges

At the hearing in this matter, Hedges testified that he has been a foreign correspondent for 20 years. Tr. 156.  He won the Pulitzer Prize for journalistic reporting.  Tr. 157.  Over the course of his career, he has primarily worked in Latin America, Africa, the Middle East, and the Balkans.  Tr. 157.  He makes his living writing, teaching, and lecturing.  He has published a number of articles in the New York Times, the Christian Science Monitor, the Dallas Morning News, Harper's Magazine, and the New York Review of Books.  Tr. 157.

After September 11, 2001, Hedges was based in Paris and covered al-Qaeda in all European countries (with the exception of Germany) as well as the Middle East.  Tr. 157.[7]  As part of that coverage, Hedges retraced the steps of Mohammed Atta, one of the participants in the 9/11 events; he covered the abortive Paris embassy bombing plot, the suicide bombing attack on the synagogue

---

[5] Based upon the oral representations of plaintiffs' counsel, plaintiff Bolen was apparently ill and unable to appear for deposition.  She did attend the hearing, but due to the fact that she was not deposed prior to that date, she did not testify at the hearing.

[6] The Court found the testimony of each of the witnesses who testified live to be earnest and credible.

[7] Hedges does not speak German but does speak English, French, Spanish, and Arabic.  Tr. 157.

14

in Djerba in Tunisia, and he covered Richard Reed, the so-called "Shoe Bomber."  Tr. 158.

Hedges testified that some of the people he has interviewed in connection with his work were al-Qaeda members who were later detained and are currently in prison.  Tr. 158.  Accordingly to Hedges himself, his reporting on al-Qaeda or other terrorist organizations is read widely in the Middle East.  Tr. 159.  Certain of Hedges' writings appear on Islamic or jihadist websites.  Id.

Hedges stated that having covered war for 20 years, he is familiar with the fact that a number of individuals who may be detained as enemy combatants might not have ever carried a weapon.  Tr. 160.  In that regard, he referred to Osama Bin Laden's driver, a Guantanamo detainee.  Tr. 160.

Hedges testified that he has read § 1021 of the NDAA.  Tr. 160.  Hedges testified that he is also familiar with the provisions of the AUMF and has a specific understanding as to what they mean.  Tr. 165 ("enemy combatants on foreign soil that are engaged in direct hostilities with the United States and are linked directly with those who carried out the attacks of 9/11").  He does not, however, understand that § 1021 is entirely co-extensive and goes no further than the AUMF.  Tr. 165.  Indeed, he testified that he reads §1021 as "radically different" from the AUMF.  Tr. 166.  In that regard, Hedges is unclear as to the

meaning of what constitutes "associated forces" in § 1021, see Tr. 168, nor does he understand what the phrases "engaged in hostilities," "covered person," or "substantially supported" means as used in § 1021, Tr. 162-63.

Hedges testified that he has reported on 17 groups contained on a list prepared by the State Department of known terrorist organizations. (See Court Ex. 9 (Country Reports on Terrorism, Report of the U.S. State Dep't, Ch. 6 ("Terrorist Groups") (Aug. 2010) at 1 (Certification of Christopher Lynn Hedges Ex. A (Dkt. No. 11-1).)[8] Included among the groups on which Hedges has reported (and which are on the State Department lists admitted as Court Exhibit 9) are: the Abu Nidal Organization, the al-Aqsa Martyrs Brigade, the Armed Islamic Group, Al-Jihad, the Gama'a al-Islamiya, Hamas, Hizballah, Kahane Chai, the Konga-Gel, KGK (a/k/a "PKA"), the Mujahedin-e Khalq Organization ("MEK"), the Palestine Liberation Front, the Palestine Islamic Jihad, the Popular Front for the Liberation of Palestine (including also the Central Command), al-Qaeda, Revolutionary People's Party/Front, and the Salafist Group for Call and Combat. (Id. at 1-2.) See also Tr. 169.

Hedges testified that some of those organizations are considered to be in hostilities with coalition partners of the

---

[8] References to "Court Ex." refer to documents marked for identification during the March 30 preliminary injunction hearing.

United States.  For instance, the PKK is engaged in hostilities with Turkey, which is one of the United States' coalition partners.  Tr. 169.  In connection with his coverage of the PKK, he travelled with members of the PKK on occasion, and was with the PKK when it was attacked by Turkish war planes.  Tr. 170-71.

Other groups Hedges has covered, such as the Popular Front for the Liberation of Palestine ("PFLP"), have carried out acts of terrorism against U.S. targets.  Tr. 170.

Hedges has also had a number of speaking engagements in Belgium and France in which he has encountered and conversed with members of al-Qaeda and the Taliban.  Tr. 174.

In connection with his reporting on Hamas, Hedges met with members of Hamas' leadership, stayed in their homes, and socialized with them.  Tr. 172.  Hedges lived in Gaza and had frequent contact with members of Hamas in connection with his work.  Tr. 172.

Hedges testified that because he speaks a number of languages, he has been approached by publications--e.g., Harper's Magazine, the Nation and others--to return to the Middle East as a correspondent.  Tr. 172-73.  He testified that he has a realistic expectation that his work will bring him back to the Middle East. Tr. 173.

Hedges testified that since the passage of § 1021, he has altered his associational and speech activities with respect to

17

some of the organizations upon which he previously reported due to his concern that those activities might bring him within the ambit of § 1021, thereby subjecting him to indefinite military detention.  See, e.g., Tr. 174, 177, 186 ("When people begin to speak about carrying out acts that are clearly illegal or embracing acts that are violent or talking about terrorism, my reaction so far is to get out as fast as I can because I think under the NDAA [i.e., § 1021], at least as I see it, there is a possibility that those people looking at my activities from the outside would not make a distinction between myself and the person who embraced that kind of activity.").  At the time of the hearing, Hedges had speeches scheduled in Paris and Brussels at which he expected members of al-Qaeda or the Taliban to be present and he intended to change his speech as a result of § 1021.  Tr. 174.

Hedges also testified that he has previously associated with a group called Bob Avakiam Revolutionary Party, a Maoist group, which he stated he understands endorses the use of violence towards revolutionary ends--a philosophy to which Hedges stated he did not ascribe.  Tr. 177.  Despite that fact, Hedges understands § 1021 as potentially encompassing his association with the Avakiam Revolutionary Party and thus, the statute already has had a chilling effect on his associational activities.  Tr. 177.

Hedges testified that prior to the passage of § 1021 he had never feared military detention for his activities.   Tr. 206.

   2.   Alexa O'Brien

Alexa O'Brien has written a number of articles on a variety of topics relating to, inter alia, interviews of prison guards or detainees at Guantanamo Bay.  (Court Ex. 3 (series of articles authored by O'Brien, published on WL Central).)  She refers to her occupation as a "content strategist." Tr. 38.  She is the founder and website designer for U.S. Day of Rage.  Tr. 40, 42.  She testified that she founded U.S. Day of Rage in March 2011.  Tr. 42.  U.S. Day of Rage has never been involved in armed conflict with the United States, and never been a co-belligerent with al-Qaeda or the Taliban, according to O'Brien.  Tr. 52, 56.

O'Brien is also a contributor and editor to a website called "WL Central."  Tr. 40.  WL Central is "a collection" of international news journalists.  Tr. 40.  O'Brien testified that "our definition of 'news' is information that enables citizens to govern themselves."  Tr. 40.  O'Brien has made a number of contributions to that website, including reporting on WikiLeaks' release of U.S. State Department cables, the "JTF" Memoranda for Guantanamo Bay, and various revolutions in the Middle East (e.g., Egypt, Bahrain, Yemen, Iran).  Tr. 41.  Her reporting has included both articles and live blogs.  Tr. 41.  Altogether, since January 2011, she has written approximately 50 pieces covering these types

of topics.  Tr. 41.  She testified that to her knowledge WL Central has not been involved in armed conflict with the United States nor has it been a co-belligerent with al-Qaeda or the Taliban.  Tr. 56.

O'Brien testified credibly that in February 2012, she learned that an individual employed by a private security firm had allegedly been asked to tie U.S. Day of Rage to Islamic fundamentalist movements.  Tr. 43.  She received a copy of an email which indicated that there had been communications in this regard dating back to August 2011.  Tr. 43.  The email exchange was located on the WikiLeaks website and was between individuals named Thomas Kopecky and Fred Burton.  Tr. 45.  Based on first-hand knowledge, O'Brien testified that she is aware that Burton is a former diplomatic security official, previously employed by the U.S. State Department.  Tr. 45-46.

