Carl J. Mayer (CM-6589)                    Bruce I. Afran (BA-8583)
MAYER LAW GROUP LLC                        10 Braeburn Drive
1040 Avenue of the Americas, Suite 2400    Princeton, New Jersey 08540
New York, NY 10018                         609-924-2075
212-382-4686

David H. Remes, Pro Hac Vice
APPEAL FOR JUSTICE
1106 Noyes Drive
Silver Spring, MD  20910
202-669-6508

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------
CHRISTOPHER HEDGES, et al.,

      Plaintiffs,

      v.                                   INDEX NO. 1-12 CIV. 0331( KBF)

BARACK OBAMA, et al.,

      Defendants.
-------------------------------------------------------

**PLAINTIFFS' MEMORANDUM IN SUPPORT
OF MOTION FOR PERMANENT INJUNCTION**

## INTRODUCTION

On May 16, 2012, following expedited discovery and an evidentiary hearing, the Court issued an Opinion and Order ("May 16 Order") granting the plaintiffs' motion for a preliminary injunction barring enforcement of § 1021 of the NDAA.[1] On June 8, 2012, the Court ordered the record closed and directed the parties to brief the plaintiffs' application for a permanent injunction. *See* Fed. R. Civ. Pro. 65(a)(2). We have tried to avoid duplicating what was in our earlier briefs and the Court's May 16 Order. We adopt them by reference to the extent argument and assertions are not specified herein.

## ARGUMENT

## I.  STATUTORY BACKGROUND

This section sets out the relevant statutes and filings and describes their interconnections.

### A.   The NDAA

On December 31, 2011, President Obama signed the NDAA (*see* note 1, *supra*) into law, the subject of this instant action and the Court's preliminary injunction.  This injunction proceeding has concerned a single provision of the NDAA, section 1021, that targets as "covered persons" subject to indefinite military detention an undefined, amorphous and potentially broad class of persons engaged in protected advocacy activity.  Section 1021 of the NDAA provides, in pertinent part:

> Sec. 1021. Affirmation of Authority of the Armed Forces of the United States To Detain Covered Persons pursuant to the Authorization for Use of Military Force.
>
> (a) In General.--Congress affirms that the authority of the President to use all necessary and appropriate force pursuant to the [AUMF] includes the authority

---

[1]   National Defense Authorization Act for Fiscal Year 2012, Pub. L. No. 112-81, § 1021, 125 Stat. 1298, 1562 (2011) ("NDAA").

for the Armed Forces of the United States to detain covered persons (as defined in subsection (b)) pending disposition under the law of war.

(b) Covered Persons.--A covered person under this section is any person as follows:

   (1) A person who planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored those responsible for those attacks.

   (2) A person who was a part of or substantially supported al-Qaeda, the Taliban, or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act or has directly supported such hostilities in aid of such enemy forces.

Section 1021(a), (b).

### 1.  The Undefined Scope of §1021(b)(2)

Section 1021(b)(2) targets as "covered persons" not those who actually participated in the September 11, 2001 attacks, as the AUMF targets, but the far broader and undefined class of persons who have "substantially supported" groups such as "al-Qaeda" the "Taliban" or their "associated forces".  Unlike the AUMF, see infra, that focuses attention upon those who committed acts of terror, §1021(b)(2) targets the amorphous category of those who "substantially supported" certain groups, a construct that engulfs within its reach large amounts of protected expressive conduct.  The NDAA thereby expands the enforcement power beyond those who actually committed the terror acts to persons who "substantially supported" such groups, a marked distinction.  Notably, the critical terms in section 1021(b)(2) - "substantially supported," "associated forces," and "directly supported" - are not defined.

### 2.  Disposition of "Covered Persons" under Section 1021

Section 1021(a) states that the President may detain "covered persons" militarily "pending disposition under the law of war."  Hence, persons described as "covered persons" under §1021(b)(2) are subject to the "dispositions" described in §1021(c):

(c) Disposition Under Law of War.--The disposition of a person under the law of war as described in subsection (a) may include the following:

(1) Detention under the law of war without trial until the end of the hostilities authorized by the Authorization for Use of Military Force.

(2) Trial under chapter 47A of title 10, United States Code (as amended by the Military Commissions Act of 2009 (title XVIII of Public Law 111-84)).

(3) Transfer for trial by an alternative court or competent tribunal having lawful jurisdiction.

(4) Transfer to the custody or control of the person's country of origin, any other foreign country, or any other foreign entity.

As the Court noted in its order entering preliminary injunctive relief, these "dispositions" - including trial by court martial, trial by military commission, transfer to undescribed "alternative" jurisdictions, or extraordinary rendition - have the substantive effect of imposing criminal-type penalties upon "covered persons" and must be governed by due process concerns as to vagueness.[2]  See slip copy at 42-43; 54-55.

### 3.  Section 1022

In contrast to §1021(b)(2), section 1022(a)(1) is focused on "covered persons" taken on the field of battle or who directly participate in hostile conduct, persons who traditionally would be susceptible of detention by the military "pending disposition under the law of war." Section 1022(a)(2) identifies those "covered persons" as follows:

(2) COVERED PERSONS.—The requirement in paragraph (1) shall apply to any person whose detention is authorized under section 1021 who is determined—

(A) to be a member of, or part of, al-Qaeda or an associated force that acts in coordination with or pursuant to the direction of al-Qaeda; and

(B) to have participated in the course of planning or carrying out an attack or attempted attack against the United States or its coalition partners.

---

[2]   The plaintiffs also challenge the four dispositions, *see* Compl., Counts I and II, and will litigate the issue should it be necessary to do so. *See* slip copy at 45 n.18.