O'Brien testified that she also received twitter messages from a private security contractor called Provide Security.  Tr. 47.  One of the messages indicated that U.S. Day of Rage had been found on an Islamic jihadist website.  Tr. 48.  The message stated, "Now you are really in over your head with this. Muslims from an Afghanistan jihad site have jumped in."[9]

---

[9] The messages that O'Brien received were marked as Court Exhibit 4, admitted to show the reasonableness of O'Brien's fearful state of mind regarding being subject to § 1021, and not for the truth.

O'Brien also testified that in September 2011 she was contacted by someone she knew to be a Federal agent, but to whom she guaranteed confidentiality of source.  Tr. 52.  She testified that that individual had seen a memorandum from the Department of Homeland Security ("DHS") addressed to law enforcement across the nation (a) regarding the fact that DHS planned to infiltrate U.S. Day of Rage and (b) linking U.S. Day of rage to a loosely knit "organization" called "Anonymous" that O'Brien knew to be associated with cyber-terrorism.  Tr. 51-54.  O'Brien later met with a journalist who told her that he had seen either the same memo to which the federal agent had referred or one with similar content.  Tr. 69.  O'Brien testified that in August 2011 she learned of an article suggesting that U.S. Day of Rage had been posted on Shamuk and Al-Jihad, two al-Qaeda recruitment sites. Tr. 59.

O'Brien testified that since § 1021 has gone into effect (or when she perceived it to go into effect because there is a dispute by the Government as to when § 1021 became effective), it has had a chilling effect on her speech.  Tr. 72 ("Court: Are you saying that there is a causal relationship between the passage of [§ 1021] and your withholding of these articles?  A: Absolutely.").  She testified specifically to two articles that she has withheld from publication.  Tr. 70.  One of the articles details conversations with former military personnel at Guantanamo

describing physical restraints used there and other information. Tr. 70.  The second article relates to discussions with a defense attorney making accusations that a military defense attorney for a military detainee "threw a case."  When asked why she had withheld those articles, O'Brien testified she could not risk the danger to herself under § 1021.  Tr. 71.

She testified that prior to the passage of § 1021, in July 2011, she had published an article relating to a former Guantanamo detainee, Omar Deghayes, and that she was currently concerned regarding whether her publication of that article could be encompassed within the conduct of § 1021.  Tr. 77.  Plaintiffs marked as Court Exhibits 2 and 3 a number of articles published by O'Brien.  Exhibit 3 consisted of a compilation of articles that on the topics she testified gave her concern with regard to whether they would be encompassed by § 1021.  Tr. 79-80.  O'Brien also testified that she has incurred expenses in connection with § 1021 including the purchase of an additional hard drive on which she double encrypts files in order to protect them from detection by others, including for purposes of protecting them from the NDAA.

O'Brien testified that she has read § 1021.  Tr. 74.  She testified that in particular the statute's references to "associative [*sic*] forces and substantial support" led to her withholding her articles.  Tr. 74.  She stated:

> I think it's best to use an example of someone like Sami Al-Hajj, who is a Sudanese Al Jazeera cameraman, who was later released from Guantanamo Bay and now works for Al Jazeera. Again, 'substantially supported,' what does that mean?  In a war on terror where intelligence collection and the information-sharing environment are competing with the press for collection of information, it's very similar activities of collect, talking with people, getting information.  It's very hard when Secretary Clinton talks about the information war that we are in to understand what 'substantially support' means in relationship to journalists."

Tr. 74. She testified that she understood that Sami Al-Hajj had been detained for six or seven years.  Tr. 75.

O'Brien testified that she was unaware of any action taken by the United States Government to date regarding the activities of U.S. Day of Rage or against her personally under the AUMF or § 1021.  Tr.90-91.  She also testified that she is not aware of any U.S. Government official who has "threatened" to take action against U.S. Day of Rage as a result of expressive activities. Tr. 93. However, she also testified that pursuant to a request made under the Freedom of Information Act, an organization called TruthOut.org had obtained a memorandum from the Department of Homeland Security and which states "National Cybersecurity and Communications Integration Center Bulletin.  Details on 'Anonymous,' upcoming U.S. operations 17 September 2011 Occupy Wall Street, 'U.S. Day of Rage.'"  Tr. 110.[10]

---

[10] The Court admitted the document obtained pursuant to that request under the general hearsay exception contained in Fed. R. Evid. 807 as having sufficient indicia of reliability to come in for the truth.  The Court invited counsel for the Government to notify the Court if, after the hearing, they determined that the document was not authentic.  The Court has not received such a

3.   Kai Wargalla

Kai Wargalla is an organizer and activist based in London. Tr. 116.  She is the Deputy Director of Revolution Truth, an organization that conducts online, live panel discussions and campaigns relating to, inter alia, WikiLeaks.  Tr. 117-18. Wargalla also founded Occupy London in September 2011 and Justice for Assange UK.[11]  Tr. 117.  Wargalla testified that in October 2011 she received a copy of a bulletin[12] apparently issued by the City of London Police, which listed Occupy London in a "terrorism and extremism" update.  Tr. 120.

Wargalla testified that she has read § 1021.  Tr. 121-22. She expressed concern regarding the lack of definition around the phrase "covered persons" and not understanding whether her activities could be construed to bring her within that definition. Tr. 122.  She also testified that she is concerned about the lack of clarity surrounding the phrase "substantially supported."  Tr. 130.  She testified that to her, this phrase "could mean anything

---

communication and therefore assumes the document to be authentic.  See Tr. 109-111.

[11] "Justice for Assange UK" refers to an organization, the efforts of which are directed at supporting Julien Assange, founder of WikiLeaks.  See www.justice4assange.com.  Revolution Truth is an "international group of volunteers conducting campaigns on Bradley Manning and WikiLeaks . . . and online live panel discussions."  Tr. 117.

[12] Similar to many other documents presented during this hearing, the bulletin was admitted not for its truth, but for Wargalla's state of mind regarding her concerns relating to enforcement of § 1021.

really, from having someone on a panel discussion, from conducting campaigns, to organizing rallies and demonstrations." Tr. 131.

Wargalla testified that § 1021 has led to changes in the expressive activities of Revolution Truth. Revolution Truth holds live panel discussions that are streamed over the Internet. Tr. 124. In light of § 1021, Revolution Truth is considering not inviting members of certain organizations to participate whom they otherwise would have. Tr. 124-25. In particular, Wargalla testified that they would likely not invite Hamas to participate because they would not want to put themselves in danger of prosecution under § 1021. Tr. 126. She testified that other than those panel discussions, she has not made any other changes in response to the passage of § 1021. Tr. 140.

She testified that she is aware that several U.S. politicians have referred to WikiLeaks as a terrorist organization and that there is a grand jury investigation that involves WikiLeaks. Tr. 139. She also testified that she is, however, unaware of whether WikiLeaks has been officially classified as a terrorist organization. Tr. 139.

Wargalla testified that to date, she has not learned that the U.S. Government taking, or threatening to take, any action against her in connection with her expressive activities. Tr. 137. However, she testified that she fears that the U.S. Government

could well take action against her for her associational and expressive activities set forth at this litigation.

    4.   Hon. Brigitta Jonsdottir[13]

The Honorable Brigitta Jonsdottir is a member of parliament in Iceland. Tr. 147-48. She stated that she has been an activist and spokesperson for various groups such as WikiLeaks, Saving Iceland, and Friends of Tibetan Iceland. Tr. 148. She has also organized "Art Against War" in which a number of Icelandic artists and poets protested the war in Iraq. Tr. 148. She has participated in international events relating to writing and activism against the war in Iraq including Poets Against the War, Dialogue Among the Nations Through Poetry, and Poets for Human Rights. Tr. 148. As part of her work in connection with WikiLeaks, she assisted in producing a movie called "Collateral Murder." Tr. 148. That film was released in 2010, and alleges the commission of war crimes by Americans and others during the war in Iraq. She stated that

> the footage shown . . . showed an American Apache
> helicopter in Baghdad, after the Iraqi war but during
> the insurrection, open fire on a group of nine to
> eleven men, most of them unarmed, and two of whom were
> journalists working for Reuters. Eight men were
> killed, including the two journalists. A second and
> third strike killed more people and wounded two
> children.

---

[13] The parties stipulated that the declaration of Hon. Brigitta Jonsdottir could be read at the hearing as if it were live testimony to which the Government waived cross examination. Tr. 155. Naomi Wolf read the declaration into the record.

Tr. 149.