4

On February 28, 2012, the President issued a policy directive spelling out procedures for implementing § 1022.[3] The directive consists of 11 pages of specific implementation procedures including defining scope and limitations. See slip copy at 10-11. There is no corresponding policy directive spelling out procedures for implementing § 1021, thereby giving rise to the ironic construction that persons taken on the field of battle or who have directly participated in terrorist attacks are subject to clearly delineated procedures but those persons who can be detained under §1021(b)(2) – the "substantially supported" provision – are subject to no regulations or delineated procedures.

This structure is unique in American law.  The NDAA subjects persons taken on the field of combat or persons who directly participate in terrorist attacks (those "covered persons" described in §1022) to a set of noticed and published regulatory procedures, but those persons to be detained under the looser and undefined "substantially supported" provision of §1021(b)(2) can be made subject to detention by the military - the "dispositions" in §1021(c) - with no published procedure or regulatory guidelines.  This structure leads to the arbitrary circumstance that "covered persons" taken in the field of combat or in the course of committing terrorist acts (persons detained under §1022) are subject to far greater due process protections than persons taken under §1021(b)(2), who have committed no stipulated crime or participated in any act of violence.

---

[3]   2012 Daily Comp. Pres. Doc. 136 (Feb. 28, 2012), *available at* http://www.gpo.gov/fdsys/pkg/DCPD-201200136/pdf/DCPD-201200136.pdf.

**B.  The AUMF**

In the wake of the September 11, 2001 terrorist attacks by al-Qaeda, Congress passed the Authorization for Use of Military Force,  Pub. L. No. 107-40, 115 Stat. 224 (2001) (50 U.S.C. § 1541 note) ("AUMF). Section 2(a) of the AUMF ("the AUMF") provides:

> [T]he President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

As this language shows, the AUMF authorized the use of force against those persons who "planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001.  *Id*.  Congress in promulgating the AUMF carefully cabined the power granted to the executive  branch and limited its detention authority to those persons who actually carried out or participated in the planning of the 9/11 terrorist attacks or who "aided the terrorist attacks".  *Id*. Nowhere does the AUMF convey to the executive the power to detain any person -  citizen or otherwise -  who "substantially supported" Al-qaeda or the Taliban or their associated forces, as section 1021(b)(2) of the NDAA now provides.  Section 1021(b)(2) is an expansion of the detention power well beyond the original AUMF.

**C.  The Government's March 2009 Court Filing**

In *Hamdi* v. Rumsfeld, 542 U.S. 507(204) and *Rasul* v. Bush, 542 U.S. 466 (2004), the Supreme Court recognized the right of persons taken pursuant to the AUMF to some form of judicial review.  Following *Hamdi* and *Rasul*, the government established a tribunal system at Guantanamo to determine whether a detainee was properly designated as an "enemy combatant." In March 2009, in a court filing in certain Guantanamo detention proceedings, the government

set out its belief as to the scope of the president's authority to detain individuals under the

AUMF:

> [1] The President has the authority to detain persons that the President determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, and persons who harbored those responsible for those attacks. [2] The President also has the authority to detain persons who were part of, *or substantially supported, Taliban or al-Qaida forces or associated forces* that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act, or has directly supported hostilities, in aid of such enemy armed forces.[4]

The first bracketed sentence "[1]" of this standard describes the class of persons

referred to in the AUMF, i.e., those who actually "planned, authorized, committed, or aided" the

9/11 terror attacks or harbored such persons. However, the second bracketed sentence of the

standard, particularly the italicized, underscored text, has *no* counterpart in the AUMF and it is

this provision that forms the government's central defense to this injunction proceeding.  Based

on the March 2009 filing, the government argues that because the president for several years

prior to the passage of the NDAA had been asserting the power to detain persons who

"substantially supported, al-Qaeda, the Taliban or their associated forces", *id.*, §1021(b)(2) does

not impose any new legislation but merely re-affirms the pre-existing presidential policy.

As set forth below, however, neither case law nor the actual text of the AUMF

supports the government's contention that such detention power already existed under the

NDAA.

**D.  Case Law Does Not Support the Government's Argument**

No case has ever recognized the government's contention that the AUMF authorized

the detention of non-combatants on the theory that they may have "substantially supported" Al-

---

[4]    Resp'ts', Mem. Regarding the Gov't's Detention Auth. Relative to Detainees Held at Guantánamo Bay, March 13, 2009, at 2 ("March 2009 filing"), Misc. No. 08-442 (D.D.C.) (Doc. 462).

Qaeda, the Taliban or their associated forces", as the NDAA now provides.  To the contrary, judicial decisions are virtually unanimous in either: 1) rejecting such claims; 2) focusing on acts of defined "material support" under the Anti-Terrorism and Effective Death Penalty Act (ADEDPA); or 3) dealing with persons taken in actual combat under the AUMF.  As set forth below, in both *Padilla*, infra, and *Hamlily*, infra, the courts rejected Executive branch claims that the AUMF authorized such broad-based detention and in other decisions never reached the question because they were concerned solely with foreign detainees taken in combat.

For example, in *United States v. Farhane*, 634 F.3d 127 (2d Cir. 2011), the Second Circuit held that under the Anti-Terrorism and Effective Death Penalty Act (ADEDPA), 18 U.S.C. §2339A, et seq., defendants' agreement to take an oath to support Al-Qaeda, to provide medical treatment for al-Qaeda members fighting the U.S., to send money to Al-Qaeda and to provide martial arts training to al-Qaeda fighters, were all acts defined as "material support" under the AEDPA. Nowhere in *Farhane* did the Court of Appeals construe or recognize the validity of the government's theory that mere "substantial support", without definition, could give rise to military detention of civilians arrested in the United States.

In *Padilla v. Rumsfeld*, 352 F.3d 695 (2d Cir. 2003), the Second Circuit effectively rejected the same substantive position now asserted by the government, finding that the AUMF did <u>not</u> provide the "specific congressional authorization" required to overcome the Non-Detention Act, 18 U.S.C. § 4001(a), which precludes the detention of American citizens on American soil.[5]  Thus, the notion that the presidential policy enshrined in the March 2009 briefing in *Hamlily,* supra, in which the detention authority under the AUMF is said by the executive to be inherently flexible, was squarely rejected by the Second Circuit.