Jonsdottir further averred that she understands that several U.S. politicians have classified WikiLeaks as a terrorist organization. Tr. 149. She stated that she is also aware that Bradley Manning, who she stated leaked U.S. documents, has been charged in 2011 with treason, based upon, in the Government's view, his aiding of terrorists. Tr. 150. She stated that Manning allegedly leaked the footage that formed the basis for the video "Collateral Murder." Tr. 150. She has received a subpoena for her Twitter and other social media accounts for materials relating to Julian Assange and Bradley Manning. Tr. 152.

Jonsdottir stated that due to that subpoena, and now in addition due to the passage of § 1021, she is fearful of travelling to the U.S. Tr. 153. She has been invited to be the keynote speaker at a number of events in the U.S. but has declined those invitations due to her concerns. Tr. 154. She stated that she has "a very real, legitimate fear that the federal government will enforce the Homeland Battlefield Act [§ 1021] against me in that my work could be construed as giving 'substantial support' to terrorists and/or 'associated forces' because of the way the United States government views WikiLeaks." Tr. 154.

### 6.   The Remaining Plaintiffs

Other individuals are named as plaintiffs in this action and shall be plaintiffs as the matter proceeds in its subsequent

27

stages.  Those additional individuals include Bolen, Chomsky, and Ellsberg.  Plaintiffs are not relying on those individuals to support their motion for preliminary injunctive relief.[14]

B.   Defendants

Defendants in this action are President Barack Obama, U.S. Secretary of Defense Leon Panetta, and the Department of Defense (the "DOD").

In their Amended Complaint, plaintiffs also named members of Congress--John McCain, John Boehner, Harry Reid, Nancy Pelosi, Mitch McConnell, and Eric Cantor.  (See Dkt. No. 4-1.)  As the Government stated at oral argument, none of those additional defendants have been served and thus, none are properly part of this action at this time.

Accordingly, when the Court refers to the "Government" in this Opinion, it is referring only to the defendants properly before this Court--i.e., President Obama, Secretary Panetta, and the DOD.

C.   Amici Curae Movants

On April 17, 2012, a group of entities and individuals-- Virginia State Delegate Bob Marshall, Virginia State Senator Dick Black, Downsize DC Foundation, DownsizeDC.org, Inc., U.S. Justice

---

[14] As mentioned, Court required that any person upon whom plaintiffs wished to rely for evidentiary support for their motion needed to both submit a declaration by a certain point in time and make him/herself available for deposition.  (Dkt. No. 16.)  Plaintiffs Hedges, O'Brien, Wargalla did so and the parties reached agreement with respect to plaintiff Jonsdottir.

Foundation, Institute on the Constitution, Gun Owners Foundation, Gun Owners of America, Inc., The Lincoln Institute for Research and Education, the Western Center for Journalism, Conservative Legal Defense and Education Fund, U.S. Border Control, Restoring Liberty Action Committee, Tenth Amendment Center, Center for Media and Democracy, Bill of Rights Defense Committee, Pastor Chuck Baldwin, Professor Jerome Aumente, and the Constitution Party National Committee (collectively, the "Amici Movants")--filed a motion to file amicus brief.  (Dkt. No. 31.)

The Amici Movants filed their motion, in support of plaintiffs' motion for preliminary injunction, because they "share Plaintiffs' concerns that, as members of the press or organizations which exercise First Amendment freedom of press rights, they could be targeted due to the nature of the work that they do and opinions they express."  (Decl. of Steven J. Harfenist in Supp. of Mot. for Leave to File Amicus Curae Br. (Dkt. No. 32) ¶ 7.)  Although some of the arguments in the amicus brief overlap substantially with the arguments advanced by plaintiffs, certain arguments differ entirely--i.e., the amicus brief "injects new issues" into this matter which the Court need not--and will not-- consider.  See 16A Wright, Miller & Cooper, Fed. Prac. & Proc. § 3975.1 (4th ed. 2012) ("In ordinary circumstances, an amicus will not be permitted to raise issues not argued by the parties.").  To the extent that the Amici Movants reiterate

arguments already made by plaintiffs, the Court does not find the amicus brief necessarily helpful.  See Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d 93, 106 n.10 (2d Cir. 2010) (quoting Universal City Studios, Inc. v. Corley, 273 F.3d 429, 445 (2d Cir. 2001)). However, the Court accepts the amicus brief for filing in order to have a full record on this motion.

III. THE GOVERNMENT'S REPRESENTATIONS REGARDING § 1021

The Government did not call any witnesses at the hearing on this motion.  They did, however, submit briefing in advance of (and subsequent to) the hearing, cross-examine plaintiffs at the hearing, and made legal arguments at the hearing.  As stated above, the Government's main contention is that § 1021 is merely an "affirmation" of the authority given the President in 2001 under the AUMF--it goes no further and does nothing more.  See, e.g., Tr. 214-15.  (See also Gov't's Mem. of Law In Opp'n to Pls.' Mot. for a Prelim. Inj. ("Gov't Mem.") (Dkt. No. 24) at 7-10.) The Government relies upon Supreme Court precedent which has upheld the authority granted under the AUMF, including Hamdi.  Tr. 214.

The Court asked whether there was any language in the AUMF similar to § 1021(b)(2) regarding in particular the phrases "substantially supported," "associated forces," and "directly supported."  Tr. 215-16.  The Government stated that the phrase "directly supported" has not been interpreted in any case law but

30

is referenced in the Government's March 2009 Memorandum. Tr. 216. However, the Government argued that the phrase "associated forces" can be tied directly into the body of law relating to the Laws of War as being co-extensive with co-belligerency. Tr. 220-21. According to the Government, therefore, the Laws of War place important and clear limits on which organizations can be construed as "associated forces." Tr. 221.

As to the phrase "substantially supported," the Government conceded that the two cases in which that language has previously been examined--Barhoumi v. Obama, 609 F.3d 416 (D.D.C. 2010), and al-Bihani v. Obama, 590 F.3d 866, 873-74 (D.C. Cir.), reh'g en banc denied, 619 F.3d 1 (D.C. Cir. 2010), cert. denied, 131 S. Ct. 1814 (2011)--did not construe the contours or parameters of that phrase. Tr. 223.

The Court asked "when we are talking about cases which have used the phrase 'substantially supported' and said that that is a valid criterion under the AUMF or of the legislation, that's not the same thing as saying that . . . any court has found, one way or the other, that 'substantially supported' has an understandable meaning to an ordinary citizen?" The Government responded, "It's true that the courts have not expressly ruled that, that's right." Tr. 223.

> The Court then asked: Give me an example. Tell me what it means to substantially support associated forces.

31

Government: I'm not in a position to give specific examples.

Court: Give me one.

Government: I'm not in a position to give one specific example.

Tr. 226.

The Court then asked:  What does 'directly supported' mean?

Government:  We have not said anything about that in our brief.

Court:  What do you think it means?

Government:  . . . Your Honor, we had focused so much on the phrase that was challenged by the plaintiffs, 'substantial support' that I have not thought through exactly and we have not come to a position on what 'direct support' and what that means.

Tr. 229-230.

The Court then asked:  "Assume you were just an American citizen and you're reading the statute and you wanted to make sure you do not run afoul of it because you are a diligent U.S. citizen wanting to stay on the right side of §1021, and you read the phrase 'directly supported'.  What does that mean to you?"

Government: Again it has to be taken in the context of armed conflict informed by the laws of war.

Court: That's fine. Tell me what that means?

The Government then returned to the Laws of War and finally stated, "I cannot offer a specific example. I don't have a specific example."

Tr. 230.

The Court then asked the Government specific questions

regarding plaintiffs' present and intended activities at issue

here and whether those activities would fall within the scope of
§ 1021.  The Court required that each plaintiff testifying at the
evidentiary hearing both to submit a declaration prior to the
hearing on the topics about which he/she intended to testify and
to submit to deposition.  (See Dkt. No. 16.)  The Government
therefore knew well before the hearing the types of expressive and
associational conduct in which each plaintiff would testify he/she
engaged, and the conduct he/she asserted had already been or would
imminently be chilled.  In short, plaintiffs' positions should
have come as no surprise to the Government.  Nevertheless, when
confronted with what the Court assumed was certainly among the
critical questions likely to be posed at the hearing--i.e.,
whether plaintiffs' activities fell within § 1021's scope, the
Government responded, "I can't make specific representations as to
particular plaintiffs.  I can't give particular people a promise
of anything."  Tr. 235.