---

[5]   The Supreme Court reversed on jurisdictional grounds, obviating the need to reach the merits.

The D.C. Circuit has decided eighteen Guantánamo habeas cases on the merits, all of which concerned claimants who were actually a "part of" Al-qaeda, the Taliban or their associated forces under the AUMF.  In none of these cases did the court hold that the AUMF authorized the broader detention of those who "substantially support" such groups as is now contained in section 1021(b)(2) of the NDAA.[6]

In fifteen of these cases, the DC Circuit found that the detainee was "part of" Al-Qaeda and thus lawfully detained under the AUMF and in the other three cases the court found the detainee to be "part of" an "associated force" and thus also lawfully detained under the AUMF.[7] But despite the plethora of cases, neither the D.C. Circuit nor any other court has recognized the authority of the  "substantially supported" language in the government's March 2009 policy statement that now appears in the NDAA. In sum, the only "authority" to support the government's position that the "substantially supported" test has been a long-recognized policy under the AUMF is the government's own briefing in March 2009 in *Hamlily, infra*, where the Court rejected that very position.

In *Hamlily v. Obama*, 616 F.Supp2d 63, 75 (D.D.C. 2009), the court directly rejected the argument that the "substantially supported" standard was authorized under the AUMF, the

---

[6]    For economy, we cite only the petitioner's name: *Suleiman*, 670 F.3d 311 (D.C. Cir. 2012); *Kandari*, --- F.3d --, 2011 WL 6757005 (D.C. Cir. Dec. 9, 2011), *cert. pet. pending*, No. 11-1054; *Latif*, 666 F.3d 746 (D.C. Cir. 2011), *cert. pet. pending*, No.11-1027; *Khan*, 655 F.3d 20 (D.C. Cir. 2011); *Almerfedi*, 654 F.3d 1 (D.C. Cir. 2011), *cert. pet. pending*, No. 11-683; *Al Alwi*, 653 F.3d 11 (D.C. Cir. 2011), *cert. pet. pending*, No. 11-7700; *Al-Madhwani*, 642 F.3d 1071 (D.C. Cir. 2011), *cert. pet. pending*, No. 11-7020; *Esmail*, 639 F.3d 1075 (D.C. Cir. 2011); *Uthman*, 637 F.3d 400 (D.C. Cir. 2011), *cert. pet. pending*, No. 11-413; *Hatim*, 632 F.3d 720 (D.C. Cir. 2011); *Warafi*, 409 F. App'x 360 (D.C. Cir. Feb. 11, 2011); *Salahi*, 625 F.3d 745 (D.C. Cir. 2010); *Al-Adahi*, 613 F.3d 1102 (D.C. Cir. 2010); *Al Odah*, 611 F.3d 8 (D.C. Cir. 2010); *Bensayah*, 610 F.3d 718 (D.C. Cir. 2010); *Barhoumi*, 609 F.3d 416 (D.C. Cir. 2010); *Awad*, 608 F.3d 1 (D.C. Cir. 2010); *Al-Bihani*, 590 F.3d 866 (D.C. Cir. 2010), *cert. pet. pending*, No. 10-1383.

[7]    *Khan*, 655 F.3d 20; *Al-Bihani*, 590 F.3d 866; *Bensayah*, 610 F.3d 718.

very claim the government raises here.  See also slip copy at 43.  While one district court did

agree that the AUMF could include the "substantially supported" standard for detention of

Afghan detainees, that decision, *Gherebi v. Obama*, 609 F. Supp.2d 43 (D.D.C. 2009), pointedly

refused to apply the "substantially supported" standard to persons coming under the protection of

the U.S. Constitution, thereby rejecting the position the government now asserts, i.e., that the

AUMF allowed such broader detention power as to U.S. civilians.  See *Gherebi*, 609 F. Supp.2d

at 55 n.7.[8]  Moreover, *Gherebi* has been effectively overruled since it relied upon an overall

detention standard that the D.C. Circuit later abrogated. *See Uthman v. Obama*, 637 F.3d 400

(D.C. Cir. 2011), *cert. pet. pending*, No. 11-413.  In this regard, the government's reliance on

*Hamlily v. Obama*, 616 F. Supp.2d 63 (D.D.C. 2009), to define "associated forces"[1], see Gov't's

Mem. of Law in Opp'n to Pls.' Mot. for a Prelim. Inj., at 6, 23 (filed Mar. 26, 2012) (Doc. 24), is

questionable, particularly since *Uthman* appeared to rely upon the vastly different "material

support" standard under the Anti-Terrorism and Effective Death Penalty Act upheld in *Holder*.

See *Uthman,* 637 F.3d at 402, n.2.

     As this analysis shows, no case law recognizes the government's claim that the

AUMF embraced the "substantially supported" detention standard now incorporated under

section 1021(b)(2) of the NDAA.

---

[8] Specifically, the district court in *Gherebi v. Obama*, 609 F. Supp.2d 43 (D.D.C. 2009), noted
that its acceptance of the "substantially supported" test was limited to persons detained outside
the U.S. in combat and was not intended to address other potential applications "such as whether
the President can militarily detain an individual subject to the protections of the United States
Constitution…"  609 F. Supp.2d at 55 n.7.  Thus, even this singular instance in which the
"substantially supported" test was accepted by a court as to Afghan detainees, the court itself
refused to recognize the viability of the test in the new context under §1021(b)(2) of the NDAA
as to persons subject to the protection of the U.S. Constitution.