It must be said that it would have been a rather simple
matter for the Government to have stated that as to these
plaintiffs and the conduct as to which they would testify, that
§ 1021 did not and would not apply, if indeed it did or would not.
That could have eliminated the standing of these plaintiffs and
their claims of irreparable harm.  Failure to be able to make such
a representation given the prior notice of the activities at issue
requires this Court to assume that, in fact, the Government takes

33

the position that a wide swath of expressive and associational
conduct is in fact encompassed by § 1021.

With respect to the witnesses who had appeared in Court, the
Court had the following colloquy with the Government:

> Court:  These people have real things they are saying.
> These are not speculative or hypotheticals. These are
> people who have actually written articles that we have
> here. [The Court then held up the articles written by
> O'Brien and marked as Court Ex. 3.] We are trying to
> figure out, are these articles going to subject Ms.
> O'Brien to risk under § 1021? . . . .
>
> Government: Again, I'm not authorized to make specific
> representations regarding specific people.  I'm saying
> that 'associated forces' cannot extend to groups that
> are not armed groups at all.
>
> Court: So we don't know about the articles, it
> depends?
>
> Government: Maybe they are an armed group.

Tr. 236.

> With respect to Jonsdottir the Court asked:
>
> I'm asking you as a representative of the United
> States Government here today, can Ms. Jonsdottir
> travel to the United States without any concern that
> she will be captured by her current activities under
> § 1021?
>
> Government: Again, I can't make representations on
> specifics.  I don't know what she has been up to. I
> don't know what is going on there.

Tr. 239.

> With regard to Hedges the Court asked,
>
> Is it possible, in your view, that Mr. Hedges, any of
> his activities as he has described them, should they
> occur in the future, [and also as to his past

activities], can you say that he would not be subject
to military detention  without trial under § 1021?

Government:  I'm not prepared to address that question
here today, but I would answer that by saying that his
concerns that he has raised are addressed by what I
have said and he has the burden of showing that his
fear as articulated is a reasonable fear.

Tr. 245.

DISCUSSION

Plaintiffs' challenge to the constitutionality of § 1021 and
request for preliminary injunctive relief requires this Court to
answer the following questions:  do these plaintiffs have the
standing to bring this action?  If plaintiffs do have standing--or
at least some of them do--are they able to meet the demanding
standards for preliminary injunctive relief?

As set forth below, the Court answers those questions in the
affirmative.

I.   ARTICLE III AND PLAINTIFFS' STANDING

Article III, § 2 of the United States Constitution empowers
this Court only to entertain actual cases and controversies.
"Standing doctrine determines 'whether the plaintiff has made out
a 'case or controversy' between himself and the defendant within
the meaning of Art. III' and is therefore 'entitled to have the
courts decide the merits of the dispute or of particular issues.'"
Amnesty Int'l USA v. Clapper, 638 F.3d 118, 131 (2d Cir. 2011)
(quoting Warth v. Seldin, 422 U.S. 490, 498 (1975)).  "A citizen

who dislikes a particular law may not require a court to address its constitutionality simply by stating in a complaint his belief, however deeply held, that the law is inconsistent with some provision of the Constitution." Id.  Concrete injury is required. Id.

In Allen v. Wright, 468 U.S. 737 (1984), the Supreme Court made clear that standing is "built on a single basic idea--the idea of the separation of powers." Id. at 752.  Article III limits judicial review of legislative or executive acts only to those instances in which it is truly necessary to protect a complaining party's interests.  Clapper, 638 F.3d at 132.

The Supreme Court has set forth three elements a plaintiff must establish to show standing: first, a plaintiff must have suffered a concrete or particularized invasion of a legally protected interest, which is must be actual or imminent, not conjectural or hypothetical; second, there must be a causal connection between the injury and the conduct complained of--that is, the injury has to be fairly traceable to some action by the defendant; and third, it must be likely, not merely speculative, that the injury will be redressed by a favorable decision.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992); see also Clapper, 638 F.3d at 131-32; Pac. Capital Bank, N.A. v. Conn., 542 F.3d 341, 350 (2d Cir. 2008).

36

The Second Circuit recently took on the question of standing again in Clapper.  There, the Second Circuit found that plaintiffs challenging certain legislation (i.e., section 702 of the Foreign Intelligence Surveillance Act of 1978--a recent amendment to the statute) had demonstrated that they suffered present injuries when they demonstrated concrete economic and professional harms.  638 F.3d at 135.  The Court noted that in cases in which plaintiffs allege an injury based on prospective government action, they need only show a realistic danger of direct injury.  Id. (quoting Babbitt, 442 U.S. at 298).  The court found further that where plaintiffs allege a prospective injury to First Amendment rights, they must only show an actual and well-founded fear.  Id.  The Second Circuit also stated that "the fact that the Government has authorized the potentially harmful conduct [here, indefinite detention under § 1021] means that the plaintiffs can reasonably assume that government officials will actually engage in that conduct by carrying out the authorized [detention]."  Id. at 138.

Here, each of the four plaintiffs who testified (either live or via declaration as in the case of Jonsdottir) has shown an actual fear that their expressive and associational activities are covered by § 1021; and each of them has put forward uncontroverted evidence of concrete--non-hypothetical--ways in which the presence of the legislation has already impacted those expressive and associational activities.

For instance, Hedges has testified that he is currently concerned about associating with certain individuals and in fact has now removed himself from certain situations in the course of his professional activities because of that concern.  In addition, given his prior journalistic activities relating to certain organizations such as al-Qaeda and the Taliban, as well as others that are denominated terrorist organizations by the U.S. State Department (e.g., associating with these individuals in these groups as part of his investigative work, reporting on the groups in the press), he has a realistic fear that those activities will subject him to detention under § 1021.  That fear cannot be said to be ill-founded when, at the injunction hearing itself, the Government was unwilling to commit that such conduct does not fall within § 1021's ambit.[15]

Further, and as discussed below, since this Court is not convinced that § 1021 is simply a "reaffirmation" of the AUMF, and since the Government has authorized detention for violations of § 1021, plaintiffs here can reasonably assume that Government officials will actually undertake the detention authorized by the statute.  See Clapper, 638 F.3d at 138.

O'Brien likewise has established a reasonable fear of future government action that is likely to occur.  O'Brien has written a

---

[15]  The inability to make specific representations as to the plaintiffs here renders confusing the Government's repeated assertion that plaintiffs' fears are unreasonable.

series of articles already--some of which relate to al-Qaeda, the Taliban, or "associated forces" no matter how defined.  The Government was unwilling to state at the hearing that O'Brien would not be detained under § 1021 for her expressive conduct in regard to those articles.  Moreover, O'Brien testified that she has withheld at least two articles from publication because of her concerns regarding the potential for her expressive conduct in those articles to render her a "covered person" under §1021 and thereby subject her to military detention.

Wargalla stated that, as Deputy Director of RevolutionTruth.org, she is concerned that she not expose herself or others to possible detention under § 1021 by inviting Hamas to participate in certain panel discussions.  That is a clear chilling of her associational activities,[16] and supports a reasonable fear that at least some of her associational activities could result in enforcement under § 1021.  Again, it is important to this Court's determination that that at the hearing on this motion the Government was unwilling to represent that Wargalla's activities would not subject her to detention under §1021.

Jonsdottir's concerns are based upon her specific fear that her connections to WikiLeaks, the video "Collateral Murder" (which

---

[16] It is less clear that her activities with respect to Occupy London would provide her with a sufficient basis for standing--the only connection she draws between that group and known terrorist groups is her understanding that the City of London included Occupy London on an "extremist and terrorist" update along with other organizations including al-Qaeda and FARC.

constitutes expressive conduct), and other associational anti-war organizations could cause her to fall within the definition of "covered person" under § 1021.  She also testified by declaration that she has not engaged in certain expressive conduct in the form of speeches in the United States given her concerns.  Again, the Government refused to state that those activities would not be subject to prosecution under § 1021.  Under such circumstances, her fear is reasonable.

Each of the four plaintiffs who presented evidence in connection with this motion therefore have specific, concrete past actions which they fear may already have brought them within the ambit of § 1021, to which the Government has not represented--and will not represent--otherwise.  Each have also already experienced a chilling of specific associational and expressive conduct.  On the record before the Court on this motion, those plaintiffs have shown actual, as well as imminent and particularized, invasion of legally-protected interests.  See Clapper, 638 F.3d at 131-32.

Plaintiffs have also shown a "causal connection" between their imminent injury and potential detention under § 1021.  Each plaintiff testified that certain of his or her expressive or associational conduct had in fact been chilled as a result of his/her understanding (or lack thereof) of the scope of § 1021. That creates the necessary link between their asserted injury and

40

the action by the Government--namely, the passage of § 1021 in its current form.  See id. at 132.