## II.  THIS ACTION

Plaintiffs, individuals and an organization engaged in core First Amendment activity, *see* slip copy at 13-28, brought this action to invalidate § 1021. Among other things, plaintiffs claim that § 1021, on its face and as applied, violates the First Amendment because it sweeps protected speech into its ambit. In particular, plaintiffs claim that the vagueness of the undefined terms in § 1021(b)(2) chills their First Amendment expression by placing them in fear of being treated as "covered persons" as a result of engaging in such expression, and thus subject to indefinite military detention under § 1021(a) and the four dispositions set out in § 1021(c).[9] Plaintiffs assert with equal force that § 1021(b)(2) is substantially overbroad under the First Amendment in that it embraces protected speech activity.  Finally, Plaintiffs contend that § 1021, on its face and as applied, violates the Due Process Clause of the Fifth Amendment on the ground that the undefined terms in § 1021(b)(2) are too vague to give notice of what activities will bring them within the definition of "covered person" and make them subject to the dispositions described in § 1021(c).

Plaintiffs moved for a declaratory judgment and preliminary and permanent injunctive relief. On March 30, 2012, after briefing and expedited discovery, the Court held an evidentiary hearing on the plaintiffs' motion. Three of the plaintiffs (Hedges, O'Brien, and Wargalla) testified live and, pursuant to stipulation, another plaintiff (Jónsdóttir) by sworn declaration. The Government did not call any witnesses, submit any documentary evidence, or

---

[9]   The plaintiffs claim that their speech is chilled not just by military detention under §§ 1021(a) and 1021(c)(1), but also by the other dispositions set out in section 1021(c)(2)–(4). *See* Compl. ¶ 27 and Counts I-V; Pls.' Mem. in Support of Prelim. Inj., at 27 (Doc. 19). There is record evidence of chill from each of these dispositions. See Hedges Test., Tr. 178:1–7, 206:9–24; Hedges Aff. ¶¶ 6, 10 (Doc. 11).

file any declarations in connection with its opposition to the plaintiffs' motion. The government has since confirmed that it will offer no evidence at trial of this matter.

In its May 16 Order, the Court granted the plaintiffs' motion for a preliminary injunction. The Court rejected the government's position that § 1021 did not work a change in the law and merely "affirmed" authority conferred a decade earlier by the AUMF, noting the material distinctions between the NDAA's "substantially supported" test and the earlier more limited provisions of the AUMF. Slip copy at 3–4, 59–60, 62–64. The Court, based on extensive factual findings, held that the plaintiffs had standing to challenge section 1021, *id.* at 35–44, and satisfied the four preliminary injunction conditions.

First, the Court held that the plaintiffs had shown a likelihood of success on their First Amendment facial challenge to § 1021 as substantially overbroad. *Id.* at 51–52. (Finding overbreadth, the Court did not address the as applied claim). Second, the Court ruled that the plaintiffs had shown a likelihood of success on their claim that § 1021 violated the Due Process Clause for vagueness. *Id.* at 52–56. The Court did not "reach the question of whether a facial challenge . . . would succeed on the fifth amendment claim at this stage," *id.* at 57–58.[10] Finally, the Court held that the balance of equities and the public interest supported preliminary injunctive relief. *Id.* at 61–66, 67–68. Following the entry of preliminary injunctive relief, the government informed the Court that it would not offer any evidence at trial. Accordingly, the Court directed that closing briefs be filed prior to entry of final judgment.

---

[10] This aspect of the Court's decision appears to refer to the plaintiffs' claim that military detention of U.S. civilians or citizens in the United States would violate the Fifth Amendment's guarantee of trial in the civil courts. Although the Court did not explicate the reasons for its determination not to address this particular issue, Counsel infer that because the Court held the statute to be unenforceable for overbreadth and vagueness, the Court saw no need to address the lawfulness of military custody over U.S. civilians detained in the U.S. Plaintiffs preserve this issue for future adjudication.

**III. SECTION 1021 DOES NOT "AFFIRM" AUMF AUTHORITY BUT GOES SUBSTANTIALLY BEYOND SUCH AUTHORITY.**

The government's primary defense to the proceeding – indeed, its only asserted defense – is that the NDAA merely re-affirms the older AUMF, adds nothing new to the legislation and therefore imposes no new statutory burdens.  Looked at in this light, the government says plaintiffs have no standing since, if they have not been made subject to the older AUMF, they should have no fear of detention under the NDAA that merely re-affirms the AUMF's original detention authority.

This argument is belied by the clear difference between the AUMF and section 1021(b)(2) of the NDAA whose detention authority sweeps far more broadly.  The AUMF provides a limited authority for detention of those persons who "planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons…"  Section 1021(b)(2) is a far more expansive enactment that permits the president to detain those persons who "substantially supported" groups such as Al-qaeda, the Taliban and their "associated forces", a grant of authority going far beyond the limited construct of the AUMF.

**A. Section 1021 Authority Is Broader Than AUMF Authority.**

The Force Clause in the AUMF empowers the President to effectuate detention authority in a specific manner and context: (1) in connection with a clearly identified event – the terrorist attacks of 9/11/01;  (2) against a clearly defined group of persons – those who "planned, authorized, committed, or aided the terrorist attacks...";  and (3) for a clearly stated purpose – "to prevent any future acts of international terrorism against the United States…".

 The differences between the authority conferred by the AUMF and that recognized by § 1021 are self-evident, *see* e.g. slip copy at 63-64, and are described in brief below.  For

example, the scope of authority under the AUMF is limited to those who "planned, authorized, committed, or aided the terrorist attacks" of September 11, 2001 or those who "harbored such organizations or persons . . ."   In contrast, the authority recognized in the NDAA through the definition of "covered person" in § 1021(b)(2) is far broader, extending beyond a specific event (the September 11 attacks) to those who "substantially supported al-Qaeda, the Taliban, or [unnamed] associated forces" without the limiting definitions of the AUMF and without sufficient clarity to identify the "mental state" necessary to invoke responsibility.  *See* slip copy at 64.