Further, with respect to the "costs" undertaken to avoid being prosecuted under the challenged statute as discussed in Clapper, see 638 F.3d at 134, the Court finds that all four plaintiffs have sufficiently sustained "costs" to confer standing. The Court does not find that the costs incurred must be monetary. Although the plaintiffs in Clapper had sustained monetary costs based upon their reasonable fear of future government action that was likely to occur--as have certain plaintiffs in this action (e.g., O'Brien's purchase of a hard drive to protect certain of her articles)--it cannot be that only monetary costs will suffice to evidence the "reasonable fear" of "future government harm that is reasonably likely to occur."  Id. at 140.  The costs to plaintiffs in changing their respective associational or expressive activities imposes concrete, personal, human costs on these plaintiffs.[17]  Forgoing professional opportunities cannot be said not to carry some costs, even of those costs cannot be quantified in monetary terms.  The human costs associated with altering their behavior--both in their personal, day-to-day lives

---

[17] Plaintiffs focus on the monetary costs associated with their pursuing this litigation in relation to their standing arguments.  (See, e.g., Certification of Kai Wargalla (Dkt. No. 18) ¶ 18; Certification of Alexa O'Brien (Dkt. No. 14) ¶  30.)  Those costs are not properly considered as costs associated with plaintiffs' "reasonable fear of future government harm," and the Court does consider them in its analysis of plaintiffs' standing here.

as well as their professional lives--are certainly cognizable costs undertaken based upon their reasonable fear.

Indeed, the fact that the instant action is a "pre-enforcement" challenge to the NDAA goes precisely to that point.  Courts have been willing to review pre-enforcement challenges with respect to criminal statutes more readily than for civil.  See, e.g., Holder, 130 S. Ct. at 2717; see also Babbitt v. Farm Workers, 442 U.S. 289, 298 (1979).

In Holder, the Supreme Court reviewed a pre-enforcement challenge to a criminal statute based upon the fact that "[p]laintiffs face a 'credible threat of prosecution' and 'should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.'"  130 S. Ct. at 2717 (quoting Babbitt, 442 U.S. at 298).  There, plaintiffs claimed that they had provided certain support to the PKK and LTTE before the enactment of the statute at issue and would do so again if the "statute's allegedly unconstitutional bar were lifted."  Id.  The Supreme Court noted that "[t]he Government has not argued to this Court that plaintiffs will not be prosecuted for what they wish to do."  Id.  Thus, the Court concluded that the case before it presented a justiciable case or controversy (with plaintiffs who had standing).  Id.

Section 1021 of the NDAA is not classically a "criminal statute" in that it does not provide for a maximum or minimum

42

period of imprisonment.  However, there can be no doubt that the
possibility of indefinite military detention, involving similar
deprivation of personal liberty as criminal incarceration, is
analogous to a criminal statute.  Indeed, as the court noted in
Hamlily v. Obama, 616 F. Supp. 2d 63 (D.D.C. 2009), when reviewing
the breadth of the term "substantially support" with respect to
detention authority under the AUMF, "a detention authority that
sweeps so broadly is simply beyond what the law of war will
support.  The Government's approach in this respect evidences an
importation of principles from the criminal law context."  Id. at
75.  An individual detained under § 1021 could be subject to
military detention until the cessation of hostilities--and in the
context of the war on terrorism, that is an uncertain period of
time to be sure.

In addition, and this bleeds into the Court's analysis of
plaintiffs' irreparable harm below, the uncontroverted testimony
at the evidentiary hearing indicated that certain plaintiffs have,
intend to or would engage in conduct that the Government will not
represent is outside of § 1021.  Thus, similar to the Supreme
Court's finding in Holder as well as the Second Circuit's in
Clapper, these plaintiffs have standing precisely because their
"undisputed testimony clearly establishes that they are suffering
injuries in fact, and because [the Court] finds those injuries are
causally connected to [§ 1021]--because they are taken in

43

anticipation of future government action that is reasonably likely
to occur." Clapper, 638 F.3d at 140.

Finally, the injunctive relief requested by plaintiffs will,
at least preliminarily, redress the alleged injuries connected to
enactment of § 1021.  Each of the four plaintiffs testified that
the recent chilling of his or her expressive and associational
conduct is directly related to § 1021; therefore, issuance of the
relief they seek would redress this asserted injury.  Id. at 132,
143-45.

Accordingly, plaintiffs Hedges, O'Brien, Wargalla, and
Jonsdottir have sufficiently established their standing to bring
this action.

II.  PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

In order for plaintiffs to demonstrate entitlement to
preliminary injunctive relief, they must demonstrate (a) a
likelihood of success on the merits of their claims of
constitutional infirmity; (b) that they will suffer irreparable
harm in the absence of the requested relief; (c) that the balance
of the equities tips in their favor; and (d) that the injunction
is in the public interest.  Winter v. Natural Resources Defense
Council, 555 U.S. 7, 20 (2008); accord Salinger v. Colting, 607
F.3d 68, 79-80 (2d Cir. 2010).

"[T]here is judicial power to enjoin enforcement of an act of
Congress pending final determination of constitutionality where

44

such an injunction is necessary in order to prevent irreparable damage." Heart of Atlanta Motel v. United States, 85 S. Ct. 1, 2 (1964). However, "[j]udicial power to stay an act of Congress, like judicial power to declare an act unconstitutional, is an awesome responsibility calling for the utmost circumspection in its exercise." Id.; Turner v. Broad. Sys. v. F.C.C., 507 U.S. 1301, 1302 (1993). In the context of determining whether the justiciable controversy here favors preliminary relief, this Court has kept clearly before it those admonitions on judicial restraint.

1.  Likelihood Of Success On The Merits[18]

Plaintiffs have asserted both facial and as applied challenges against § 1021. They assert that the statute's purported overbreadth captures their expressive and associational conduct in violation of their rights under the First Amendment, and they separately assert that the statute's vagueness violates their due process rights under the Fifth Amendment.

This Court starts with the proposition that there is strong presumption of validity that attaches to an act of Congress. This Court's first task is to try to avoid having to pass on constitutional questions. See F.C.C. v. Fox Television Stations,

---

[18] Plaintiffs focus heavily on the constitutionality of the type of military detention authorized by § 1021. That question of such detention has been examined at length by the Supreme Court--and the contours of what is, and is not, permissible are well established at this point. The Court need not reach the issue of detention here because the question of constitutionality rests most significantly in plaintiffs' First and Fifth Amendment claims.

Inc., 566 U.S. 502, 516 (2009) ("The so-called canon of
constitutional avoidance is an interpretive tool, counseling that
ambiguous statutory language be construed to avoid serious
constitutional doubts."). If such "constitutional avoidance" is
itself unavoidable, the Court must then seek to find an
interpretation of the statute that upholds the constitutionality
of the legislation. United States v. Nat'l Dairy Prods. Corp.,
372 U.S. 29, 32 (1963).

    The Court's attempt to avoid having to deal with the
Constitutional aspects of the challenge was by providing the
Government with prompt notice in the form of declarations and
depositions of the precise conduct in which plaintiffs are
involved and which they claim places them in fear of military
detention. To put it bluntly, eliminating these plaintiffs'
standing simply by representing that their conduct does not fall
within the scope of § 1021 would have been simple. The Government
chose not to do so--thereby ensuring standing and requiring this
Court to reach the merits of the instant motion.

            a.    Facial versus As Applied Challenge: The First
                  Amendment

    This Court approaches plaintiffs' facial challenge to § 1021
with great caution. The Supreme Court has repeatedly cautioned
that facial challenges to the constitutionality of a law--which,
if successful, would invalidate the entirety of the law--are

disfavored.  Washington State Grange v. Washington State
Republican Party, 552 U.S. 442, 449 (2008).  Outside the context
of the First Amendment, it is accepted that a facial challenge
must generally fail when a statute has a plainly legitimate sweep.
Id.  Facial challenges run the risk of declaring the
constitutionality of statutes on an inadequate record; they run
the risk of addressing more than the bare minimum that must be
addressed in order to resolve the problem before a court; and they
most importantly threaten to short circuit the democratic process
by preventing laws embodying the will of the people from being
implemented in a manner consistent with the Constitution.  Id. at
451.  "We must keep in mind that 'a ruling of unconstitutionality
frustrates the intent of the elected representatives of the
people.'"  Ayotte v. Planned Parenthood of Northern New England,
546 U.S. 320, 329 (2006) (quoting Regan v. Time, Inc., 468 U.S.
641, 652 (1984) (plurality)).[19]

The statute at issue here has a plainly legitimate sweep.
Indeed, as this Court noted at the evidentiary hearing, the
conduct in which the plaintiffs here engage is without a doubt
not the core conduct that is intended to be covered by the
statute.  See Tr. 20-21.  Section 1021 is a statute aimed at

---

[19] Outside the First Amendment context, a facial challenge can generally only
prevail when a plaintiff establishes that no set of circumstances exist under
which the law would be valid. Washington State Grange, 552 U.S. at 449.  In
other words, the Court is quite mindful of the nearly infinite bar that applies
to facial challenges when something other than the First Amendment is at issue.

individuals associating with, and providing some degree of
support (a degree known only to the drafters of § 1021, if at
all), terrorists connected to al-Qaeda and the Taliban.  It
stands to reason that the type of person Congress intended to be
"covered" under § 1021 is someone who has taken up arms, or might
be providing arms, to al-Qaeda, the Taliban or some of their off-
shoots.  No doubt the public should be protected from such people
and we should affirmatively defer to Congress and those in
appropriate law enforcement and military positions wherever
possible as to how best to accomplish this.