As this Court has already found, slip copy at 63-64, and the government has nowhere refuted, the description of "covered persons" in §1021(b)(2) goes far beyond the delineated category of persons under the AUMF, i.e. those persons who actively took part in the terrorist attacks of 9/11.  To the contrary, the NDAA targets those who merely "substantially supported" such groups, and without the AUMF's temporal limitation as to the events of 9/11, a marked and material change in legislative focus.  It is because of distinctions such as these that this Court, in the preliminary order, rejected the government's contention that the NDAA merely reaffirmed the older AUMF adding nothing new to the previous legislation.  Slip copy at 63-64.

## B.  The Government's Argument that the NDAA Merely Re-Affirms the AUMF Lacks Substantive Merit

The government agrees that in enacting § 1021, "the 2011 Congress did not purport to state the 2001 Congress's intent." Slip copy at 2 n.1. Instead, the government argues that the Court must read § 1021 "against the backdrop of existing Executive practice and court decisions."[11] But neither Executive practice nor court decisions support the government's

---

[11]   *Id.* at 1; *see also id.* at 3, 7.

contention that § 1021 merely imports into the NDAA pre-existing detention authority under the AUMF.

       1. *Judicial construction.* The government claims that *Hamdi* construed the AUMF to authorize military detention in general.[12] As the Supreme Court noted repeatedly, however, *Hamdi* was construing the AUMF to authorize military detention only within the four corners of the AUMF, which is anchored in the September 11 attacks, and only in the narrowed, particular circumstances of the case that focused on foreign detainees taken in combat in Afghanistan. *See Hamdi*, 542 U.S. at 516; *id.* at 518-19.[13] Moreover, as noted above, the D.C. court in *Hamlily* rejected the government's March 2009 "substantially supporting" standard, even as to Guantanamo detainees, a direct repudiation of the government's claim that the standard has long been recognized, while the Court in *Gherebi* refused to apply it to persons subject to the jurisdiction of the U.S. Constitution. 609 F. Supp.2d at 55 n.7. Thus, those courts that considered an expansion of the AUMF authority all rejected the argument that the government raises here, namely that the AUMF supports broader detention powers and that the NDAA is a harmless "re-affirmation" of such powers. *Hamlily* rejected on its face such argument, holding that the president's "substantially supported" test could *not* sustain detention under the AUMF, while the Second Circuit in *Padilla* effectively rejected this argument on the ground that the AUMF did

---

[12]  *See id.* at 2 n.1.

[13]  The government asserts that the Supreme Court held in *Hamdi* that the AUMF "authorized detention of a U.S. citizen who was 'part of or supporting forces hostile to the United States or its coalition partners.'" *Id.* at 6 (quoting 542 U.S. at 518, 521). The government suggests that the Court upheld broad detention authority. In fact, the Court repeatedly stressed the limited nature of its holding. The Court stated: "Here the basis asserted for detention by the military is that Hamdi was carrying a weapon against American troops on a foreign battlefield." *Id.* at 522. "We hold that . . . Congress authorized the detention of combatants in the *narrow* circumstances alleged here." *Id.* at 509. "We conclude that the AUMF is explicit congressional authorization for the detention of individuals in the *narrow* category we describe." *Id.* at 517. "Congress has clearly and unmistakably authorized detention in the *narrow* circumstances considered here." *Id.* at 519. *See also id.* at 518, 521 [emphasis added].

not contain the "specific congressional authorization" required to overcome the Non-Detention Act, 18 U.S.C. § 4001(a), that bars detention of American citizens on U.S. soil.

  2. "*Executive practice*."  In essence, the government argues that because (a) its March 2009 filing is the Executive's construction of the AUMF, and (b) section 1021 essentially copies the detention standard set out in the March 2009 filing, it follows that (c) the courts should treat § 1021 as the Executive's construction of the AUMF, and (d) the Court should give weight to the Executive's construction as such.[14]

  Even accepting the unusual contention that the government's legal defense is entitled to greater weight than the plaintiffs' legal argument, by its own terms the government's argument must fail since the March 2009 filing was itself limited to combatants held at Guantanamo, not to civilians who may have "substantially supported" al-Qaeda or the Taliban or their associates. The government made it clear in *Hamlily* that the detention authority described in the March 2009 filing "is limited to the authority upon which the Government is relying to detain the persons now being held at Guantánamo Bay. It is not, at this point, meant to define the contours of authority for military operations generally, or detention in other contexts."[15]  Thus, in its March 2009 brief, the government itself said it was addressing *only* those persons detained at Guantanamo under the AUMF, not any broader authority to detain U.S. civilians.  Section § 1021 (b)(2) now extends the detention standard of the March 2009 filing to those "other contexts" to which the government said its March 2009 briefing did *not* apply.

  Based on this record, even so-called "executive practice" as evinced in the March 2009 filing will not support the government's contention that section 1021(b)(2) merely follows long established policy since the "executive practice" referenced in the March 2009 filing did

---

[14] Government Supplemental Memorandum at 6-7.
[15] March 2009 filing, at 2.

not, by the government's own admission, extend beyond Guantanamo detainees.  In sum, the

defense that section 1021(b)(2) contains detention standards long recognized under the AUMF is

not only unsupported by case law, but the only source of authority for this position – the

government's March 2009 brief in Hamlily - was self-limited by the government to cases at

Guantanamo under the AUMF and, by the government's own statement at the time, was not

intended to apply to "other contexts", *id*, including the broader civilian and domestic context

now addressed by the NDAA.

## IV.   THE GOVERNMENT'S MAY 25, 2012 FILING BOLSTERS THE PLAINTIFFS' STANDING.

In its May 16 Order, the Court ruled that four of the plaintiffs—Hedges, O'Brien,

Wargalla, and Jonsdottir—had "sufficiently established their standing to bring this action." Slip

copy at 44. With respect to the injury prong of the standing test, the Court stated the plaintiffs

had "put forward specific evidence of actual and threatened irreparable harm." *Id.* at 4. The

Court commented:

> [I]t would have been a rather simple matter for the Government to have stated that
> as to these plaintiffs and the conduct as to which they would testify, that § 1021
> did not and would not apply, if indeed it did or would not. That could have
> eliminated the standing of these plaintiffs and their claims of irreparable harm.
> Slip copy at 33.