     Nevertheless, with respect to § 1021, and particularly in
light of the Government's representations that it could not
represent that plaintiffs' expressive and associational conduct
does not bring them within the ambit of the statute, plaintiffs
have stated a more than plausible claim that the statute
inappropriately encroaches on their rights under the First
Amendment.

     When a statute encroaches on rights guaranteed by the First
Amendment, facial challenges are allowed to prevent the
possibility that a statute's mere existence might inhibit free
expression.  See Members of the City Council of the City of Los
Angeles, et al. v. Taxpayers for Vincent, 466 U.S. 789 (1984).
In Dombrowski v. Pfister, 380 U.S. 479 (1965), the Supreme Court
stated, "Because of the sensitive nature of constitutionally

48

protected expression, we have not required that all of those subject to overbroad regulations risk prosecution to test their rights.  For free expression--of transcendent value to all society, and not merely those exercising their rights--might be the loser."  Id. at 486.

When a statute captures both speech and non-speech conduct, the overbreadth of a statute (e.g., the overbreadth equating with capturing constitutionally protected conduct) "must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep."  Broaderick v. Oklahoma, 413 U.S. 601, 615 (1973).  "However, where the statute unquestionably attaches sanctions to protected conduct [e.g., expressive and associational conduct], the likelihood that the statute will deter that conduct is ordinarily sufficiently great to justify an overbreadth attack."  Erznoznik v. City of Jacksonville, 422 U.S. 205, 217 (1975).  "In short, there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds."  Id. at 216; Members of the City Council of the City of Los Angeles, 466 U.S. at 801.

In Citizens United v. Federal Election Commission, 130 S. Ct. 876 (2010), Justice Kennedy wrote that "[s]peech is an essential mechanism of democracy, for it is the means that hold officials

accountable to the people . . . .  The right of citizens to

inquire, to hear, to speak, and to use information to reach

consensus is a pre-condition to enlightened self-government."

Id. at 899.  Laws that burden political speech are therefore

subject to strict scrutiny.  Id. at 898.  "The First Amendment

protects speech and speaker, and the ideas that flow from each."

Id. at 899.

     A facial challenge is appropriate here.  That does not,

however, mean that plaintiffs have necessarily shown a likelihood

of success on the merits as to that claim--the Court separately

analyzes that below.  As the Supreme Court noted in Broaderick,

"it has been the judgment of this Court that the possible harm to

society in permitting some unprotected speech to go unpunished is

outweighed by the possibility that protected speech of others may

be muted and perceived grievances left to fester because of the

possible inhibitory effects of overly broad statutes."  413 U.S.

at 612.  There is a societal interest against requiring official

approval for protected speech or delegating standardless

discretionary power to local functionaries, resulting in

virtually unreviewable prior restraints on First Amendment

rights.  See id.; see also Cox v. State of Louisiana, 379 U.S.

536, 557 (1965) ("It is clearly unconstitutional to enable a

public official to determine which expressions of view will be

permitted and which will not or to engage in invidious

discrimination among persons or groups either by use of a statute
providing a system of broad discretionary licensing power or, as
in this case, the equivalent of such a system by selective
enforcement of an extremely broad prohibitory statute.").

        b.   <u>Likelihood of Success on Plaintiffs' First
Amendment Claim</u>

Here, each of the four plaintiffs who testified at the
evidentiary hearing put forward evidence that their expressive and
associational conduct has been and will continue to be chilled by
§ 1021. The Government was unable or unwilling to represent that
such conduct was not encompassed within § 1021. Plaintiffs have
therefore put forward uncontroverted proof of infringement on
their First Amendment rights.

Applying strict scrutiny to the question of whether there is
a compelling government interest that outweighs infringement upon
First Amendment rights, the Court finds that plaintiffs have shown
a likelihood of success that there is not. Again, that is
particularly so in light of the Government's position that §1021
does no more than the AUMF; therefore, the infringing potential
for § 1021 may well be unintentional, but it is real nonetheless.
There is no doubt that the type of speech in which Hedges,
O'Brien, Wargalla, and Jonsdottir engage is political in nature.
It is also likely that some of their views may be extreme and

unpopular as measured against views of an average individual.
That, however, is precisely what the First Amendment protects.

It is certainly true, as this Court stated at the hearing,
that not all speech is in fact protected by the First Amendment.
The "exceptional circumstances" in which the First Amendment does
not cover speech has been limited to speech that incites
violence, is obscene, or is incidental to criminal activity.
Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 590 (1976).
However, the type of speech in which the plaintiffs here have
engaged does not, as presented at the hearing, fall into any of
those categories.

This Court is left then, with the following conundrum:
plaintiffs have put forward evidence that § 1021 has in fact
chilled their expressive and associational activities; the
Government will not represent that such activities are not covered
by § 1021; plaintiffs' activities are constitutionally protected.
Given that record and the protections afforded by the First
Amendment, this Court finds that plaintiffs have shown a
likelihood of succeeding on the merits of a facial challenge to
§ 1021.

       c.   The Due Process Challenge: Is the Statute Void
            for Vagueness?

To satisfy the Due Process Clause of the Fifth Amendment,
individuals are entitled to understand the scope and nature of

statutes which might subject them to criminal penalties.  Thus, "[a] penal statute must define the criminal offense (1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement." Skilling v. United States, 130 S. Ct. 2896, 2928 (2010).  That analysis is performed against the backdrop of a strong presumption of validity given to acts of Congress.  Id.

In the absence of an accompanying First Amendment challenge, a vagueness challenge is generally evaluated on an "as applied" basis.  United States v. Rybicki, 354 F.3d 124, 129 (2d Cir. 2003); accord United States v. Whittaker, 999F.2d 38, 42 (2d Cir. 1993).

However, there is an exception to the general rule that vagueness challenges are generally evaluated on an "as applied" basis:  courts have allowed facial attacks for vagueness when a criminal statute lacks a mens rea requirement, even in the absence of an accompanying First Amendment challenge.  See City of Chicago v. Morales, 527 U.S. 41 (1999).  In City of Chicago, the Supreme Court found a criminal statute that lacked a scienter requirement vague and subject to facial invalidation.  Id. at 55. As stated above, § 1021 (unlike § 1022, or even 18 U.S.C. §§ 2339A/B--i.e., the statute(s) under review in Holder) lacks a knowledge requirement; an individual could fall within the

definition of "covered person" under § 1021 without having either intentionally or recklessly known that he or she was doing so.

A question, then, for this Court is whether § 1021 should be treated as analogous to a criminal statute. If it is, then the test set forth in Skilling applies. See Rybicki, 354 F.3d at 129. As stated above, this Court preliminarily finds that § 1021, which could be used for the indeterminate military detention, is sufficiently akin to a criminal statute to be treated as such. At the hearing on this motion, the Government was unwilling or unable to state that these plaintiffs would not be subject to indefinite detention under § 1021. Plaintiffs are therefore at risk of detention, of losing their liberty, potentially for many years. In relevant part, then, that is the analytical equivalent of a penal statute. Cf. Hamlily, 616 F. Supp. 2d at 75 ("[A] detention authority that sweeps so broadly is simply beyond what the law of war will support. The Government's approach in this respect evidences an importation of principles from the criminal law context.").