In response, the government has offered yet *another* standard, which it included in its

memorandum in support of its motion for reconsideration filed on May 25, 2012 ("May 25

filing").[16] This standard—really nothing more than a gloss on § 1021—only makes the threat of

injury to the plaintiffs' First Amendment and Due Process rights more pronounced.  In its most

recent submission the government stated:

---

[16]   Gov't's Mem. of Law in Support of its Mot. for Recon. of the May 16, 2012, Opinion and
Order, at 3-4 (May 25, 2012) (Doc. 38) ("May 2012 filing").

As a matter of law, individuals who engage in the *independent* journalistic activities or *independent* public advocacy described in plaintiffs' affidavits and testimony, *without more*, are not subject to law of war detention as affirmed by section 1021(a)-(c), *solely* on the basis of such *independent* journalistic activities or *independent* public advocacy.[17]

As the italicized qualifiers, and similar qualifiers elsewhere in the May 25 filing show, this standard is no safe harbor. It does not provide the assurance the Court sought. It is a vague gloss on a vague statute; its vagueness and reach merely reinforce the plaintiffs' standing. See infra, Section V (A).  Such assurances do not, in any event, mitigate or negate the actual text of the law.  As plaintiff Hedges stated in his certification: "Regardless of how the government says it may apply the law, its language in its present form plainly gives rise to this type of jeopardy." Hedges Cert. ¶ 6.

## V.  THE COURT SHOULD PERMANENTLY ENJOIN SECTION 1021

"The requirements for a permanent injunction are "essentially the same" as for a preliminary injunction, except that the moving party must demonstrate 'actual success' on the merits." *New York Civil Liberties Union v. New York City Transit Auth.*, --- F.3d ----, 2012 WL 10972, at *5 (2d Cir. Jan. 4, 2012). As this Court stated:

> In order for plaintiffs to demonstrate entitlement to preliminary injunctive relief, they must demonstrate (a) a likelihood of success on the merits of their claims of constitutional infirmity; (b) that they will suffer irreparable harm in the absence of the requested relief; (c) that the balance of the equities tips in their favor; and (d) that the injunction is in the public interest.

Slip copy at 44 (citations omitted). *See also Ognibene v. Parkes*, 671 F.3d 174, 182 (2d Cir. 2012) ("The party requesting permanent injunctive relief must demonstrate (1) irreparable harm . . . and (2) actual success on the merits."). However, "[a]lthough a showing of 'irreparable harm' is required for the imposition of any injunctive relief, preliminary or permanent, the 'imminent'

---

[17]   *Id.* at 4.

aspect of the harm is not crucial to granting a permanent injunction." *Rodriguez ex rel.*

*Rodriguez v. DeBuono*, 175 F.3d 227, 235 n.9 (2d Cir. 1999) (citations omitted).

**A.  The new standard offered by the government to allay the Court's concerns further supports the plaintiffs' First Amendment and Due Process claims.**

Far from curing the defects in the government's case, the government's new standard

only exacerbates the First Amendment and Due Process violations found by the Court.

Moreover, the standard is merely a position staked out in a brief.[18]  Our serious treatment of the

standard does not mean that we consider the standard serious. To recapitulate, the new standard

states:

> As a matter of law, individuals who engage in the *independent* journalistic
> activities or *independent* public advocacy described in plaintiffs' affidavits and
> testimony, *without more*, are not subject to law of war detention as affirmed by
> section 1021(a)-(c), *solely* on the basis of such independent journalistic activities
> or independent public advocacy.

As the italicized words show, the safety of this harbor is illusory and creates ever

more questions as to the scope of the government's claimed detention powers. What activities

may the government consider to be within the "without more" language?  What conduct is

deemed to be "*solely* on the basis of such independent journalistic activities…"?  What are

"independent" activities and what is "*independent* public advocacy"  and, based on the qualifier

"*public* advocacy", does the government reserve the right to detain based upon "*private*

advocacy"?  The term "independent," which does not appear in § 1021, is undefined, open to

---

[18]   The government asserts that its standard is a legal standard ("as a matter of law"), but the standard, like the government's March 2009 filing in the Guantánamo cases, "simply states the government's litigation position," and "does not have the effect of law." Slip copy at 7. *See Vermont Right To Life Committee, Inc. v. Sorrell*, 221 F.3d 376, 383-84 (2d cir. 2000). The standard is "nothing more than a post-hoc litigation position," *Bogues v. United states*, 703 F. Supp.2d 318, 327 (S.D.N.Y. 2010), serving a litigation need. *Cf. Ames v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 567 F.2d 1174, 1177 n.3 (2d cir. 1977) (citing *Fleming v. Van Der Loo*, 160 F.2d 906, 912 (D.C. Cir. 1947) (no particular weight to be given to an administrative interpretation of a regulation "made after [the] controversy had arisen")).

application "on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972). *Cf. F.C.C. v. Fox Television Stations, Inc.*, --- S. Ct. ----, 2012 WL 2344462, at *13 (2012) (holding indecency policy void for vagueness under the Due Process Clause).  If the government's new standard evinced in its May 25, 2012 brief were a statute, its vagueness and internal confusion would render it the very model of an unconstitutional enactment.

Moreover, the limitation by the government to "the activities described in the plaintiffs' affidavits and testimony" is backward-looking. In the future, the plaintiffs, and others like them, will undoubtedly engage in First Amendment activities *not* described in the plaintiffs' affidavits and testimony. Indeed, it is the very nature of free speech that it continually evolves and changes, acquiring ever wider and more diverse contours.