Before anyone should be subjected to the possibility of indefinite military detention, the Due Process Clause of the Fifth Amendment requires that individuals be able to understand what conduct might cause him or her to run afoul of § 1021. Unfortunately, there are a number of terms that are sufficiently vague that no ordinary citizen can reliably define such conduct.

Plaintiffs have shown a likelihood of success on their vagueness challenge. The terms upon which they focused at the hearing relate to who is a "covered person."  In that regard, plaintiffs took issue with the lack of definition and clarity regarding who constitutes an "associated forces," and what it means to "substantially" or "directly" "support" such forces or, al-Qaeda or the Taliban.

The Government's strongest position is with respect to the definition of "associated forces."  The Government argued that there is an accepted definition of what constitutes "associated force" under the Laws of War, which is defined in terms of principles of co-belligerency and the Laws of War.  Specifically, "associated forces" is understood, at least by the Government, to be "'individuals who, in analogous circumstances in a traditional international armed conflict between the armed forces of opposing governments, would be detainable under principles of co-belligerency.'"  (Gov't Mem. at 6 (quoting March 2009 Mem. at 7); see also Gov't Supp. Mem. at 9.)[20]  The Court notes that even accepting the Government's definition of "associated forces," that does not resolve plaintiffs' concerns since they each testified to

---

[20] As discussed above, Hedges testified that he knows a number of individuals detained as enemy combatants pursuant to the Laws of War who were not "armed" per se.  Thus, the definition provided by the Government--albeit in a "litigation position" taken in a wholly separate litigation--does not provide clear parameters to plaintiffs here regarding the meaning of "associated forces."

activities with or involving individuals or organizations that are "associated forces" as defined by the Government.

As to "substantially" or "direct" "support," plaintiffs have the stronger argument, stating that those terms lack sufficient definition. That is particularly persuasive in light of the fact that a number of other statutes, including the prong of the NDAA that directly follows this one (i.e., § 1022 of the NDAA), have lengthy definitional provisions. See Pub. L. 112-81, 125 Stat. 1298 § 1022. The Government was unable to define precisely what "direct" or "substantial" "support" means. Instead, the Government pointed to cases in which the phrase "substantially supported" had been referred to in connection with the interpretation of the AUMF (Gov't Mem. at 5 & n.5), but also conceded, as it must, that the parameters of "substantial support" were not at issue and not addressed in those cases. In addition, the Government conceded that the statute lacks a scienter or mens rea requirement of any kind. Tr. 230-31. Thus, an individual could run the risk of substantially supporting or directly supporting an associated force without even being aware that he or she was doing so.

Finally, and most importantly of course, the Government was unable to state that plaintiffs' conduct fell outside § 1021. In the face of what could be indeterminate military detention, due process requires more. Indeed, § 1022 of the NDAA contains a

long series of definitions, as does 18 U.S.C. §§ 2339A and 2339B (examined in Holder).  In Holder, the Supreme Court specifically found that the statute at issue was not unconstitutionally vague because of the very definitions and the knowledge requirement that are missing from this statute.  See Holder, 130 S. Ct. at 2719-22.

But, as the Supreme Court stated in Holder, its upholding of §§ 2339A and 2339B does not mean "that any other statute relating to speech and terrorism would satisfy the First Amendment.  In particular, we in no way suggest that a regulation on independent speech would pass constitutional muster, even if the Government were to show such speech benefits foreign terrorist organizations."  Id. at 2730.  That is precisely the difficult situation in which § 1021 puts this Court:  the statute at issue places the public at undue risk of having their speech chilled for the purported protection from al-Qaeda, the Taliban, and "associated forces"--i.e., "foreign terrorist organizations." The vagueness of § 1021 does not allow the average citizen, or even the Government itself, to understand with the type of definiteness to which our citizens are entitled, or what conduct comes within its scope.

Because this Court has also found that that plaintiffs have shown a likelihood of success on the merits of their facial challenge under the First Amendment, this Court need not and does

not reach the question of whether a facial challenge (versus an as applied challenge) would succeed on the Fifth Amendment claim at this stage.

### d.   Possible Limiting Constructions

The Supreme Court has instructed courts to "refrain from invalidating more of the statute than is absolutely necessary." Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 684 (1987) (quoting Regan, 468 U.S. at 652)).  This Court is mindful of its responsibility not to enjoin a statute without considering whether the statute--or the majority of the statute--is susceptible to a limiting construction that renders the statute constitutional. See, e.g., Washington State Grange, 552 U.S. at 456; Ayotte, 546 U.S. at 328-29; Reno v. Am. Civil Liberties Union, 521 U.S. 844, 884 (1997).  The Court has considered that responsibility carefully and does not believe that the brevity of this statute, the myriad interpretations of "substantial support," "direct support," and "associated forces," and the absence of clear guidance from the Government on appropriate definitions for those terms, renders § 1021 susceptible to a limiting construction that would not result in the Court improperly taking on a legislative role.

It is certainly true that in certain instances it is possible to place a limiting construction on a statute that will save it from facial invalidation.  See Reno, 521 U.S. at 884.  In

Skilling, the Supreme Court reiterated that "it has long been our practice, however, before striking a federal statute as impermissibly vague, to consider whether the prescription is amenable to a limiting construction." 130 S. Ct. at 2929. Indeed, every reasonable construction must be resorted to. Id. Justice Scalia warned, however, that "construction[s]" should not be judicial "inventions." Id. at 2931 n.43.

In considering a facial challenge, a court can "impose a limiting construction on a statute only if it is 'readily susceptible' to such a construction." Reno, 521 U.S. at 884. There is no such construction available here. This Court could state, and has considered, imposing a construction that simply says that (1) knowledge is a required element; and (2) that speech and association protected by the First Amendment are not covered. However, that adds words and provides meaning in a way that dips into the role of legislature. Importing that construction into § 1021 might, in fact, run contrary to what Congress intends; Congress may want to capture certain otherwise protectable associational conduct or they may want to capture conduct that is not "knowing"--and they therefore may not want a court using a blunt instrument of caselaw construction to alter their legislative intent.

The Court has also considered importing certain principles from the AUMF into § 1021 to give the statute at issue a limiting

construction.  But that runs afoul of at least three things.
First, it runs afoul of Justice Scalia's admonition in Skilling
that courts should not "invent" limiting constructions.  130 S.
Ct. at 2931 n.43.  Second, it runs afoul of the separation of
powers between the Executive and Legislative branches at it
imports a construction provided by the Executive, and not
Congress.  Doing so would strip Congress of its power to
legislate--and to give statutes the meaning it intends.  Even
though Congress entitled § 1021 an "affirmation" of the AUMF, see
Pub. L. 112-81, 125 Stat. 1298 § 1021, the stark differences
between § 1021 and the AUMF (as discussed further below) leave the
Court without a framework provided by Congress itself through
which to impose a limiting construction and salvage § 1021--or any
part thereof.  Third, it runs afoul of the rule of construction
that states that courts must presume that Congress acted
intentionally in crafting legislation--and in importing (or not)
concepts from one statute into a related or "reaffirming" statute.
Cf. Bates v. United States, 522 U.S. 23, 30-31 (1997).  One choice
Congress had to "affirm" the AUMF could have been to restate it
verbatim--or simply state, "We affirm the AUMF" and stop there.
They did not.  The Court finds that importing its interpretation
of principles from the AUMF into § 1021 would ignore the
differences between those two statutes that this Court is required
to assume are intentional.  Cf. id.

Because this Court cannot fashion an appropriate limiting construction, it finds that preliminarily enjoining enforcement of § 1021 is the only appropriate remedy at this stage.

    2.   Irreparable Injury

The second essential element of sustaining a claim for preliminary injunctive relief is that a plaintiff suffers irreparable harm in the absence of such relief.  Salinger, 607 F.3d at 80.  In the context of the First Amendment, the Supreme Court has held that the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.  Elrod v. Burns, 427 U.S. 347, 373 (1976).  In Salinger, the Second Circuit reiterated that point, but clarified that it did not mean that First Amendment challenges necessarily carried a presumption of irreparable injury; rather, that the loss of First Amendment freedoms--even for a short duration--constituted irreparable injury without more.  607 F.3d at 81-82.

Here, the uncontradicted testimony at the evidentiary hearing was that the plaintiffs have in fact lost certain First Amendment freedoms as a result of the enactment of § 1021.  Hedges, Wargalla, and Jonsdottir have changed certain associational conduct, and O'Brien and Jonsdittir have avoided certain expressive conduct, because of their concerns about § 1021.  Under Elrod and Salinger, that is sufficient to meet the element of irreparable harm.  Moreover, since plaintiffs continue to have

61

their associational and expressive conduct chilled, there is both actual and continued threatened irreparable harm.