Ironically, the government's new standard establishes that section 1021(b)(2) is directed at or embraces speech and expressive conduct.  That the government now reserves for itself the right to determine whether speech is "independent" journalistic activity or "independent" *public* advocacy demonstrates the fundamentally expressive nature of the activities subject to the NDAA.  Such unconstrained authority runs directly afoul of the Supreme Court's warning that government officials may not be invested with the power to determine which speech is punishable and which passes muster.  See *Cox v. State of Louisiana,* 379 U.S. 536, 557 (1965). That the "independent" character of speech, as measured by some undisclosed standard, can be the determinant in deciding whether an individual may fall within the ambit of § 1021(a) military detention and § 1021(c) dispositions unavoidably has a chilling effect, particularly because the individual will learn only after-the-fact whether she or he has crossed the

line. Journalists and authors, and citizen activites, need to know in advance. The government, even now, will say only, "it depends."[19]

The "independent" speech or "independent" advocacy standard, even if defined (which it is not), would still be overbroad since much protected advocacy is not "independent" but is associated with other people and groups.  See e.g. *NAACP v. Alabama*, 357 U.S. 449, 460 (1958) ("Effective advocacy of both public and private points of view is enhanced by group association…").

A simple example will suffice to demonstrate the threatening and overbroad nature of the government's "independent" speech or advocacy standard: A lawyer for Guantanamo inmates may condemn or criticize their continued incarceration and use such speech for the purpose of raising money to pay for expenses or fees for the detainees' defense.  Such speech, though constitutionally protected, is arguably *non*-independent since the lawyer is plainly a fiduciary to his clients who are likely to be al-Qaeda or Taliban members and could subject its speaker to section 1021 detention, even under the government's new "independent" advocacy standard.

By way of further example, war correspondents such as plaintiff Chris Hedges imbed and travel with combatants, are often formally accredited to such groups, travel with them on their operations and may even wear military-style clothing (without markings or insignia) in the

_____

[19] The government says as much when it states that its detention authority is "context-dependent," Recon. mem. at 4 n.5. The government states:

> To require the government to evaluate and declare [in advance] whether or not a statute affirming [sic] the authorization of the use of force—here, in the form of detention—during an armed conflict would apply to specific individuals for specific conduct would place the government in an untenable position.

*Id.* at 7.

course of such activity.  Is such journalist who is accredited to and covering such a group "independent" within the meaning of the government's newly-enunciated standard?  Hedges himself testified that he was placed by the Transportation Safety Administration (TSA) on a terrorist watch list and detained at airports for nothing other than such journalistic work.  Can he maintain confidence that he is deemed to be engaged in "independent" speech or advocacy by the government when the government itself detained him and placed him on a watch list for such activity?  Notably, the government failed to refute or controvert this testimony.

Plaintiffs Kai Wargalla and Alexa O'Brien testified vividly as to how their groups were directly identified by security professionals and by government agencies as being a part of or associated with extremist Muslim organizations.  O'Brien testified her organization US Day of Rage (a campaign finance reform group) was placed on a Department of Homeland Security extremist watch list; the Court invited the government to refute the authenticity of the document obtained under FOIA – the government never did.  Can US Day of Rage and O'Brien remain confident that they will be regarded as "independent" speakers and therefore protected under the NDAA in such a climate?

Wargalla testified that she and co-plaintiff Jennifer Bolen had ceased inviting certain speakers to the Revolution Truth web casts to avoid being associated with extremist groups as a result of the NDAA's provisions even before the government announced its "independent" advocacy standard.  Since the government has now made it clear that associational speech – i.e., non-independent speech - may subject individuals to the detention provisions, the chilling effect is even greater after the announcement of the "independent" advocacy standard than before.

The Court itself found that Hedges, O'Brien and Wargalla have all "changed certain *associational* conduct…", see slip copy at 61 [emphasis added], because of their concerns arising

under §1021. Since the Court has found that plaintiffs' actions are "associational" it follows that the government's claim that their "independent" speech is outside of the NDAA will give little confidence to them or to others that they can avoid the reach of the law. Virtually all political speech being "associational", see e.g. *NAACP v. Alabama*, 357 U.S. at 460, it seems impossible to discern just what speech would be "independent" under the government's undefined formulation and why *non*-independent speech should bear an presumptive stigma. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 928 (1982) (associational speech directed at encouraging listeners to "unite" fully protected under First Amendment).

The "independent" speech standard merely exacerbates the inherent vagueness in NDAA's fundamental terms of "substantially supported", "associated forces" and "directly supported" that stand in sharp contrast with 18 U.S.C. § 2339A and B, the "material support" statute at issue in *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705 (2010). In *Holder*, the Court rejected the plaintiffs' claim that, as applied to them, the statute violated their First Amendment right of freedom of speech because the narrowness of the statute:

> Congress has prohibited "material support," which most often does not take the form of speech at all. And when it does, the statute is carefully drawn to cover only a narrow category of speech to, under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations.

130 S. Ct. at 2723. *See also id.* at 2726 ("The statute reaches only material support coordinated with or under the direction of a designated foreign terrorist organization."). *Holder* noted that Congress "took care to add *narrowing* definitions to the material-support statute over time. These definitions increased the clarity of the statute's terms." *Humanitarian Law Project v. Holder*, 1130 C. Ct. 2705, 2720 (2010) [emphasis added]. In contrast to Congress's "narrowing" actions in connection with the AEDPA as construed in *Holder*, the government's new

interpretative standard under the NDAA adds no clarity but merely layers the NDAA with ever

growing ambiguity and overbreadth.

**B.  The plaintiffs will suffer irreparable harm absent an injunction**

"The loss of First Amendment freedoms, for even minimal periods of time,

unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). *See*

*also Conn. Dep't of Env'l Prot. v. O.S.H.A.*,  356 F.3d 226, 231 (2d Cir. 2004) ("[V]iolations of

constitutional rights are presumed irreparable.") (quoting *Elrod*, 427 U.S. at 373).  The Court has

already held that the threatened incarceration under the terms of the statute comprise "irreparable

harm".   See slip copy at 61-62.  As the government has stated it will offer no evidence or

witnesses, it would appear that the Court's preliminary finding of irreparable harm should stand

unchanged.  In any event, the government's new "independent" speech or advocacy standard

would seem to reinforce the perception of such irreparable harm since the formula introduces

ever more uncertainty into the legislative analysis.