In addition, it is certainly the case that if plaintiffs were detained as a result of their conduct, they could be detained until the cessation of hostilities--i.e., an indeterminate period of time.  Being subjected to the risk of such detention, particularly in light of the Government's inability to represent that plaintiffs' conduct does not fall with § 1021, must constitute a threat of irreparable harm.  The question then is: Is that harm immediate?  Since the Government will not say that the conduct does not fall outside of §1021, one cannot predict immediacy one way or the other.  The penalty we know would be severe.

The Government argues that there cannot be a threat of imminent harm because § 1021 is simply an "affirmation" of the AUMF--and since plaintiffs have not to date been subject to detention under the AUMF, there is no reasonable basis for them to fear detention under §1021.  (See Gov't Mem. at 16-25.)  That argument, however, ignores that, as mentioned above, there are obvious differences between the AUMF and § 1021.  Section 1021 is certainly far from a verbatim reprise of the AUMF.  This Court assumes, as it must, that Congress acted intentionally when crafting the differences as between the two statutes.

First, by its terms, the AUMF is tied directly and only to those involved in the events of 9/11.  Pub. L. 107-40, 115 Stat. 224 at § 2(a) (authorization of the president to use force related to "attacks that occurred on September 11, 2001); see also id. at Preamble ("Whereas, on September 11, 2001, acts of treacherous violence were committed against the United States and its citizens . . .").  Section 1021, in contrast, has a non-specific definition of "covered person" that reaches beyond those involved in the 9/11 attacks by its very terms.  See Pub. L. 112-81, 125 Stat. 1298 § 1021(b)(2) (a "covered person" is "[a] person who was a part of or substantially supported al-Qaeda, the Taliban, or associated forces that are engaged in hostilities against the United States . . .").  To wit, § 1021 speaks in terms of "engaged in hostilities," id.; that is the present progressive tense, not the past tense relating to 9/11.

Relatedly, the individuals or groups at issue in the AUMF are also more specific than those at issue in § 1021.  At issue in the AUMF are those who were directly involved in the 9/11 attacks while those in § 1021 are specific groups and "associated forces." Compare Pub. L. 107-40, 115 Stat. 224 at § 2(a) with Pub. L. 112-81, 125 Stat. 1298 § 1021(b)(2).  But the Government has not provided a concrete, cognizable set of organizations or individuals that constitute "associated forces," lending further indefiniteness to § 1021.

63

Further, any question of "support" is specifically defined by the verbs in the statute--i.e., "planned," "authorized," "committed," or "aided" in relation to the 9/11 attacks themselves or "harbored" in relation to the organizations or persons who engaged in the just-discussed acts.  Pub. L. 107-40, 115 Stat. 224 at § 2(a).  Such clarity is not provided in § 1021 with respect to what acts--and what mental state related to those acts--falls within the broad, general phrase of "substantial support."

Thus, the indefinite--indeed, vague--nature of § 1021, coupled with the Government's inability to provide assurances that the specific conduct at issue here (of which the Government had ample notice) would not subject plaintiffs to prosecution and detention for their acts lays the foundation for plaintiffs' reasonable fear of irreparable harm.[21]

  3.   Balancing Of The Equities

In considering whether to issue a preliminary injunction, the Court must consider, as noted above, "the balance of the hardships

---

[21] The assertion that President Obama's Signing Statement erases any reasonable fear of imminent harm does not take into account precisely on what that Signing Statement focuses.  It does not state that § 1021 of the NDAA will not be applied to otherwise-protected First Amendment speech nor does it give concrete definitions to the vague terms used in the statute.  Rather, the Signing Statement simply assures the public that the Obama "Administration will not authorize the indefinite military detention without trial of American citizens" and "will interpret section 1021 in a manner that ensures that any detention it authorizes complies with the Constitution, the laws of war, and all other applicable law."  Singing Statement, 2011 DAILY COMP. PRES. DOC. 978 at 1, 2. Thus, the question only goes to the constitutionality of the detention authorized by § 1021--not the type of conduct that may fall within § 1021. Accordingly, the Signing Statement does not eliminate the reasonable fear of future government harm that is likely to occur--i.e., the irreparable injury at issue here.

between the plaintiff and defendant and issue the injunction only if the balance of the hardships tips in the plaintiff's favor." Salinger, 607 F.3d at 80.

The Government's primary argument in opposition to this motion is that § 1021 is simply an affirmation of the AUMF; that it goes no further, it does nothing more.  As is clear from this Opinion, this Court disagrees that that is the effect of § 1021 as currently drafted.  However, if the Government's argument is to be credited in terms of its belief as to the impact of the legislation--which is nil--then the issuance of an injunction should have absolutely no impact on any Governmental activities at all.  The AUMF does not have a "sunset" provision:  it is still in force and effect.  Thus, to the extent the Government believes that the two provisions are co-extensive, enjoining any action under § 1021 should not have any impact on the Government.

Even if, however, § 1021 does convey some authority not provided under the AUMF, the equities nonetheless tip strongly in favor of enjoining its enforcement.  The Government was given a number of opportunities at the hearing and in its briefs to state unambiguously that the type of expressive and associational activities engaged in by plaintiffs--or others--are not within § 1021.  It did not.  This Court therefore must credit the chilling impact on First Amendment rights as reasonable--and real.  Given

our society's strong commitment to protecting First Amendment
rights, the equities must tip in favor of protecting those rights.

Moreover, Congress can add definitional language to the
statute and resolve the issues the plaintiffs have raised and the
Court has flagged.  By adding definitions and imposing a scienter
requirement, it can resolve the issues with the statute and
proceed with enforcement activities it deems fit.  In the
meantime, there are a variety of other statutes which can be
utilized to detain those engaged in various levels of support of
terrorists--including the AUMF and § 1022.  Thus, preliminarily
enjoining the enforcement of § 1021 does not divest the Government
of its many other tools.

4.   Public Interest

There is a strong public interest in protecting rights
guaranteed by the First Amendment.  See Pac. Gas & Elec. Co. v.
Pub. Utils. Comm'n of Cal., 475 U.S. 1, 8 (1986) ("The
constitutional guarantee of free speech serves significant
societal interests . . . .  By protecting those who wish to enter
the marketplace of ideas from government attack, the First
Amendment protects the public's interest in receiving
information." (quotation marks and citations omitted)); Salinger,
607 F.3d at 82.  There is also a strong public interest in
ensuring that due process rights guaranteed by the Fifth Amendment
are protected by ensuring that ordinary citizens are able to

66

understand the scope of conduct that could subject them to indefinite military detention.  Cf. Mathews v. Eldridge, 424 U.S. 319, 335, 348-49 (1976).

Weighed against these public interests is the strong public interest in upholding acts of Congress and thereby maintaining the appropriate separation of powers; there is also a clear public interest which counsels for cautious use of judicial power to enjoin an act of Congress, and the public interest in ensuring protection from terroristic acts--and that law enforcement has the tools necessary to be as effective as possible in that regard.

 The Government has assisted the Court in its deliberations with respect to the risks associated with the various interests on each side of the ledger.  In light of the Government's contention that § 1021 does nothing new, that it goes no further than the AUMF, the Court can only assume that the Government believes that preliminarily enjoining enforcement of § 1021 will not expose the public to any increased risk and that § 1021 does not add anything new to law enforcement's tools.[22]

This Court is acutely aware that preliminarily enjoining an act of Congress must be done with great caution.  However, it is the responsibility of our judicial system to protect the public from acts of Congress which infringe upon constitutional rights.

---

[22] The Court disagrees with this scope argument, as set forth above, but refers to it as an indication of the expected impact on the Government.

As set forth above, this Court has found that plaintiffs have shown a likelihood of success on the merits regarding their constitutional claim and it therefore has a responsibility to insure that the public's constitutional rights are protected.

Accordingly, this Court finds that the public interest is best served by the issuance of the preliminary relief recited herein.

CONCLUSION

For the aforementioned reasons, plaintiffs' motion for preliminary injunction is GRANTED; enforcement of § 1021 of the NDAA is preliminarily enjoined pending further order of this Court or amendments to the statute rendering this Opinion & Order moot.

The Clerk of the Court is directed to terminate the motion for preliminary injunction and the motion to file amicus brief at Docket Nos. 3 and 31.

SO ORDERED:

Dated: New York, New York
       May 16, 2012

Katherine B. Forrest
UNITED STATES DISTRICT JUDGE