**C.  The balance of the equities tips in the plaintiffs' favor**

At the hearing on the preliminary injunction application, the government presented no

witnesses, no exhibits and failed to refute any documentary or testimonial evidence offered by

plaintiffs.  In conference with the Court the government stated that it would not be submitting

any evidence, testimony or offer any witnesses at trial.  Since the government offered no basis on

which to infer that it will suffer harm or interference with any material security function if

preliminary relief is granted, and will offer no evidence at all, the balance of the equities plainly

favors plaintiffs; no opposition is presented as to plaintiffs' claims of harm and no showing is

made by the government that it will suffer substantive harm from the imposition of injunctive

relief.  Because the government claims that the NDAA merely reaffirms the existing enforcement

powers under the long-standing AUMF, the effect of the injunction on the government's powers

must necessarily be "nil". Slip copy at 65-66. The government cannot have it both ways, claiming that the NDAA adds nothing new to existing law and, at the same time, that an injunction against the NDAA will harm the government. As the Court found, if the effect of the new statute is "nil" its being enjoined cannot have any material harmful impact on the government's enforcement powers. Slip copy at 65-66.

As the Court has already found, the government has a variety of enforcement tools at its disposal including the AEDPA that prohibits a wide range of clearly defined forms of "material support" to terrorist groups. Since *Holder* upheld the constitutionality of the AEDPA, this power will continue to be fully available to the government regardless of the injunctive relief as to section 1021. As the Court also noted, the AUMF has no sunset provision, slip copy at 65, and it will continue in force unimpeded.[20]

Here plaintiffs have set forth unchallenged cognizable claims of injury, chilling effect upon their journalist endeavors, specific instances of how they have changed their journalistic conduct and ended associational activities in fear of the implications of the NDAA, concrete examples of having been tied by government agencies to terror and radical groups, being placed on government watch lists, investigated by the Department of Homeland Security, and, in the case of Jonsdottir, faced the unusual subpoena of her personal email accounts though being a member of a NATO ally's parliament and, in the case of Hedges having actually been detained at

---

[20] Until now, the government has rested its detention authority on the AUMF. In its reconsideration motion, the government for the first time claimed that an injunction would interfere with "the President's constitutional authority as Commander-in-Chief." Recon. Mot. at 2; id. at 7-9. The government offers the Court a string of maxims, but they have no application here as the plaintiffs challenge only section 1021, leaving intact §1022, the AUMF and AEDPA, all of which convey to the government enforcement power over persons committing terrorist acts or who are detained in combat. The President's power as Commander-in-Chief is thus left unimpaired.

airports due to no known cause other than his journalistic activity. The Court has found that such testimony represented "concrete" examples of actions that give rise to standing. Slip copy at 40.

The government failed to dispute these assertions (even where the contrary evidence would be within the government's control such as whether Hedges was placed on a watch list for his journalistic activities or whether US Day of Rage was investigated as an extremist group by DHS). Similarly, the government failed to offer any testimony that such were the result of anything other than the plaintiffs' ordinary exercise of their particular expressive interests and failed to offer any assurance to the Court that such expressive conduct as a presumptive matter was not within the scope of the NDAA's detention powers. As noted above, the government's newly-raised "independent" advocacy standard not only fails to clarify the issues but actually seems to impose a presumption that *non*-independent speech will subject one to detention, a presumption wholly without support in our law under which speech can be limited in only the most discreet and narrow circumstances and in which associated speech is highly protected. See *NAACP v. Alabama*, supra.

Under these circumstances, the weighing of the equities favors entry of permanent injunctive relief as to section 1021.

**D. The injunction is in the public interest**

As the Court held in its decision on the preliminary injunction application, see Slip copy at 66 citing cases, there exists a strong public interest in protecting First Amendment rights, *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.,* 475 U.S. 1, 8 (1986), and in protecting the public from a statute that would chill such rights by vague and undefined terms that may lead to incarceration for extended, indeed, indefinite periods. Cf. *Mathews v. Eldridge*, 424 U.S. 319, 335, 348–49 (1976). While the Court must be cognizant of the need to respect the separation of of powers between the branches, Slip copy at 67, where the government fails to offer a

substantive basis for showing harm from the injunction the public interest requires injunctive relief to protect against intrusion into protected expressive rights and to avoid the chilling effect of vague and undefined statutory terms that threaten long term incarceration.  Slip copy at 67-68. Since the government asserts that the existing law does not nothing other than merely re-affirm the previous authority under the AUMF, the government already has the enforcement power it needs under the pre-existing statutory structure and the injunction will not unduly hamper governmental interests.  As the Court recognized in its preliminary injunction ruling, because of the absence of demonstrative injury to the government, the clear demonstration of actual success on the merits and the threat to expressive conduct caused by the NDAA, the public interest supports the entry of injunctive relief.  Slip Op at 67-68.

## CONCLUSION

For the reasons set forth herein and in plaintiffs' pre-hearing and post-hearing briefs, adopted by reference herein, permanent injunctive relief should issue barring the enforcement of section 1021 of the NDAA.

David H. Remes
APPEAL FOR JUSTICE
  A Human Rights and Civil
  Liberties Law Practice
Washington, D.C.
202-669-6508

Carl J. Mayer
1040 Avenue of the Americas, Suite 2400
New York, NY 10018
212-382-4686

S/Bruce I. Afran
10 Braeburn Drive
Princeton, New Jersey 08540
609-924-2075

Attorneys for Plaintiffs

Robert Jaffe, Esq.
Of Counsel