UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

CHRISTOPHER HEDGES et al.,

                  Plaintiffs,

    v.

BARACK OBAMA et al.,

                  Defendants.

------------------------------------------------------------ x

12 Civ. 331 (KBF)

## Government's Memorandum of Law in Support of Final Judgment Denying a Permanent Injunction and Dismissing This Action

PREET BHARARA
United States Attorney for the
Southern District of New York
86 Chambers Street
New York, New York 10007
Telephone: 212.637.2703, .2728
Fax: 212.637.2702
E-mail: benjamin.torrance@usdoj.gov
          christopher.harwood@usdoj.gov

BENJAMIN H. TORRANCE
CHRISTOPHER B. HARWOOD
Assistant United States Attorneys

    – Of Counsel –

## Table of Contents

Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

Statutory Background: The AUMF and the NDAA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

    A.   The Government's Detention Authority Under the 2001 AUMF. . . . . . . . . . . . . . .   3

    B.   Section 1021's Affirmation of the AUMF's Detention Authority . . . . . . . . . . . . . .   6

    C.   Section 1021 Reflects Congress's Endorsement of Existing Executive Practice. . . . .   8

    D.   Plaintiffs', and This Court's, Contrary Understanding Rests on a Misreading of Both
        Section 1021 and the AUMF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

I. Plaintiffs Lack Standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

    A.   Plaintiffs' Burden to Establish Standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

    B.   Plaintiffs Have Not Established an Injury In Fact. . . . . . . . . . . . . . . . . . . . . . . . .   18

        1.   Plaintiffs' Activities as They Describe Them Do Not Implicate the Military
             Detention Authority Affirmed by Section 1021. . . . . . . . . . . . . . . . . . . . . . . . .   19

        2.   Plaintiffs' Asserted Fear That Section 1021 Will Be Applied Against Them Is
             Unreasonable and Insufficient. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

            a.   Plaintiffs Cannot Overcome Consistent Past Practice or the President's Clear
                Signing Statement to Demonstrate a Reasonable Fear of Detention. . . . . . .   24

            b.   Plaintiffs' Asserted Fear of Detention Is Not Supported by the Record. . . . .   26

            c.   There Is Not a Sufficient Nexus Between Plaintiffs and "al-Qaeda, the
                Taliban, or Associated Forces". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

        3.   The Non-Citizen Plaintiffs Have Not Shown a Legally Cognizable Injury Under
             the First or Fifth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29

    C.   Plaintiffs' Alleged Injuries Cannot Be Redressed by the Injunction They Seek. . . . .   30

II. The Permanent Injunction Should Be Denied on the Merits. . . . . . . . . . . . . . . . . . . . . .   31

    A.   Applicable Legal Standards. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32

    B.   Section 1021 Is Constitutional. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33

i

1.   Plaintiffs' Facial Attacks Fail. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33

2.   Plaintiffs' Vagueness Challenge Fails. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37

    a.   Military-Force Authorization Statutes Are Not Susceptible to Vagueness
        Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37

    b.   Section 1021 Is Not Impermissibly Vague. . . . . . . . . . . . . . . . . . . . . . . . . . .   40

C.   Plaintiffs Cannot Show Their Entitlement to Injunctive Relief. . . . . . . . . . . . . . . .   43

1.   Plaintiffs Cannot Establish Irreparable Harm. . . . . . . . . . . . . . . . . . . . . . . . . .   44

2.   The Equities and the Public Interest Require That the Injunction Be Denied
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   44

3.   An Injunction, If Issued, Should Be Limited in Scope. . . . . . . . . . . . . . . . . . . . .   47

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   49

## Table of Authorities

*Cases:*

*Amnesty Int'l USA v. Clapper*, 638 F.3d 118 (2d Cir. 2011). . . . . . . . . . . . . . . . . . . .  19, 26, 27

*A.B. Small Co. v. American Sugar Refining Co.*, 267 U.S. 233 (1925). . . . . . . . . . . . . . . . .  38

*ACLU v. NSA*, 493 F.3d 644 (6th Cir. 2007)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

*Adams v. Zelotes*, 606 F.3d 34 (2d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34

*al-Adahi v. Obama*, 613 F.3d 1102 (D.C. Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

*al-Bihani v. Obama*, 590 F.3d 866 (D.C. Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . .  6, 14, 16

*Alexander v. United States*, 509 U.S. 544 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

*American Booksellers Found. v. Dean*, 342 F.3d 96 (2d Cir. 2003). . . . . . . . . . . . . . . . . .  36, 37

*American Commc'ns Ass'n v. Douds*, 339 U.S. 382 (1950). . . . . . . . . . . . . . . . . . . . . . . . . .  41

*American Insurance Ass'n v. Garamendi*, 539 U.S. 396 (2003). . . . . . . . . . . . . . . . . . . . . . .  9

*Association of Data Processing Serv. Orgs. v. Camp*,
    397 U.S. 150 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

*Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289 (1979). . . . . . . . . . . . . . . . . . . .  24

*Barhoumi v. Obama*, 609 F.3d 416 (D.C. Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . .  6, 14, 35

*Bates v. United States*, 522 U.S. 23 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

*BedRoc Ltd. v. United States*, 541 U.S. 176 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

*Bensayah v. Obama*, 610 F.3d 718 (D.C. Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . .  15, 22, 23

*Betancourt v. Bloomberg*, 448 F.3d 547 (2d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

*Blodgett v. Holden*, 275 U.S. 142 (1927). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

*Board of Trustees of SUNY v. Fox*, 492 U.S. 469 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . .  36

*Bonds v. Tandy*, 457 F.3d 409 (5th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

*Boumediene v. Bush*, 553 U.S. 723 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3, 37, 39

*Brache v. Westchester County*, 658 F.2d 47 (2d Cir. 1981)............................. 33

*Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491 (1985)............................ 36, 37

*Califano v. Yamasaki*, 442 U.S. 682 (1979). ....................................... 47

*Cannon v. University of Chicago*, 441 U.S. 677 (1979). ............................. 10

*Chase Bank USA, N.A. v. McCoy*, 131 S. Ct. 871 (2011)............................. 24

*Chicago & Southern Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103 (1948)............. 9

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). ............................ 18, 19, 25

*Coates v. City of Cincinnati*, 402 U.S. 611 (1971)................................... 41

*Colepaugh v. Looney*, 235 F.2d 429 (10th Cir. 1956)................................ 40

*Conn. Nat'l Bank v. Germain*, 503 U.S. 249 (1992)................................. 11

*Connally v. General Constr. Co.*, 269 U.S. 385 (1926) ............................. 41

*DKT Mem. Fund Ltd. v. USAID*, 887 F.2d 275 (D.C. Cir. 1989)....................... 30

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006). ........................... 18, 26

*Dames & Moore v. Regan*, 453 U.S. 654 (1981). .................................... 9

*Department of Navy v. Egan*, 484 U.S. 518 (1988)................................. 32

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)......................... 43, 45

*Edelman v. Lynchburg Coll.*, 535 U.S. 106 (2002)................................. 10

*FEC v. National Right To Work Committee*, 459 U.S. 197 (1982)...................... 40

*Farrell v. Burke*, 449 F.3d 470 (2d Cir. 2006)................................... 41

*Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46 (1989)............................ 27

*Fourco Glass Co. v. Transmirra Products Corp.*, 353 U.S. 222 (1957)................. 12

*Franklin v. Massachusetts*, 505 U.S. 788 (1992). ............................. 45, 46

*Graham v. Butterworth*, 5 F.3d 496 (11th Cir. 1993)................................ 24

*Grayned v. City of Rockford*, 408 U.S. 104 (1972). ............................... 41

*Haig v. Agee*, 453 U.S. 280 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Hamlily v. Obama*, 616 F. Supp. 2d 63 (D.D.C. 2009). . . . . . . . . . . . . . . . . . . . . . . . . 5, 14

*Holder v. Humanitarian Law Project*, 130 S. Ct. 2705 (2010).. . . . . . . . . . . . . . . . . . . *passim*

*In re Guantanamo Bay Detainee Litig.*, Misc. No. 08-442. . . . . . . . . . . . . . . . . . . . . . . . 3

*Jordan v. DeGeorge*, 341 U.S. 223 (1951). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 43

*Katcoff v. Marsh*, 755 F.2d 223 (2d Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.*, 130 S. Ct. 2433 (2010). . . . . . . . . . . . 12

*Khan v. Obama*, 655 F.3d 20 (D.C. Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Kinnell v. Graves*, 265  F.3d 1125 (10th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . 38, 40

*Laird v. Tatum*, 408 U.S. 1 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Leaf Tobacco Exporters Ass'n v. Block*, 749 F.2d 1106
    (4th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*In re Liberatore*, 574 F.2d 78 (2d Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Lorillard v. Pons*, 434 U.S. 575 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Los Angeles Police Department v. United Reporting Public Corp.*,
    528 U.S. 32 (1999).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)   . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803). . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Meinhold v. U.S. Department of Defense*, 34 F.3d 1469 (9th Cir. 1994). . . . . . . . . . . . . . 48

*Members of City Council of City of Los Angeles v. Taxpayers for Vincent*,
    466 U.S. 789 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 36

*Microsoft Corp. v. i4i Ltd. Partnership*, 131 S. Ct. 2238 (2011). . . . . . . . . . . . . . . . . . . 12

*Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475 (1866). . . . . . . . . . . . . . . . . . . . . . . . . 45

*Mistretta v. United States*, 488 U.S. 361 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

v

*Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743 (2010)................... 43, 44, 48

*Munaf v. Geren*, 553 U.S. 674 (2008)............................................ 45

*Nash v. United States*, 229 U.S. 373 (1913)...................................... 43

*National Lead Co. v. United States*, 252 U.S. 140 (1920)......................... 9, 10

*New York v. Ferber*, 458 U.S. 747 (1982)........................................ 34

*Northwest Austin Municipal Utility District Number One v. Holder*,
    557 U.S. 193 (2009)........................................................ 32

*Padilla v. Rumsfeld*, 352 F.3d 695 (2d Cir. 2003)................................. 16

*Parhat v. Gates*, 532 F.3d 834 (D.C. Cir. 2008)................................... 5

*Perez v. Hoblock*, 368 F.3d 166 (2d Cir. 2004).................................... 38

*In re Petitioners Seeking Habeas Corpus Relief*,
    700 F. Supp. 2d 119 (D.D.C. 2010)........................................... 6, 14

*Printz v. United States*, 521 U.S. 898 (1997)..................................... 32

*Prize Cases (The Amy Warwick)*, 67 U.S. (2 Black) 635 (1863)...................... 9

*Ex Parte Quirin*, 317 U.S. 1 (1942)............................................. 33

*Raines v. Byrd*, 521 U.S. 811 (1997)............................................ 18

*Renne v. Geary*, 501 U.S. 312 (1991)........................................... 18, 37

*Rostker v. Goldberg*, 453 U.S. 57 (1981)......................................... 32

*Russello v. United States*, 464 U.S. 16 (1983).................................... 12

*Salahi v. Obama*, 625 F.3d 745 (D.C. Cir. 2010)............................... 5, 22, 23

*Salazar v. Buono*, 130 S. Ct. 1803 (2010)....................................... 18

*Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010).................................. 44

*Sanchez-Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir. 1985)....................... 45

*Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49 (2005)............................ 18

*Skilling v. United States*, 130 S. Ct. 2896 (2010)................................. 43

vi

*Smith v. Goguen*, 415 U.S. 566 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Sompo Japan Ins. Co. of America v. Union Pacific R. Co.*,
    456 F.3d 54 (2d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998). . . . . . . . . . . . . . . . . . . 30

*Tax Analysts & Advocates v. Blumenthal*, 566 F.2d 130 (D.C. Cir. 1977). . . . . . . . . . . . . 29

*In re Territo*, 156 F.2d 142 (9th Cir. 1946). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Uthman v. Obama,* 637 F.3d 400 (D.C. Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*U.S. Civil Serv. Commission v. National Association of Letter Carriers*,
    413 U.S. 548 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States ex rel. Turner v. Williams*, 194 U.S. 279 (1904). . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Bailey*, 34 U.S. (9 Pet.) 238 (1835). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Clark*, 582 F.3d 607 (5th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936) . . . . . . . . . . . . . . . . . . 9

*United States v. Mendoza*, 464 U.S. 154 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*United States v. Midwest Oil Co.*, 236 U.S. 459 (1915). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Morrison*, 529 U.S. 598 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. National Dairy Products Corp.*, 372 U.S. 29 (1963). . . . . . . . . . . . . . . . . 40

*United States v. National Treasury Employees Union*,
    513 U.S. 454 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*United States v. Payden*, 598 F. Supp. 1388 (S.D.N.Y. 1984). . . . . . . . . . . . . . . . . . . . . 39, 40

*United States v. Raines*, 362 U.S. 17 (1960). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Sischo*, 262 U.S. 165 (1923) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Stevens*, 130 S. Ct. 1577 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990). . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Vuitch*, 402 U.S. 62 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Williams*, 553 U.S. 285 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Wilson*, 290 F.3d 347 (D.C. Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Valley Forge Christian Coll. v. Americans United for Separation of*
   *Church & State*, 454 U.S. 464 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 29

*Vermont Right to Life Committee v. Sorrell*, 221 F.3d 376 (2d Cir. 2000). . . . . . . . . . . . . .  24

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
   455 U.S. 489 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

*Virginia Society for Human Life, Inc. v. FEC*, 263 F.3d 379 (4th Cir. 2001). . . . . . . . .  47, 48

*Virginia v. Hicks*, 539 U.S. 113 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35, 36

*Waldman Public Corp. v. Landoll, Inc.*, 43 F.3d 775 (2d Cir. 1994) . . . . . . . . . . . . . . . .  47

*Warafi v. Obama*, 704 F. Supp. 2d 32 (D.D.C. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . .  14

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

*Warth v. Seldin*, 422 U.S. 490 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 22

*Washington State Grange v. Washington State Republican Party*,
   552 U.S. 442 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982). . . . . . . . . . . . . . . . . . . . . . . . . .  45

*Whitmore v. Arkansas*, 495 U.S. 149 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

*Winter v. NRDC*, 555 U.S. 7 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 45

*Wisconsin Right to Life, Inc. v. Paradise*, 138 F.3d 1183 (7th Cir. 1998). . . . . . . . . . . . 20, 24

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).. . . . . . . . . . . . . . . . . . . .  9


**Statutes and Other Authorities:**

10 U.S.C. § 113. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  46

10 U.S.C. § 162. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  46

18 U.S.C. § 4001. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

147 Cong. Rec. S9948-02 (Oct. 1, 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

157 Cong. Rec. S7638-02 (Nov. 17, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7, 8

157 Cong. Rec. S8632 (Dec. 15, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7, 8

Act of June 18, 1812, ch. 102, 2 Stat. 755. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38

Act of May 13, 1846, ch. 16, 9 Stat. 9. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38

Act of Apr. 25, 1898, ch. 189, 30 Stat. 364. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38

*Curtis A. Bradley & Jack L. Goldsmith, Congressional Authorization and
   the War on Terrorism,* 118 Harv. L. Rev. 2047 (2005). . . . . . . . . . . . . . . . . . . . . . . . . .   38

Geneva Convention (III). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   39

Geneva Convention (IV). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

Jeh C. Johnson, "National Security Law, Lawyers, and Lawyering in the Obama Administra-
   tion," Dean's Lecture at the Yale Law School, Feb. 22, 2012. . . . . . . . . . . . . . . . . . . . . . .   6

Joint Res. of Apr. 6, 1917, ch. 1, 40 Stat. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38

Joint Res. of Dec. 8, 1941, ch. 561, 55 Stat. 795 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38

Joint Res. of Dec. 11, 1941, ch. 564, 55 Stat. 796 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40

Joint Res. of Aug. 10, 1964, Pub. L. No. 88-408, 78 Stat. 384 . . . . . . . . . . . . . . . . . . . . . . .   38

*Oppenheim's International Law: A Treatise* (7th ed. 1952). . . . . . . . . . . . . . . . . . . . . . . . . .   5

*Parry & Grant, Encyclopaedic Dictionary of Int'l Law* (3d ed. 2009). . . . . . . . . . . . . . . . . .   5

Presidential Policy Directive/PPD-14 (Feb. 28, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

Pub. L. No. 102-1, 105 Stat. 3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38

Pub. L. No. 107-243, 116 Stat. 1498. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38

Pub. L. No. 107-40, 115 Stat. 224. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Pub. L. 112-81, 125 Stat. 1298. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Statement by Pres. Obama upon Signing H.R. 1540, 2011 U.S.C.C.A.N. S11, S12. . . . .   8, 25

**Preliminary Statement**

Defendants Barack Obama, Leon Panetta, and the Department of Defense (collectively, the "government") respectfully submit this memorandum in opposition to plaintiffs' request for a permanent injunction against the operation of a portion of section 1021 of the National Defense Authorization Act for Fiscal Year 2012, Pub. L. 112-81, 125 Stat. 1298 (Dec. 31, 2011) (the "NDAA"), and in support of the government's request that the Court enter final judgment in its favor.[1]

Plaintiffs present a truly extraordinary claim in this action. They seek to enjoin the operation of a statute enacted by Congress and signed into law by the President, a statute that codifies a longstanding Executive military-detention authority that has been upheld by the courts, and therefore enjoys the endorsement of all three branches of the government. While that alone would be an ambitious endeavor, plaintiffs reach even further, and claim that they, as journalists and activists, may obtain an injunction to invalidate the statute on its face, to apply worldwide, and, most unusually, to prohibit certain uses of the military detention authority exercised by the United States and the Commander-in-Chief during an ongoing armed conflict. Any one of those facts should cause extreme hesitation by the Court; taken together, they require the most exacting scrutiny to ensure that if the judicial power is to be exercised in such a far-reaching manner it is clearly within the Court's jurisdiction to do so.

Yet plaintiffs cannot come close to establishing that jurisdiction, as they cannot carry their burden of demonstrating even the basic elements of standing. They claim they fear military detention, based on an erroneous interpretation of the statute that would extend its scope in direct contradiction of the statute's words, and with no regard for the context that gives it

---

[1]   No defendant has been served with process to date, and the government respectfully preserves all pertinent defenses. In particular, members of Congress named as defendants have not been served, have not appeared in this case, and are unnecessary to resolution of this action.

meaning. They persist in asserting that interpretation even though it is contravened by over a decade of history; they cannot point to a single example of the military's detaining anyone for engaging in conduct even remotely similar to the type of expressive activities they allege could lead to detention. And they continue to seek unprecedented injunctive relief despite already obtaining assurance from the government in this case that based on their allegations they are not detainable under this statute. Plaintiffs therefore have fallen far short of meeting their burden to show they have been injured by the statute; their complaints are the types of generalized grievances of allegedly unlawful government conduct that have been repeatedly held insufficient to support standing. Even if plaintiffs had some cognizable injuries, those harms would not be redressed by an injunction against section 1021; as plaintiffs themselves acknowledge, such an injunction would have "nil" effect, for the government would continue to possess the identical detention authority under the 2001 Authorization for the Use of Military Force. Plaintiffs thus would achieve no meaningful relief from the injunction they seek, and lack standing for that reason as well. Because plaintiffs lack standing, this Court need not (and must not) unnecessarily decide the constitutional questions plaintiffs present.

If it were necessary to reach the merits, plaintiffs' claims would fail. Their facial and overbreadth challenges, if even appropriate in this context, founder on the indisputable fact that section 1021 has a plainly legitimate sweep that dwarfs the purported infringement on free expression; indeed, the statute is not even aimed at speech or expressive conduct. Nor is the statute unconstitutionally vague: it does not prohibit any conduct and therefore is not even subject to vagueness analysis. Even if it were it would still be valid, as its meaning as informed by context is more than clear enough to meet constitutional standards. All of plaintiffs' claims on the merits fail, but in particular none of their theories can come close to justifying the invalidation of the non-punitive war-time authority that Congress affirmed in section 1021.

For all those reasons, the Court should enter judgment for the government.

**Statutory Background: The AUMF and the NDAA**

**A.  The Government's Detention Authority Under the 2001 AUMF**

The AUMF was enacted in the immediate wake of the September 11, 2001, terrorist attacks on the United States. It provides

> [t]hat the President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

Pub. L. 107-40, 115 Stat. 224 (Sept. 18, 2001), § 2(a). Shortly thereafter, the President ordered U.S. armed forces to Afghanistan pursuant to the AUMF, "with a mission to subdue al Qaeda and quell the Taliban regime that was known to support it." *Hamdi v. Rumsfeld*, 542 U.S. 507, 510 (2004). During the ensuing hostilities, which are ongoing, the government has captured and detained a number of individuals pursuant to authority the Supreme Court recognized as conferred by the AUMF. *See id.* 518 ("detention of individuals . . . for the duration of the particular conflict in which they were captured, is so fundamental and accepted an incident to war as to be an exercise of the 'necessary and appropriate force' Congress has authorized the President to use").[2]

Since *Hamdi* the government has explained the detention authority granted by the AUMF in the course of habeas corpus proceedings brought by detainees held at the U.S. Naval Station at Guantanamo Bay, Cuba. *In re Guantanamo Bay Detainee Litig.*, Misc. No. 08-442, Respondents' Mem. Regarding the Government's Detention Authority Relative to Detainees Held at Guantanamo Bay, dated March 13, 2009 ("March 2009 Memorandum"). (Plaintiffs characterize this standard as exclusive to Guantanamo detainees, Pls.' Trial Br. 16, but that

---

[2]   Although *Hamdi* was a plurality opinion, the Court later recognized that five Justices concurred in this core holding. *Boumediene v. Bush*, 553 U.S. 723, 733 (2008).

is incorrect: as the government has explained in other cases, it has applied this standard to those detained under the AUMF elsewhere.[3]) To begin with, "[t]he detention authority conferred by the AUMF is necessarily informed by principles of the laws of war," March 2009 Mem. at 1—consistent with *Hamdi*, which construed the AUMF "based on longstanding law-of-war principles." 542 U.S. at 520-21.[4] As informed by the law of war, the government's detention authority under the AUMF extends to those the President "determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, and persons who harbored those responsible for the September 11 attacks"—as provided in the language of the AUMF itself—as well as "those persons whose relationship to al-Qaida or the Taliban would, in appropriately analogous circumstances in a traditional international armed conflict, render them detainable." March 2009 Mem. at 1. Thus, the definitional framework for the government's AUMF detention authority is as follows:

> The President has the authority to detain persons that the President determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, and persons who harbored those responsible for those attacks. The President also has the authority to detain persons who were part of, or substantially supported, Taliban or al-Qaida forces or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act, or has directly supported hostilities, in aid of such enemy armed forces.

---

[3]    Gov't Br. in *al Maqaleh v. Gates*, No. 09-5265 (D.C. Cir.), doc. no. 1206197, filed Sept. 14, 2009, at 9-10 ("Written criteria of the Department of Defense, approved on July 2, 2009, limit the category of individuals who may be detained on a long-term basis by the United States military at the [Bagram Theater Internment Facility, Afghanistan]" according to same criteria set forth in March 2009 Memorandum); *id.*, Addendum (July 2009 Detainee Review Procedures) at 1, 3 (detention criteria, and cover letter noting that they "adopt the definitional framework of detention authority" in the March 2009 Memorandum).

[4]    "The laws of war include a series of prohibitions and obligations, which have developed over time and have periodically been codified in treaties such as the Geneva Conventions or become customary international law. *See, e.g., Hamdan v. Rumsfeld*, 548 U.S. 557, 603-04 (2006)." March 2009 Mem. at 1.

*Id.* at 1-2.[5] The government further explained that while the circumstances justifying detention of an individual for providing "substantial support" to enemy forces will need to be identified case by case going forward, and "may require the identification and analysis of various analogues from traditional international armed conflicts," it is clear that "the concept of 'substantial support' . . . does not justify the detention . . . of those who provide unwitting or insignificant support" to al-Qaeda, the Taliban, or associated forces. *Id.* at 2; *see Salahi v. Obama*, 625 F.3d 745, 751-52 (D.C. Cir. 2010) (determination of detention's legality must be made case by case, but "purely independent conduct of a freelancer is not enough" under "part of" test (quotation marks omitted)); *Bensayah v. Obama*, 610 F.3d 718, 725 (D.C. Cir. 2010).

Further, the government explained with respect to the concept of "associated forces" that "many different private armed groups [have] trained and fought alongside al-Qaida and the Taliban. In order 'to prevent any future acts of international terrorism against the United States,' AUMF, § 2(a), the United States has authority to detain individuals who, in analogous circumstances in a traditional international armed conflict between the armed forces of opposing governments, would be detainable under principles of co-belligerency." March 2009 Mem. at 7; *see Hamlily v. Obama*, 616 F. Supp. 2d 63, 74-75 (D.D.C. 2009) ("associated forces" "mean[s] 'co-belligerents' as that term is understood under the law of war").[6] The General Counsel of the Department of Defense recently stated that the term "associated force"

---

[5]   Prior to the government's March 2009 articulation of AUMF detention authority, the Department of Defense used a detention standard for persons held at Guantanamo that included "'an individual who was part of or supporting Taliban or al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners [including] any person who has committed a belligerent act or has directly supported hostilities in aid of enemy armed forces.'" *Parhat v. Gates*, 532 F.3d 834, 837-38 (D.C. Cir. 2008) (quoting Secretary of the Navy, Implementation of Combatant Status Review Tribunal Procedures (July 29, 2004), at E-1 § B, and Deputy Secretary of Defense, Order Establishing Combatant Status Review Tribunal (July 7, 2004), at 1).

[6]   *Cf.* Parry & Grant, *Encyclopaedic Dictionary of Int'l Law* (3d ed. 2009) 102 (defining co-belligerents); 2 *Oppenheim's International Law: A Treatise* § 77 & n.1 (7th ed. 1952) (noting "co-belligerents" are "associated with one another for purposes of the war").

is based on the well-established concept of co-belligerency in the law of war. . . . An 'associated force,' as we interpret the phrase, has two characteristics to it: (1) an organized, armed group that has entered the fight alongside al Qaeda, and (2) is a co-belligerent with al Qaeda in hostilities against the United States or its coalition partners.[7]

The definitional framework articulated by the government in the March 2009 Memorandum has been endorsed by the courts in the habeas corpus litigation involving aliens detained at Guantanamo under authority of the AUMF. *E.g.*, *Barhoumi v. Obama*, 609 F.3d 416, 432 (D.C. Cir. 2010); *In re Petitioners Seeking Habeas Corpus Relief*, 700 F. Supp. 2d 119, 135 (D.D.C. 2010) (recognizing circuit's holding approving detention authority definition).[8]

## B. Section 1021's Affirmation of the AUMF's Detention Authority

In section 1021 of the NDAA, Congress affirmed the preexisting authority described above, adopting the operative language of the government's definitional framework stated in the March 2009 Memorandum nearly verbatim, and noting that the new provision was not intended to change the government's authority. The section begins by stating that "Congress *affirms* that the authority of the President to use all necessary and appropriate force pursuant to the [AUMF] includes the authority for the Armed Forces of the United States to detain covered persons (as defined in subsection (b)) pending disposition under the law of war." Pub. L. No. 112-81, 125 Stat. 1298, 1562, § 1021(a) (emphasis added). "Covered persons," in turn, are described in section 1021(b) using the language of the March 2009 Memorandum:

(1) A person who planned, authorized, committed, or aided the terrorist attacks that

---

[7]    Jeh C. Johnson, "National Security Law, Lawyers, and Lawyering in the Obama Administration," Dean's Lecture at the Yale Law School, Feb. 22, 2012 (text available at http://www.lawfareblog.com/2012/02/jeh-johnson-speech-at-yale-law-school/).

[8]    *See also al-Bihani v. Obama*, 590 F.3d 866, 873-74 (D.C. Cir.), *rhg. en banc denied*, 619 F.3d 1 (D.C. Cir. 2010), *cert. denied*, 131 S. Ct. 1814 (2011). While the *al-Bihani* majority disagreed with the government's view regarding the role of international law in interpreting the AUMF detention authority, 590 F.3d at 871, the government consistently has made clear that it views its detention authority under the AUMF as informed by the law of war. *See, e.g.*, Br. for Respondents in Opp. to Pet. for Cert., *al-Bihani v. Obama*, S. Ct. No. 10-1383, at 10 (Nov. 23, 2011); Response to Pet. for Rhg. & Rhg. En Banc, *al-Bihani v. Obama*, D.C. Cir. No. 09-5051, at 6-7 (May 13, 2010).

occurred on September 11, 2001, or harbored those responsible for those attacks.

(2) A person who was a part of or substantially supported al-Qaeda, the Taliban, or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act or has directly supported such hostilities in aid of such enemy forces.

To the extent there could be any doubt that section 1021, in "affirm[ing]" the AUMF authority, does not confer any new or additional authority, Congress provided that "[n]othing in this section is intended to limit *or expand* the authority of the President or the scope of the [AUMF]," *id.* § 1021(d) (emphasis added), and, "[n]othing in this section shall be construed to affect existing law or authorities relating to the detention of United States citizens, lawful resident aliens of the United States, or any other persons who are captured or arrested in the United States," *id.* § 1021(e).

Members of Congress expressed the same understanding in floor debates. As Senator Levin, chair of the Senate Armed Services Committee, stated: "Those who say we have written into law a new authority to detain American citizens until the end of hostilities are wrong. Neither the Senate bill nor the conference report establishes new authority to detain American citizens—or anybody else." 157 Cong. Rec. S8632, S8633 (Dec. 15, 2011). Similarly, Senator Levin noted "the detainee provisions in our bill do not include new authority for the permanent detention of suspected terrorists. Rather, the bill uses language provided by the administration to codify existing authority that was adopted by both the Bush administration and the Obama administration and that has been upheld in the Federal courts." 157 Cong. Rec. S7638-02, S7640 (Nov. 17, 2011). The Armed Services Committee's ranking minority member, Senator McCain, agreed: "This section simply restates the authority to detain what has already been upheld by the Federal courts. We are not expanding or limiting the authority to detain as

established by the 2001 authorization for the use of military force." 157 Cong. Rec. at S8636.[9]

The President reiterated the point upon signing the NDAA:

Section 1021 affirms the executive branch's authority to detain persons covered by the 2001 [AUMF]. This section *breaks no new ground* and is unnecessary. The *authority it describes was included in the 2001 AUMF,* as recognized by the Supreme Court and confirmed through lower court decisions since then. Two critical limitations in section 1021 [subsections (d) and (e), quoted above] confirm that it *solely codifies established authorities.* . . . My Administration strongly supported the inclusion of these limitations in order to *make clear beyond doubt* that the legislation does *nothing more than confirm authorities* that the Federal courts have recognized as lawful under the 2001 AUMF.

Statement by Pres. Obama upon Signing H.R. 1540, 2011 U.S.C.C.A.N. S11, S12 (Dec. 31, 2011) ("Signing Statement") (emphasis added). The President further noted that "[m]y Administration will interpret section 1021 in a manner that ensures that any detention it authorizes complies with the Constitution, the laws of war, and all other applicable law." *Id.*

In addition, section 1021 confirms that detention authority under the AUMF is informed by the law of war. Section 1021(c)(1) of the NDAA explicitly refers to "[d]etention under the law of war." Senate floor statements confirm that members of Congress understood that section 1021 concerned detention consistent with the law of war.[10] Other provisions in the same subtitle of the NDAA repeatedly refer to the law of war. *E.g.*, §§ 1023(b), 1024(b).

## C.  Section 1021 Reflects Congress's Endorsement of Existing Executive Practice

In enacting section 1021, Congress endorsed existing Executive practice and interpretation,

---

[9]  *Accord* 157 Cong. Rec. S8632, S8663 (Dec. 15, 2011) (Sen. Ayotte: "what is the law today . . . we are reaffirming in this bill. But we are not adding or subtracting from the President's authority that he has, as the Commander-in-Chief of our country, to protect our country against members of al-Qaida." Sen. Graham: "The Senator is correct."); *id.* at S8656 (Sen. Durbin: "we have agreed, on a bipartisan basis, to include language in the bill . . . that makes it clear this bill does not change existing detention authority in any way.").

[10]  157 Cong. Rec. S7638-02, S7670 (Nov. 17, 2011) (Sen. Graham: "When someone is captured as a member of al-Qaida . . . [t]hey are being held under the law of war." Sen. Levin: "That is correct."); *id.* at S7956-02 (Sen. Graham: section 1021 "reaffirms the fact this body believes al-Qaida and affiliated groups are a military threat to the United States and they can be held under the law of war").

upheld by the courts. Under well-established principles, when Congress legislates knowing of "an established usage of an executive department of the government," it "amounts to an implied legislative recognition and approval of the executive construction of the statute." *National Lead Co. v. United States*, 252 U.S. 140, 146-47 (1920); *accord United States v. Bailey*, 34 U.S. (9 Pet.) 238, 256 (1835). The "relevant practices of the Executive Branch" and "the Executive Branch's interpretation of the law through its implementation" form "background understandings" that "Congress is presumed to preserve, not abrogate." *United States v. Wilson*, 290 F.3d 347, 356-57 (D.C. Cir. 2002) (quotation marks and alterations omitted). Thus, "in determining the meaning of a statute or the existence of a power, weight shall be given to the [Executive's] usage itself,—even when the validity of the practice is the subject of investigation." *United States v. Midwest Oil Co.*, 236 U.S. 459, 472-73 (1915); *see Lorillard v. Pons*, 434 U.S. 575, 580 (1978); *see also Mistretta v. United States*, 488 U.S. 361, 408 (1989) ("Our principle of separation of powers anticipates that the coordinate Branches will converse with each other on matters of vital common interest.").

Congress's endorsement of prior Executive practice is presumed even more strongly in areas of foreign affairs, national security, and war powers, where the President has broad authority independent of congressional enactments. *American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414-15 (2003); *Chicago & Southern Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948); *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319-21 (1936); *Prize Cases (The Amy Warwick)*, 67 U.S. (2 Black) 635, 668-70 (1863). "[W]here there is no contrary indication of legislative intent and when . . . there is a history of congressional acquiescence in conduct of the sort engaged in by the President," Congress may be seen as "invit[ing]" the exercise of that "'independent presidential responsibility'" in the "'areas of foreign policy and national security.'" *Dames & Moore v. Regan*, 453 U.S. 654, 678-79 (1981) (quoting *Youngstown*

*Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring), and *Haig v. Agee*, 453 U.S. 280, 291 (1981)). Thus, when Congress acts alongside a "longstanding and officially promulgated view that the Executive has [a certain] power . . . for reasons of national security and foreign policy," and "le[aves] [that power] untouched," it has "implicitly approved" it. *Id.* at 680, 682 n.10 (quotation marks omitted); *accord Haig*, 453 U.S. at 297-98, 301 (when there is "no evidence of any intent to repudiate" Executive policy, courts "conclude that Congress . . . adopted the longstanding administrative construction").

In this case, the Executive's interpretation and application of the detention authority conferred by the AUMF has been expressed in various related forms over the years, including the Department of Defense's 2004 detention standard that included one who was "part of or supporting al-Qaeda, Taliban, or associated forces," *supra* n.5, and, later, the government's March 2009 Memorandum—a document that was not merely a routine act of litigation advocacy, but the Executive's formal statement of the definitional framework governing detention in the Guantanamo Bay cases,[11] also applied shortly thereafter by the Department of Defense to detention under the AUMF in Afghanistan, *supra* n.3. Congress was obviously aware of, and thus endorsed, the Executive's interpretation, as it adopted the Executive's language nearly verbatim into section 1021. *See Lorillard*, 434 U.S. at 581 ("where, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the *interpretation* given to the incorporated law" (emphasis added)); *National Lead*, 252 U.S. at 146-47; *Wilson*, 290 F.3d at 356-57. Similarly, Congress is presumed to have known of judicial precedents—here, the multiple decisions of the D.C. Circuit endorsing the government's detention standard—and to be expressing approval of that

---

[11]   As directed by the court, Order in *Hamlily*, No. 05-cv-0763, docket no. 154 (D.D.C. Feb. 11, 2009) (seeking "clear, uniform understanding" of "core controlling legal standard" of detention authority to be applied in all cases).

background law when it acts. *Edelman v. Lynchburg College*, 535 U.S. 106, 116-17 (2002); *Cannon v. University of Chicago*, 441 U.S. 677, 696-98 (1979).

By taking the language of the Executive's definitional framework, Congress approved the interpretations—the interpretation expressed in the March 2009 Memorandum, as well as the interpretation of the D.C. Circuit opinions endorsing the government's framework—that went along with it. Accordingly, section 1021 takes meaning from that history and context—including that the detention authority is informed by principles of the law of war, when appropriate by analogy to traditional international armed conflicts; that the term "associated forces" is to be understood as based on principles of co-belligerency in the law of war; that the "substantial support" prong does not permit detention of those who provide "unwitting or insignificant support" to al-Qaeda, the Taliban, or associated forces; and that the latter two concepts will develop in the context of applying law-of-war principles to concrete facts in individual cases going forward.

### D. Plaintiffs', and This Court's, Contrary Understanding Rests on a Misreading of Both Section 1021 and the AUMF

In the preliminary injunction ruling, this Court held that section 1021 must have meaning "independent" of the AUMF, as Congress must have acted "intentionally" in choosing different words. PI Order 3-4, 60, 62-64. That analysis was incorrect for several reasons. To begin with, "[t]he preeminent canon of statutory interpretation requires [courts] to 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.'" *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992)). In section 1021, Congress said what it meant: that it was merely "affirm-[ing]," not "expand[ing]" or "limit[ing]," prior law, placing its imprimatur on the interpretations of existing AUMF detention authority asserted by the President and upheld by the courts. Due respect for a co-equal branch of government requires that Congress be taken at its word.

Moreover, it is "well-established" that in considering a "codification" of existing laws, courts "should not 'infer that Congress . . . intended to change their effect.'" *Sompo Japan Ins. Co. of America v. Union Pacific R. Co.*, 456 F.3d 54, 64 (2d Cir. 2006) (quoting *Fourco Glass Co. v. Transmirra Products Corp.*, 353 U.S. 222, 227 (1957) (alterations omitted)), *abrogated on other grounds*, *Kawasaki Kisen Kaisha Ltd. v. Regal–Beloit Corp.* 130 S. Ct. 2433 (2010). Nor is it unusual for Congress's reason for legislating to consist of codifying existing understandings. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2249 n.8 (2011) ("Congress meant to codify [judge-made law], not to set forth a new [standard] of its own making"); *In re Liberatore*, 574 F.2d 78, 86 (2d Cir. 1978). This Court's apparent assumption that Congress must be presumed to be changing the law is unsupported by precedent, and contrary to the cases cited here as well as the fact that Congress may reasonably act to codify and make explicit an existing standard, thereby providing the public with clearer notice and stating its approval of existing practice. That Congress did just that here is demonstrated by its clear statement that its reason was to "affirm," not to "limit" or "expand," the government's authority to detain individuals pursuant to the AUMF.

That clear language controls the statute's meaning, and neither plaintiffs nor the Court in its prior order have cited any precedent stating there is a presumption Congress is changing the law, strong enough to overcome Congress's plain statement of intent *not* to change the law. The Court relied on *Bates v. United States* for the conclusion that there is a "rule of construction . . . that Congress acted intentionally" in its use of different language in different statutes. PI Order 60. But *Bates* announced no such rule; it merely reiterated the well-established presumption that when Congress includes language in one section of a statute but omits it from another section of the same statute, it intended the omission to be meaningful. 522 U.S. 23, 29-30 (1997); *accord Russello v. United States*, 464 U.S. 16, 23 (1983). That,

however, is only a presumption, and even if it applied to separate enactments would be overcome by Congress's express statement that it is not changing the standard adopted under an earlier enactment.

Moreover, although as the Court noted Congress could have simply written "we affirm the AUMF," PI Order 60, that would not have accomplished the same purpose. To state that an existing statute continues to exist would be truly superfluous. But section 1021 does more than state that the AUMF remains in force. It affirms a specific definitional framework for detention that had developed in Executive practice and case law under the AUMF, placing Congress's imprimatur upon it by writing it into statutory law, in a way that (contrary to the Court's hypothetical) it had not expressly been before. *See United States v. Sischo*, 262 U.S. 165, 169 (1923) (rejecting argument that the natural reading of a phrase would "add nothing," because "there is no canon against making explicit what is implied"). That, however, does not imply that Congress intended to change that framework, especially given the legislature's explicit statement that it had no such intention.

Although plaintiffs seek to limit the AUMF's detention authority to those who "actively took part in the terrorist attacks of 9/11," Pls.' Trial Br. 14; *see id.* 7 (section 1021(b)(2) has "*no* counterpart in the AUMF"), that interpretation is inconsistent with the statute and case law. The AUMF authorized the use of force against those "nations, organizations, or persons" the President "determines planned, authorized, committed, or aided" the September 11 attacks or "harbored such organizations or persons." Pursuant to that force authorization, the President engaged in military action against al-Qaeda and the Taliban—not merely those individuals who "actively took part" in executing the 2001 attacks—and a primary and unquestionably authorized method of "subdu[ing]" and "quell[ing]" those entities is to detain those who are part of them. *Hamdi*, 542 U.S. at 510, 518 (detention is "fundamental and accepted . . . incident to

war" authorized by AUMF). For instance, the detainee in *Hamdi* was not alleged to have taken part in the September 11 attacks; instead, the government asserted that he was "affiliated with a Taliban military unit" and was captured while armed in Afghanistan. 542 U.S. at 512-13. Later cases in the court of appeals have confirmed that the AUMF detention authority is broader than plaintiffs maintain: the D.C. Circuit has repeatedly upheld the government's detention standard to extend to those who were "part of" forces covered by the AUMF—including those who were part of "associated forces." *E.g.*, *Khan v. Obama*, 655 F.3d 20, 32-33 (D.C. Cir. 2011); *Barhoumi*, 609 F.3d at 418. And while plaintiffs rely heavily on the *Hamlily* district court's disapproval of the "substantially supported" prong of the detention standard, Pls.' Trial Br. 9-10 (citing 616 F. Supp. 2d at 75-77), that part of the decision was later abrogated by the court of appeals, *see al-Bihani*, 590 F.3d at 872-74; *al Warafi v. Obama*, 704 F. Supp. 2d 32, 37 (D.D.C. 2010), *aff'd in part and remanded on other grounds*, 409 F. App'x 360 (D.C. Cir. 2011); *Petitioners*, 700 F. Supp. 2d at 135.

Section 1021 goes no further than the AUMF, and is faithful to the earlier statute's purpose and scope. In specifying entities against which military force has been authorized under the AUMF (pursuant to the President's "determin[ation]"), section 1021 is connected to the September 11 attacks in the same way the AUMF is. This Court wrote that section 1021 "reaches beyond those involved in the 9/11 attacks" by referring to those who "are engaged in hostilities" in the present tense. PI Order 63. But there can be no doubt that the AUMF has continuing and future effect, as it authorizes the ongoing war against al-Qaeda, the Taliban, and their associated forces, and indeed is expressly forward-looking, authorizing force "in order to prevent any future acts of international terrorism against the United States" by the pertinent entities. Again, section 1021 does no more than that.

The Court also described the AUMF as "more specific" than section 1021. PI Order 63. But

section 1021 names al-Qaeda and the Taliban, where the AUMF allows the President to "deter-mine[]" which entities were involved in, or harbored those involved in, the September 11 attacks, *i.e.*, al-Qaeda and the Taliban. And while the AUMF authorized force against "nations, organizations, or persons," section 1021 more specifically concerns the detention of individuals. As for section 1021's authorization of detention regarding associated forces, that authority is limited by the provision's express statement that it provides no more authority than the AUMF did, § 1021(d), (e), and by the law-of-war principle of co-belligerency. The Court criticized the government for "not provid[ing] a concrete, cognizable set of organizations or individuals that constitute 'associated forces.'" PI Order 63. But the government did specify groups considered by the courts to be "associated forces" reached by the AUMF detention authority, such as those named in *Khan* or *Barhoumi*. Govt.'s Mar. 26, 2012, Mem. 24. And it would be impossible for the government to establish a fixed list of all the groups that may be fighting alongside al-Qaeda or the Taliban as associated forces, in the course of an ongoing war with shifting allegiances among the United States' enemies.[12]

Plaintiffs incorrectly attempt to cast section 1021 as having undefined and unprecedented scope by comparing it to NDAA section 1022. Pls.' Trial Br. 5. It is surprising that plaintiffs would hold up section 1022, a statute that *mandates* military detention of a subset of those subject to detention under section 1021 or the AUMF, § 1022(a), as a model to contrast with section 1021, which only affirms the Executive's existing discretionary authority to detain

---

[12]   Also relevant to the scope of section 1021 is the legislative history of the AUMF. As initially proposed, the AUMF would have authorized the Executive to use force "to deter and pre-empt any future acts of terrorism or aggression against the United States." 147 Cong. Rec. S9948-02, S9949-51 (Oct. 1, 2001). Congress, however, chose to limit the AUMF to the use of force "in order to prevent any future acts of international terrorism against the United States by [the] nations, organizations, or persons" whom the President determined "planned, authorized, committed, or aided the [Sept. 11 attacks] or harbored such organizations or persons." 115 Stat. 224 (2001). Section 1021, which neither limits nor expands the scope of the AUMF, thus cannot be read to authorize the detention of persons based on activities in connection with groups other than al-Qaeda, the Taliban, or associated forces.

under the AUMF. Yet the comparison is inapt. Plaintiffs note the President issued procedures implementing section 1022 but not for section 1021. But that is simply because section 1022(c) expressly requires such procedures, while section 1021 does not. Additionally, even if an individual is determined under those procedures not to be covered by section 1022, he or she may still be detained under section 1021, as the determination regarding mandatory detention is "without prejudice to the question of whether the individual may be subject to detention under the 2001 AUMF, as informed by the laws of war, and affirmed by section 1021 of the NDAA." Presidential Policy Directive/PPD-14 (Feb. 28, 2012), § VII, at 10; *see id.* § III.F, at 8 (determination that person is covered is "without prejudice to that individual's appropriate disposition under the law of war in accordance with sections 1021(c) and 1022(a)(3)," which include detention until the end of hostilities). Plaintiffs' contention that determinations regarding mandatory detention under section 1022 somehow accord individuals greater protection against detention than determinations regarding section 1021 is, therefore, completely baseless.[13]

For all those reasons, section 1021 must be read in accordance with its plain text and clear

---

[13]   Plaintiffs inaccurately suggest that the D.C. Circuit in *Uthman v. Obama* "abrogated" the detention standard offered by the government. Pls.' Trial Br. 10. To the contrary, *Uthman* joins the precedents that endorse and apply the government's definitional framework. 637 F.3d 400, 402-03 (D.C. Cir. 2011), *cert. denied*, 2012 WL 2076353 (June 11, 2012). *Uthman* overturned a district court decision and determined that a person need not be part of al-Qaeda's "command structure" to be "part of" al-Qaeda and thus detainable; that refinement (advocated by the government in that case) in no way "abrogates" the government's AUMF standard. Plaintiffs' contention that *Uthman* "rel[ied] upon" the "material support" standard upheld in *Holder* also is wrong: first, the *Uthman* court stated expressly in the footnote plaintiffs cite that it was not even considering that standard as it was not at issue; and second, the case cited in that footnote—*al-Bihani*, 590 F.3d at 872—took its "materially support" language from the 2006 and 2009 Military Commissions Acts, not the "material support" statute at issue in *Holder*. 637 F.3d at 402 n.2.

Plaintiffs also rely on the reversed decision in *Padilla v. Rumsfeld*, 352 F.3d 695 (2d Cir. 2003), *rev'd on jurisdictional grounds*, 542 U.S. 546 (2004), to argue that the Non-Detention Act, 18 U.S.C. § 4001(a), prohibits AUMF detention without further congressional authorization. Pls.' Trial Br. 8. *Hamdi* rejected precisely that argument, holding that the AUMF itself constitutes the necessary authorization. 542 U.S. at 517; *see id.* at 579-99 (Thomas, J., dissenting) (accepting legality of AUMF detention, although without specifically discussing § 4001).

congressional intent—it affirms, rather than limits or expands, the AUMF's existing authority. Read properly, the statute causes no injury to plaintiffs: they cannot demonstrate that they have a reasonable fear that section 1021 will be applied to them, or that their purported injury would be redressed by an injunction against the provision, and therefore they lack standing. And even if the Court were to reach the merits, plaintiffs cannot overcome the strong presumption of constitutionality that attaches to section 1021; specifically, and contrary to plaintiffs' contentions here, the statute neither infringes on First Amendment rights nor is impermissibly vague.

## Argument

## I. Plaintiffs Lack Standing

Plaintiffs cannot establish standing for numerous reasons. Even though they point only to speculative, subjective, and unreasonable fears, the government has nonetheless responded to the Court's invitation to definitively "eliminate[] . . . standing," PI Order 33, by assuring plaintiffs that their allegations and evidence do not establish that they are detainable under section 1021. But even absent that assurance, plaintiffs cannot meet their burden, as they cannot establish that they are in any imminent danger of being detained, or that any of their alleged injuries would be redressed by preventing the government from relying on authority that is identical to the authority the government had before section 1021 was enacted. Judgment accordingly should be entered for the government.

## A.  Plaintiffs' Burden to Establish Standing

"The judicial power . . . is not an unconditioned authority to determine the [validity] of legislative or executive acts," but is limited by Article III of the Constitution "to the resolution of 'cases and controversies.'" *Valley Forge Christian Coll. v. Americans United for Separation of Church & State*, 454 U.S. 464, 471 (1982). Standing assures that litigants have a sufficient

"personal stake in the outcome of the controversy . . . to justify exercise of the court's remedial powers on [their] behalf." *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975). It is thus a threshold jurisdictional requirement and "an indispensable part of the plaintiff's case." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The "standing inquiry [is] especially rigorous when reaching the merits of the dispute would force [the Court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997).

Plaintiffs bear the burden to establish each element of standing: injury in fact, causation, and redressability. *Salazar v. Buono*, 130 S. Ct. 1803, 1826 (2010); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006); *Lujan*, 504 U.S. at 561. Indeed, federal courts must "presume that [they] lack jurisdiction unless the contrary appears affirmatively from the record." *DaimlerChrysler*, 547 U.S. at 342 n.3 (quotation marks omitted); *Renne v. Geary*, 501 U.S. 312, 316 (1991). Plaintiffs bear not only the burden of coming forward with evidence to support their claim to standing, but also the ultimate burden of persuasion. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57 (2005) (citing *Lujan*); *Bonds v. Tandy*, 457 F.3d 409, 411 (5th Cir. 2006). Thus, contrary to this Court's prior order, it is not enough for plaintiffs to simply "put forward evidence," PI Order 52, *id.* 51 ("put forward uncontroverted proof"); their evidence must actually demonstrate standing. In short, it is not the government's burden to "eliminat[e] . . . standing," PI Order 33, 46; it is plaintiffs' burden to establish it, a burden they cannot meet by pointing to an absence of evidence or an absence of assurance from the government about their status.

## B. Plaintiffs Have Not Established an Injury In Fact

To establish an injury in fact, a plaintiff must demonstrate "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560. "Abstract injury," *City of Los Angeles v. Lyons*, 461

U.S. 95, 101 (1983), and "[a]llegations of possible future injury" that enter "the area of specula-tion and conjecture," "do not satisfy the[se] requirements," *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990). Rather, "[a] threatened injury must be certainly impending to constitute injury in fact." *Id.* (quotation marks omitted); *accord Lyons*, 461 U.S. at 102 (noting that threat of injury must be "immediate and real"). To satisfy these requirements, plaintiffs seeking pre-enforce-ment review of a statute imposing criminal sanctions—as distinct from a military-force authorization statute like section 1021, *infra* 37-40—must demonstrate that they face "a credible threat of prosecution." *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2717 (2010). Even under *Amnesty Int'l USA v. Clapper*—a case in which the Supreme Court has granted the government's petition for certiorari—a plaintiff seeking review of a statute authorizing potentially injurious government conduct must show that his or her fear of future injury from that conduct is objectively reasonable and the plaintiff has sustained ongoing, present harms in an effort to avoid the feared injury. 638 F.3d 118, 134 (2d Cir.), *reh'g en banc denied*, 667 F.3d 163 (2d Cir. 2011), *cert. granted*, 132 S. Ct. 2431 (May 21, 2012).[14] A plaintiff cannot establish standing if his or her fear is "fanciful, paranoid, or otherwise unreasonable." *Amnesty*, 638 F.3d at 134.

### 1. Plaintiffs' Activities as They Describe Them Do Not Implicate the Military Detention Authority Affirmed by Section 1021

All of plaintiffs' alleged injuries depend on their purported fear that section 1021 will be applied against them because of their journalistic activities and public advocacy. As discussed below, that fear is unreasonable and thus not sufficient for standing; moreover, this Court's requirement that the government "eliminat[e]" standing by offering assurances to plaintiffs,

---

[14]   Under *Amnesty*, a plaintiff may also establish standing by demonstrating that there is an "objectively reasonable likelihood" that a statute will be applied against him or her. 638 F.3d at 134. As explained below, however, plaintiffs here cannot show an objectively reasonable fear of detention under section 1021, and therefore also cannot demonstrate an "objectively reasonable likelihood" of injury.

PI Order 31-33, 37-38, 46, 56, 62, 65, is inconsistent with the clear law placing the burden on plaintiffs to demonstrate standing.

Regardless, the government has now satisfied the Court's requirement: As a matter of law, individuals who engage in the independent journalistic activities or independent public advocacy described in plaintiffs' affidavits and testimony, without more, are not subject to law of war detention as affirmed by section 1021(a)-(c), solely on the basis of such conduct. Put simply, plaintiffs' descriptions in this litigation of their activities, if accurate, do not implicate the military detention authority affirmed in section 1021.

That construction of section 1021 is consistent with the detention authority granted by the AUMF, which is informed by the law of war. Notably, plaintiffs have not argued that detention under the law of war would extend to the types of independent journalistic activities or independent public advocacy they have alleged. Moreover, the government's construction is consistent with longstanding Executive practice and interpretation: for ten years the Executive Branch has been applying its military detention authority under the AUMF, and it has never taken the position that a person could be made subject to its military detention authority merely for engaging in the independent journalistic activities or independent public advocacy at issue here. Thus, plaintiffs' claimed fear of detention based solely on the independent journalistic activities or independent public advocacy they allege is without any factual or legal foundation. *Wisconsin Right to Life, Inc. v. Paradise*, 138 F.3d 1183, 1185 (7th Cir. 1998) (despite "genuine apprehension," fear of enforcement not well founded due to longstanding consistent government practice and interpretation).

Plaintiffs criticize the government for advancing a new "standard" that they say provides "nothing more than a gloss on § 1021." Pls.' Trial Br. 17. But the government's submission on this point is not a "standard" at all; the standard remains the standard that the government

articulated under the AUMF and that was affirmed by Congress in section 1021. Rather, the government has stated this construction to address the Court's concerns: to "eliminate[] the standing of *these* plaintiffs" by "stat[ing] that as to *these* plaintiffs and the conduct as to which they would testify . . . § 1021 did not and would not apply." PI Order 33 (emphasis added).[15] Plaintiffs contend that the government has not "provide[d] the assurance the Court sought," but the government has directly answered the Court's query by stating, *supra* at 20, "plaintiffs' descriptions in this litigation of their activities, if accurate, do not implicate the military detention authority affirmed in section 1021." In addition, plaintiffs' assertion that the government's construction "exacerbates the First Amendment and Due Process violations found by the Court," Pls.' Trial Br. 19, is baseless, as addressed below. More fundamentally, though, plaintiffs have lost sight of the fact that the question the Court posed concerned standing, not the merits, and the negation of the alleged injury plaintiffs claim. Because the government has confirmed that section 1021 is not implicated by plaintiffs' alleged activities, they clearly have no standing according to this Court's analysis, and cannot maintain this suit.

Instead of accepting the assurances that the Court sought, and the government has provided, as to "*these* plaintiffs," plaintiffs now seek assurances regarding unspecified future conduct that plaintiffs vaguely suggest would be chilled, Pls.' Trial Br. 20—an unreasonable and impossible request that disregards the fact that their standing to maintain *this* facial challenge depends on the activities plaintiffs have already described. They demand to "know in advance" the precise scope of what activities may be covered, Pls.' Trial Br. 20-21; but as further explained below, *infra* Part II.B.2.b, even in the criminal law where stricter standards apply, the Supreme Court has admonished that "perfect clarity and precise guidance have

---

[15]   For that reason too, plaintiffs are incorrect that the "new standard establishes that section 1021(b)(2) is directed at or embraces speech," Pls.' Trial Br. 20; the construction is not a standard, and does not establish the scope of the statute except to make clear that plaintiffs' alleged activities are outside its scope.

never been required even of regulations that restrict expressive activity." *Holder*, 130 S. Ct. at 2719 (quotation marks omitted). Finally, plaintiffs imply that the government can never be permitted to "determine" whether expressive conduct is relevant, Pls.' Trial Br. 20-21; but of course, even in the criminal context, the government must "determine" whether an expressive act is within a statute's scope before taking enforcement action, *see, e.g.*, *United States v. Williams*, 553 U.S. 285, 298 (2008) ("Many long established criminal proscriptions . . . criminalize speech . . . .").

Indeed, plaintiffs' refusal to accept the government's assurance illustrates the consequence of erroneously shifting the burden: unwarranted litigation seeking limitations on U.S. authority based on opposition to U.S. policy. To require the government to bear that burden would cause the government to be inundated with copycat suits and be forced to give countless advisory opinions based on litigants' self-serving and malleable descriptions of their actual or anticipated activities, regardless of whether they have shown a reasonable fear of the statute's application. Mar. 29, 2012, Tr. ("Tr.") 268-69. The government cannot be required to define the outer boundaries of its authority by giving such *ex ante* assurances, especially to those who lack a sufficient "personal stake in the outcome of the controversy . . . to justify exercise of the court's remedial powers on [their] behalf." *Warth*, 422 U.S. at 498-99. And it would be particularly inappropriate for a court to require the government to do so in the context of ongoing military action.

Plaintiffs also object to the use of the word "independent" in the government's construction of section 1021, arguing it is a new distinction that is vague and overbroad. Pls.' Trial Br. 20-22. But the principle that "independent" actors may be outside the scope of the AUMF is in no way new; it has been reiterated by courts in this area for years. *Salahi*, 625 F.3d at 752 ("'purely *independent* conduct of a freelancer is not enough' to establish that an individual is

'part of' al-Qaida") (emphasis added) (quoting *Bensayah*, 610 F.3d at 725). Moreover, it is clear from context, and from the government's statements at the evidentiary hearing, that "independent" does not mean not "associated with [any] other people or groups," Pls.' Trial Br. 21, but independent of al-Qaeda, the Taliban, or their associated forces engaged in hostilities against the United States. *See* Tr. 277 (explaining that a propagandist who is part of al-Qaeda might be detainable under law of war).[16] Beyond that, plaintiffs marshal a series of speculative hypotheticals, Pls.' Trial Br. 21-22, disregarding "the incontrovertible proposition that it would indeed be undesirable for [a court] to consider every conceivable situation which might possibly arise in the application of complex and comprehensive legislation. The delicate power of pronouncing an Act of Congress unconstitutional is not to be exercised with reference to hypothetical cases thus imagined." *United States v. Raines*, 362 U.S. 17, 21-22 (1960) (quotation marks omitted). Again, it is not appropriate to expect the government to make categorical statements about the outer boundaries of its detention authority in hypothetical scenarios that could arise in an armed conflict, particularly because that authority is so context-dependent.

Finally, plaintiffs complain that the construction the government has offered is merely a "litigation position." Pls.' Tr. Br. 19 & n.18. But in a facial challenge a court is required to "'consider any limiting construction that a[n] . . . enforcement agency has proffered.'"

---

[16]   This case does not involve the kind of independent expressive activity that could be relevant to detention in light of law of war principles and the First Amendment. In contrast, for example, a person's advocacy, in a theater of active military operations, of military attacks on the United States or the intentional disclosure of troop movements or military plans to the enemy, or similar conduct that presents an imperative security threat in the context of an armed conflict or occupation, could be relevant in appropriate circumstances. *See* Geneva Convention (IV), arts. 5, 41-43, 78. As discussed further herein, the government cannot be expected to make categorical statements about the scope of its detention authority in hypothetical scenarios that could arise in an armed conflict, in part, because that authority is so context-dependent. Though plaintiffs criticize the notion that the scope of detention authority is "context dependent," Pls.' Trial Br. 21 n. 19, the government's position simply acknowledges longstanding law in the D.C. Circuit, *Salahi*, 625 F.3d at 751-52 (detention determinations "'must be made on a case-by-case basis by using a functional rather than a formal approach and by focusing upon the actions of the individual in relation to the organization'") (quoting *Bensayah*, 610 F.3d at 725).

*Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 456 (2008)
(quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 795-96 (1989) (quotation marks omitted)).
During the evidentiary hearing, the Court invited the government to make precisely this
representation, Tr. 229-35, and was prepared to accept it, *see* PI Order 46 ("eliminating these
plaintiffs' standing simply by representing that their conduct does not fall within the scope of
§ 1021 would have been simple."). And other courts have been willing to accept similar
representations from the government. *Graham v. Butterworth*, 5 F.3d 496, 499 (11th Cir. 1993)
(First Amendment challenge moot after prosecutor informed plaintiff conduct "would not fall
within the ambit of the statute"); *see Holder*, 130 S. Ct. at 2717 ("the Government has not
argued to this Court that plaintiffs will not be prosecuted"); *Babbitt v. United Farm Workers
Nat. Union*, 442 U.S. 289, 302 (1979) ("State has not disavowed any intention of invoking the
criminal penalty provision"); *cf. Chase Bank USA, N.A. v. McCoy*, 131 S. Ct. 871, 880 (2011)
(deferring to government interpretation of regulation advanced in brief).[17]

In sum, the government has now done precisely what the Court said would "eliminat[e]"
these plaintiffs' standing": it has "represent[ed] that their conduct does not fall within the scope
of § 1021." PI Order 46. Accordingly, even under this Court's rationale, plaintiffs lack standing.

### 2. Plaintiffs' Asserted Fear That Section 1021 Will Be Applied Against Them Is Unreasonable and Insufficient

Regardless of the above, plaintiffs have not met their burden to establish standing.

#### a. Plaintiffs Cannot Overcome Consistent Past Practice or the President's Clear Signing Statement to Demonstrate a Reasonable Fear of Detention

In over ten years, the government has never exercised its detention authority under the

---

[17]     Unlike in *Vermont Right to Life Comm. v. Sorrell*, 221 F.3d 376, 383-84 (2d Cir. 2000),
where the state merely indicated it had "no intention" of applying the statute against the plaintiff,
the government here is stating, as a matter of law and consistent with longstanding practice, that
plaintiffs are not subject to section 1021 based on their alleged activities—a position analogous not
to *Sorrell*, but to *Wisconsin Right to Life*, 138 F.3d at 1185, where the court held no standing
existed based on longstanding executive interpretation.

AUMF or section 1021 against plaintiffs or anyone else merely for engaging in independent journalistic activities or independent public advocacy. The fact that the government has had the authority now affirmed in section 1021 for years—and that plaintiffs have not identified a single instance in which the government has sought to use that authority against any individual solely for engaging in independent journalistic activities or public advocacy—resolves the standing issue here: against this backdrop, plaintiffs cannot show that they have a reasonable fear of detention under section 1021.[18]

In addition, the President made clear in the Signing Statement that "my Administration will not authorize the indefinite military detention without trial of American citizens." NDAA Signing Statement, 2011 U.S.C.C.A.N. at S12. Accordingly, the U.S. citizen plaintiffs cannot show injury in fact. *See Lujan*, 504 U.S. at 560-61 (injury must be "*imminent*, not conjectural or hypothetical" (emphasis added; quotation marks omitted)). Speculation that a future president may reverse the current policy and apply section 1021 against U.S. citizens is insufficient to show an injury in fact. *See id.*; *Lyons*, 461 U.S. at 104-06, 108 (speculation of future action against plaintiff insufficient to confer standing). For this additional reason, the U.S. citizen plaintiffs cannot establish standing.

---

[18]   While Hedges claims to have been detained for a few hours by military authorities on one occasion in 1991—ten years before the AUMF—he admitted that this was because he had been reporting outside of the press pool system, not because of support for belligerents in an armed conflict with the United States. Tr. 199-201. Hedges also claims to have been detained, for about one hour on one occasion by non-military personnel, over ten years ago upon his arrival at an airport, which he attributes (based on an overheard remark) to his purported inclusion on a watch list. Tr. 179-80. Nothing in the record suggests that this short detention was the result of Hedges' journalistic activities involving "al-Qaeda, the Taliban, or associated forces," and this short, long-ago detention does not support a reasonable fear of imminent military detention under the law of war, particularly since Hedges has continued to engage in his alleged expressive activities. Plaintiffs' assertions (again without citation) that Hedges has been detained at "airports" (plural) due to his "journalistic work" and was placed on a "watch list" for "independent speech or advocacy," Pls.' Trial Br. 22, 25-26, are unsupported. In any event, the government has represented that no plaintiff is subject to section 1021 based on the independent journalistic activities and independent advocacy described in their affidavits and testimony, thus rendering these assertions irrelevant.

### b.  Plaintiffs' Asserted Fear of Detention Is Not Supported by the Record

Nor can plaintiffs otherwise meet their burden. In the preliminary injunction order, the Court did not determine that plaintiffs had met their burden to show injury, but simply "assume[d]" as much based on the lack of assurances from the government, and similarly stated that based on plaintiffs' evidence, "one cannot predict" the immediacy of the alleged harm to plaintiffs. PI Order 33-34, 62. Those conclusions demonstrate that jurisdiction does not appear "affirmatively from the record." *DaimlerChrysler*, 547 U.S. at 342 n.3.

Plaintiffs' attempt to make that showing depends on the "fanciful, paranoid, or otherwise unreasonable" allegation that they fear detention, *Amnesty*, 638 F.3d at 134, as more exhaustively explained in the government's prior briefs to which the government respectfully refers the Court, Gov't Mar. 26, 2012, Mem. 14-28, Gov't May 4, 2012, Mem. 7-16. Hedges, for example, interprets section 1021 as authorizing "the military to seize and detain citizens and deny legal recourse to anyone who defies the corporate state," as "allow[ing] . . . the proverbial black van to be sent to any street in America and to pick up civilians and detain them," and as removing "any legal protection for those who dissent or oppose the crimes of state." Tr. 194-97; *see id.* 174-75, 177, 186. Less dramatically, but equally unreasonably, Hedges and the other plaintiffs assert that section 1021—contrary to its language and the longstanding Executive application of the same authority under the AUMF—would authorize detention of anyone even tangentially associated with any group listed by the State Department as a terrorist organization, or even any group listed by a foreign municipal police department on an informational bulletin about "terrorism/extremism," or described by nongovernment actors in emails as *not* having connections to unnamed radical groups. *See* Gov't May 4, 2012, Mem. 8-12 (describing and citing testimony).[19] Hedges and the other plaintiffs also interpret the phrase

---

[19]   Plaintiffs refer to documents described in their hearing testimony, *e.g.*, Pls.' Trial Br. 22, (continued...)

"associated forces" in section 1021 as encompassing any group that has been classified as a terrorist organization—a clear misinterpretation of the phrase that ignores its consistent interpretation by the government and the courts.

The Court, in its preliminary injunction order, emphasized that the testifying plaintiffs had shown an "actual fear" that their activities would bring them within the scope of section 1021. PI Order 37-38. But whether actual or not, their fear is subjective, and plaintiffs must demonstrate more to support standing; even under *Amnesty*, they must show, among other things, that their subjective fear is objectively reasonable. 638 F.3d at 134; *see also Laird v. Tatum*, 408 U.S. 1, 13-14 (1972) ("[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm"); *Alexander v. United States*, 509 U.S. 544, 554 (1993); *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 60 (1989). Plaintiffs have not done this, and have thus failed to establish an injury in fact.

### c. There Is Not a Sufficient Nexus Between Plaintiffs and "al-Qaeda, the Taliban, or Associated Forces"

The lack of any meaningful nexus between plaintiffs and al-Qaeda, the Taliban, or an associated force further demonstrates the unreasonableness of plaintiffs' purported fear of

---

[19]   (...continued)

25, but all but one were admitted to show the witnesses' states of mind, not for their truth (otherwise they would be inadmissible hearsay), and therefore cannot suffice to meet plaintiffs' burden of showing an actual injury in fact traceable to section 1021. The only document admitted for its truth was a report issued by the Department of Homeland Security. Court Ex. 5. But this report does not assert, or assert facts supporting the conclusion, that O'Brien's group US Day of Rage qualifies as an "associated force" under section 1021. Indeed, plaintiffs concede that US Day of Rage is not armed and has not entered the fight alongside al-Qaeda against the United States or its coalition partners. Tr. 40-42, 56. Plaintiffs misleadingly state that the DHS report shows that US Day of Rage has been "placed on a [DHS] extremist watch list," Pls.' Trial Br. 22, and "investigated by [DHS]." *id.* 25. The document shows no such thing; it purports to be a "Bulletin" concerning activities of two groups, "Anonymous" and "Adbusters." *See* Court Ex. 5. Similarly, plaintiffs' assertion (without citation) that Wargalla and O'Brien's groups "were directly identified . . . by government agencies as being part of or associated with extremist Muslim organizations," Pls.' Trial Br. 22, is entirely unsupported, as well as irrelevant.

27

detention. By its terms, section 1021(b)(2) applies only to persons who are a part of or provided substantial support to "al-Qaeda, the Taliban, or associated forces." As discussed above, the phrase "associated forces" encompasses only "co-belligerents" (as that term is understood in light of principles of the law of war), meaning, as interpreted by the Executive, an organized armed group that has entered the fight alongside al-Qaeda and is a co-belligerent with al-Qaeda or Taliban forces in hostilities against the United States or its coalition partners.

Plaintiffs have acknowledged that groups alleged to be at issue in this action, such as WL Central, US Day of Rage, Revolution Truth, WikiLeaks, and Occupy London, are not armed, much less co-belligerent with al-Qaeda or the Taliban in armed conflict with the United States. Gov't May 4, 2012, Mem. 12-13. They are accordingly not "associated forces" within the meaning of section 1021. Other alleged connections also do not support plaintiffs' claim of injury. Two of the testifying plaintiffs, Hedges and O'Brien, alleged only the extremely attenuated link to al-Qaeda, the Taliban, or an associated force of reporting on those groups for independent journalistic outlets. *See id.* 13 (citing testimony). Wargalla alleged only a disinclination to invite Hamas representatives to participate in online panels, Tr. 117, 125, 141-42; Pls.' Trial Br. 22, but besides the insubstantiality of that potential contact, a group like Hamas cannot qualify as an "associated force" under section 1021 solely for committing acts of terrorism, and plaintiffs have offered no evidence showing that Hamas is a co-belligerent of al-Qaeda or the Taliban. Jonsdottir alleges no connection to any armed group.[20] Thus, section 1021 has no application to plaintiffs' alleged activities, and for this additional reason plaintiffs have not shown an injury in fact.

---

[20]   The Court's statement in the preliminary injunction order that "each [plaintiff] testified to activities with or involving individuals or organizations that are 'associated forces' as defined by the Government," PI Order 55-56, is therefore incorrect.

### 3.   The Non-Citizen Plaintiffs Have Not Shown a Legally Cognizable Injury Under the First or Fifth Amendment

Wargalla and Jonsdottir have not shown a cognizable injury in fact for the additional reason that, on the facts developed in these proceedings, they have no risk of deprivation of any "legally protected interest[s]" afforded by the Constitution. *Lujan*, 504 U.S. at 560-61. Both Wargalla and Jonsdottir are unadmitted and nonresident aliens. Wargalla is a citizen of Germany and a resident of the United Kingdom who had never set foot in the United States before testifying in this matter, Wargalla Aff. ¶ 1; Tr. 117, whereas Jonsdottir is a citizen and resident of Iceland who has not traveled to the United States, Jonsdottir Aff. ¶¶ 1, 18. Indeed, neither has alleged or provided evidence of any substantial connection to the United States, and in fact both have failed to establish a credible basis for fearing any future detention by the United States. *See supra* Part I.B.1-2. On the facts alleged and presented by those plaintiffs, there is no support for recognizing a basis under the First Amendment or the Due Process Clause to enjoin the political branches of our government from exercising war powers. *See United States ex rel. Turner v. Williams*, 194 U.S. 279, 292 (1904); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990).

For similar reasons, Wargalla and Jonsdottir lack standing because they have not alleged facts establishing an interest falling within the zone of interests to be protected by the First and Fifth Amendments. Even where the constitutional requirements of Article III standing have been met, a plaintiff may still lack standing under prudential principles. *Valley Forge*, 454 U.S. at 475. Prudential standing exists when the "plaintiff's complaint fall[s] within the 'zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Id.* (quoting *Association of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 153

(1970)).[21] Under the facts alleged here, the particular interests in free speech, freedom of association, and due process asserted by Wargalla and Jonsdottir as a basis for seeking to enjoin the President of the United States as Commander-in-Chief, and those acting under his authority, do not fall within the zone of interests protected by the First or Fifth Amendments. *See DKT Mem. Fund Ltd. v. USAID*, 887 F.2d 275, 283-85 (D.C. Cir. 1989) (no prudential standing because "the interests in free speech and freedom of association of foreign nationals acting outside the borders, jurisdiction, and control of the United States do not fall within the interests protected by the First Amendment"). Accordingly, even if Wargalla and Jonsdottir had Article III standing, their claims still fail.

## C. Plaintiffs' Alleged Injuries Cannot Be Redressed by the Injunction They Seek

In addition to their inability to show an injury caused by section 1021, plaintiffs lack standing because they cannot establish redressability. Plaintiffs have not challenged the AUMF, under which the government asserts the identical detention authority that plaintiffs seek to enjoin with respect to section 1021. And the Court has confirmed that this challenge does not affect the government's AUMF authority. Plaintiffs therefore cannot meet their burden to show that "it [is] likely, as opposed to merely speculative, that the[ir] injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (quotation marks omitted); *accord Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement.").

Although plaintiffs have never addressed redressability, their apparent theory is that

---

[21]    "[T]he fact that the limitations of the standing doctrine . . . are termed 'prudential limitations' does not mean that the lower courts have discretion as to whether to apply these limitations or not. . . . [T]here is a nondiscretionary duty to apply the limitations." *Tax Analysts & Advocates v. Blumenthal*, 566 F.2d 130, 137 n.37 (D.C. Cir. 1977); *accord Leaf Tobacco Exporters Ass'n v. Block*, 749 F.2d 1106, 1112 (4th Cir. 1984).

striking down section 1021 will eliminate their alleged fear of military detention because of their journalistic activities and public advocacy. But invalidating section 1021 will not change plaintiffs' situation, because section 1021 merely affirms authority that the government already possessed under the AUMF. Indeed, plaintiffs clearly concede that enjoining section 1021 will have no effect on the government's authority under the AUMF. Pls.' Trial Br. 24-25 ("Because the government claims that the NDAA merely reaffirms the existing enforcement powers under the long-standing AUMF, the effect of the injunction on the government's powers must necessarily be 'nil.'"); *accord* PI Order 65 ("The AUMF does not have a 'sunset' provision: it is still in force and effect. Thus, . . . enjoining any action under § 1021 should not have any impact on the Government."). Such an injunction, therefore, would have no effect on plaintiffs' purported injuries. An injunction against section 1021 would therefore not affect the Executive's detention authority, and for the same reason would not redress plaintiffs' purported fear of detention. *See ACLU v. NSA*, 493 F.3d 644, 671 (6th Cir. 2007) (concluding that enjoining surveillance would not redress the plaintiffs' fears of having communications intercepted because of likelihood that same surveillance would still occur). Plaintiffs accordingly lack standing.

## II. The Permanent Injunction Should Be Denied on the Merits

Even if this Court had jurisdiction, it should still grant judgment to the government on the merits. Plaintiffs' challenge falls far short of the stringent criteria for succeeding on a facial or overbreadth challenge, as, properly read, section 1021 has a plainly valid core. And even considered as purportedly applied to plaintiffs, section 1021 is neither unconstitutionally vague nor an infringement on First Amendment rights. Thus, as a matter of law—with no necessity of balancing equities, considering the alleged irreparable injury to plaintiffs, or otherwise weighing the factors governing injunctive relief—plaintiffs' challenge must be dismissed.

## A. Applicable Legal Standards

Because plaintiffs seek to enjoin application of an act of Congress, which is presumed to be constitutional, they must make a "plain showing that Congress has exceeded its constitutional bounds." *United States v. Morrison*, 529 U.S. 598, 607 (2000). "[J]udging the constitutionality of an Act of Congress is 'the gravest and most delicate duty that [a court] is called on to perform,'" *Northwest Austin Mun. Utility Dist. No. One v. Holder*, 557 U.S. 193, 204-05 (2009) (quoting *Blodgett v. Holden*, 275 U.S. 142, 147-148 (1927) (Holmes, J., concurring)), and the Court must therefore accord "great weight to the decisions of Congress," *Printz v. United States*, 521 U.S. 898, 956 n.17 (1997) (quotation marks omitted).

In addition, Congress's and the Executive's determinations in the areas of national security, war powers, and military affairs must receive great deference from the courts. Although "Congress is [not] free to disregard the Constitution . . . the tests and limitations to be applied may differ because of the military context," and the courts must "recognize that the Constitution itself requires such deference to congressional choice" in those areas due to separation of powers and the "lack of competence on the part of the courts." *Rostker v. Goldberg*, 453 U.S. 57, 64-68 (1981); *accord Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988) (courts should not "intrude upon the authority of the Executive in military and national security affairs"); *Katcoff v. Marsh*, 755 F.2d 223, 234 (2d Cir. 1985) ("when a matter provided for by Congress in the exercise of its war power and implemented by the Army appears reasonably relevant and necessary to furtherance of our national defense it should be treated as presumptively valid and any doubt as to its constitutionality should be resolved as a matter of judicial comity in favor of deference to the military's exercise of its discretion").

**B. Section 1021 Is Constitutional**

**1. Plaintiffs' Facial Attacks Fail**

Plaintiffs' facial challenge is meritless. "Facial challenges are disfavored" as they "often rest on speculation" and "run contrary to the fundamental principle of judicial restraint that courts should [not] anticipate a question of constitutional law in advance of the necessity of deciding it." *Grange*, 552 U.S. at 450 (quotation marks and citations omitted). Accordingly, a facial-challenge plaintiff must establish "that the law is unconstitutional in all of its applications." *Id.* at 449 (quotation marks omitted). At the least, "a facial challenge must fail where the statute has a plainly legitimate sweep." *Id.* (quotation marks omitted). Thus, "if a statute has a core meaning that can reasonably be understood, then it may validly be applied to conduct within the core meaning, and the possibility of such a valid application necessarily means that the statute is not vague on its face." *Brache v. Westchester County*, 658 F.2d 47, 51 (2d Cir. 1981).

In this case, this Court has already clearly held that "[t]he statute at issue here has a plainly legitimate sweep." PI Order 47. That conclusion is beyond any serious question: as the Court observed, section 1021 was intended to cover those who have entered the fight alongside al-Qaeda, the Taliban or an associated force. *Id.* 48. No one doubts the legitimacy of that purpose, and its legitimate sweep is illustrated by the numerous cases that have upheld the preexisting wartime authority section 1021 affirms. Even as to detention of U.S. citizens, in *Hamdi* the Supreme Court held that "[t]here is no [constitutional] bar to this Nation's holding one of its own citizens as an enemy combatant," at least where the individual in question was "part of or supporting forces hostile to the United States or coalition partners in Afghanistan, and who engaged in an armed conflict against the United States." 542 U.S. at 516-19; *see id.* at 589 (Thomas, J., dissenting); *cf. Ex Parte Quirin,* 317 U.S. 1, 29-35, 37 (1942) (law of war

applied to U.S. citizen). That should be the end of plaintiffs' facial challenge: questions about the precise outer bounds of this legitimate authority cannot support a facial challenge, and under the rule of *Grange* and other precedents, the law's "plainly legitimate sweep" means the facial challenge "must fail." 552 U.S. at 449; *accord United States v. Stevens*, 130 S. Ct. 1577, 1587 (2010).

For similar reasons, plaintiffs cannot succeed on their overbreadth claim. An overbreadth claim is a "second type of facial challenge," applicable in the First Amendment context, "under which a law may be overturned as impermissibly overbroad because a substantial number of its applications are unconstitutional." *Grange*, 552 U.S. at 449 n.6 (quotation marks and citations omitted). The substantiality requirement is critical: courts must "vigorously enforce[] the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Williams*, 553 U.S. at 292-93 (emphasis in original); *accord Adams v. Zelotes*, 606 F.3d 34, 38 (2d Cir. 2010). Invalidation on grounds of substantial overbreadth is considered "strong medicine," *Williams*, 553 U.S. at 293 (quotation marks omitted), that courts must apply "with hesitation, and then 'only as a last resort,'" *Los Angeles Police Dep't v. United Reporting Pub. Corp.,* 528 U.S. 32, 39 (1999) (quoting *New York v. Ferber,* 458 U.S. 747, 767 (1982)). The claimant "bears the burden of demonstrating, from the text of the law and from actual fact, that substantial overbreadth exists." *Virginia v. Hicks*, 539 U.S. 113, 122 (2003) (quotation marks, brackets, and citation omitted).

In addition, for a statute to be subject to facial overbreadth attack, it must be directed at speech: "[r]arely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech." *id.* at 124; *see Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800 n.19 (1984) (statute must "unquestionably attach[] sanctions to protected conduct"). When

"conduct" rather than "'pure speech'" is at issue, "[a]pplications of the [challenged] policy that violate the First Amendment . . . [must] be remedied through as-applied litigation." *Hicks*, 539 U.S. at 124; *accord Williams*, 553 U.S. at 302-03 (hypothetical application of statute must be addressed as applied, and, if successfully challenged, "the existence of that exception would not establish that the statute is *substantially* overbroad").

These principles defeat plaintiffs' overbreadth claim. As discussed above, this Court already concluded that section 1021 has a "plainly legitimate sweep." PI Order 47. But the Court did not proceed to the next step of overbreadth analysis, which is to assess whether plaintiffs had met their burden to establish that the statute's purported overbreadth is "*substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Williams*, 553 U.S. at 292-93; *accord Hicks*, 539 U.S. at 118-20. It is not. Section 1021's "plainly legitimate applications" are illustrated by the large number of persons lawfully detained in Afghanistan under the AUMF, as well as by the numerous decisions upholding the government's detention authority relative to Guantanamo detainees. *See, e.g., Barhoumi,* 609 F.3d at 432. By contrast, plaintiffs have not shown "from actual fact," *Hicks*, 539 U.S. at 122, that section 1021 or the AUMF has ever been or is ever likely to be applied to anyone on the basis of the kind of independent expressive activity they describe. Indeed, even accepting the Court's premise that section 1021 could apply to these plaintiffs' alleged activities—a proposition the government has now refuted—that application would be minuscule in comparison to the plainly legitimate law-of-war detention of enemy forces engaged in hostilities against the United States.[22] "[T]here comes a point at which the chilling effect of an overbroad law, significant though it

---

[22]   Although the context of the criminal statute considered in *Holder* is very different from that presented here, in that case the Court explained that "'material support' . . . most often does not take the form of speech at all. And when it does, [it] cover[s] only a narrow category of speech to, under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations." 130 S. Ct. at 2723.

may be, cannot justify prohibiting all enforcement of that law—particularly a law that reflects legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct." *Hicks*, 539 U.S. at 119 (quotation marks omitted).

Moreover, not even plaintiffs contend that section 1021 is directed at speech or expressive activities. Instead, as this Court has said, "the [expressive] conduct in which the plaintiffs here engage is without a doubt *not* the core conduct that is intended to be covered by the statute." PI Order 47. Again that is plainly correct; the statute is, as the Court concluded, directed at the detention of individuals who are part of or substantially supported al-Qaeda, Taliban, or associated forces engaged in hostilities against the United States and its coalition partners. Thus, because section 1021 "is not specifically addressed to speech or to conduct necessarily associated with speech," it cannot be challenged as facially overbroad. *Hicks*, 539 U.S. at 124.

Finally, the overbreadth challenge fails because only plaintiffs whose expression is unprotected may bring overbreadth challenges. "[A] person whose activity could validly be suppressed under a more narrowly drawn law is allowed to challenge an overbroad law because of its application to others," *Taxpayers for Vincent*, 466 U.S. 789, 800 n.19 (quotation marks omitted), acting as their "surrogate litigator," *Board of Trustees of SUNY v. Fox*, 492 U.S. 469, 481-83 (1989). But "where the parties challenging the statute are those who desire to engage in protected speech that the overbroad statute purports to punish," a facial overbreadth action does not lie, for plaintiffs may assert their own rights rather than those of chilled third parties, and only the application of the statute to those plaintiffs' protected speech should be excised as unconstitutional. *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 503-04 (1985) (proper overbreadth plaintiff is "individual whose own speech or expressive conduct may validly be prohibited or sanctioned"); *accord Taxpayers for Vincent*, 466 U.S. at 802 ("inappropriate to entertain an overbreadth challenge" where plaintiffs do not assert third-party rights different

36

from their own); *American Booksellers Found. v. Dean*, 342 F.3d 96, 104-05 (2d Cir. 2003). Thus, courts should not "proceed to an overbreadth issue unnecessarily—that is, before it is determined that the statute would be valid as applied," *Fox*, 492 U.S. at 484-85; *accord Dean*, 342 F.3d at 105, lest constitutional questions be unnecessarily decided and the overbreadth doctrine become "a means of mounting gratuitous wholesale attacks upon state and federal laws," *Fox*, 492 U.S. at 485; *Renne*, 501 U.S. at 324.

Those requirements are fatal to plaintiffs' overbreadth claim. They do not concede that section 1021 could validly be applied to them; precisely the opposite. And indeed the government has stated here that section 1021 would not be applied to the kind of independent expression they describe themselves as engaging in. Plaintiffs therefore cannot bring a facial overbreadth challenge; they may only assert their own rights and, if successful, may only obtain relief from the statute as applied. *Brockett*, 472 U.S. at 504 ("normal rule [is] that partial, rather than facial, invalidation is the required course"); *accord Dean*, 342 F.3d at 105.[23]

### 2.  Plaintiffs' Vagueness Challenge Fails

Even in an as-applied challenge, plaintiffs' vagueness challenge is insufficient. Section 1021 is not a prohibitory statute, and accordingly not subject to constitutional vagueness analysis at all. And even if it were, it would pass that scrutiny.

#### a.  Military-Force Authorization Statutes Are Not Susceptible to Vagueness Analysis

As a threshold matter, a military-force authorization—or a statute like section 1021, restating and rearticulating part of such a force authorization—is not a proper subject of vagueness analysis. Authorizations of military force (which encompass detention authority,

---

[23]  Such an as-applied remedy is available for Guantanamo detainees through habeas corpus. *See Boumediene*, 553 U.S. at 732-33.

*Hamdi*, 542 U.S. at 518) are always, and necessarily, stated in general terms.[24] Given the constantly evolving nature of armed conflict, the government's ability to conduct military operations effectively and to succeed in its armed conflicts requires flexibility and the ability to adjust to changing circumstances, including the ability to identify hostile forces that were not involved at the outset or named in Congress's authorization.[25] But despite the generality of historical authorizations of military force, no case has ever required Congress to conform such authorizations to the vagueness principles plaintiffs now invoke. By extension, when Congress affirms one particular "incident to war" that is included in a military-force authorization, *Hamdi*, 542 U.S. at 518, it similarly need not conform to vagueness principles. To the contrary, the type of concerns that give rise to vagueness doctrine cannot be squared with the nature of military operations: while courts act under vagueness principles to require legislatures to "set[] the standards of the criminal law" as to "establish minimal guidelines to govern law enforcement," *Smith v. Goguen*, 415 U.S. 566, 575 (1974), there is no similar traditional role regarding military operations—an arena the courts normally avoid.

Indeed, a military-force authorization is different in kind from the types of statutes—those that include "the exaction of obedience to a rule or standard," *A.B. Small Co. v. American Sugar Refining Co.*, 267 U.S. 233, 239 (1925)—to which vagueness principles apply. Vagueness

---

[24]   *E.g.*, Auth. for Use of Military Force Against Iraq Res. of 2002, Pub. L. No. 107-243, 116 Stat. 1498; Authorization for Use of Military Force Against Iraq Resolution, Pub. L. No. 102-1, 105 Stat. 3 (1991); Joint Res. of Aug. 10, 1964, Pub. L. No. 88-408, 78 Stat. 384 (Vietnam); Joint Res. of Dec. 8, 1941, ch. 561, 55 Stat. 795 (Japan); Joint Res. of Apr. 6, 1917, ch. 1, 40 Stat. 1 (Germany); Act of Apr. 25, 1898, ch. 189, 30 Stat. 364 (Spain); Act of May 13, 1846, ch. 16, 9 Stat. 9 (Mexico); Act of June 18, 1812, ch. 102, 2 Stat. 755 (Britain).

[25]   For example, in the Second World War, the United States engaged in military operations against military forces of Vichy France—even though Congress had not specifically authorized the use of military force against it and despite initially maintaining diplomatic relations with its government—because it was allied with Germany and engaged in hostilities against Britain. *See* Curtis A. Bradley & Jack L. Goldsmith, *Congressional Authorization and the War on Terrorism*, 118 Harv. L. Rev. 2047, 2111-12 (2005), and sources cited at nn.286-90.

doctrine serves to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Perez v. Hoblock*, 368 F.3d 166, 174 (2d Cir. 2004). But it does not provide a basis for challenging a statute that "does not prohibit any conduct." *Kinnell v. Graves*, 265 F.3d 1125, 1128 (10th Cir. 2001); *accord United States v. Payden*, 598 F. Supp. 1388, 1396 (S.D.N.Y. 1984), *rev'd on other grounds*, 759 F.2d 202 (2d Cir. 1985). Section 1021 falls in the latter category. It is not a criminal statute, as the Supreme Court has recognized: detention of those engaged in hostilities against the United States serves to prevent them "from returning to the field of battle and taking up arms once again," and not as "revenge [or] punishment." *Hamdi*, 542 U.S. at 518 (quotation marks omitted). Contrary to this Court's conclusion that a detention authorization is "the analytical equivalent of a penal statute," PI Order 54, *Hamdi* noted that detention under such an authorization is "devoid of all penal character," and the detainee is "no convict." *Hamdi*, 542 U.S. at 518 (quotation marks omitted); *id.* at 592-93 (Thomas, J., dissenting) (distinguishing military detention from criminal punishment).[26] Nor does section 1021 otherwise provide a rule or standard of conduct for any person outside the government. Under the law of war, it is clear that those who engage in certain activities (in particular, joining an enemy force) may be lawfully detained,[27] and section 1021 affirms the government's authority to impose that consequence in the present hostilities and states a definitional framework for doing so. But it does not itself prohibit conduct—any

---

[26]   Accordingly, the process accorded to a detainee need not meet standards for criminal trials. *Boumediene*, 553 U.S. at 783. Similarly, scienter requirements are different; a conscripted member of an enemy force may undeniably be detained. *Cf. al-Adahi v. Obama*, 613 F.3d 1102, 1108 (D.C. Cir. 2010) (specific motives for actions immaterial to lawful detention).

[27]   *See, e.g.*, Geneva Convention (III) Relative to the Treatment of Prisoners of War, 12 Aug. 1949, arts. 3 (contemplating detention of members of armed forces in non-international armed conflicts), 4 (contemplating detention of members of state armed forces and certain militias, volunteer corps, and organized resistance movements).

more than the congressional resolution authorizing military force against Germany in 1941[28] prohibited anyone from being part of the Wehrmacht, even though such a person was plainly subject to capture and detention. *See Hamdi*, 542 U.S. at 518-19, 524 (citing *In re Territo*, 156 F.2d 142, 143-48 (9th Cir. 1946)); *Colepaugh v. Looney*, 235 F.2d 429, 432 (10th Cir. 1956). Just as the bail statute in *Payden* "establishe[d] a framework . . . to detain an individual" but "[did] not prohibit conduct," 598 F. Supp. at 1396; *see Kinnell*, 265 F.3d at 1128, section 1021 specifies a framework for imposing lawful consequences without itself proscribing any acts.

Therefore, section 1021 cannot be said to run afoul of vagueness doctrine. In fact, plaintiffs' entire vagueness argument is built on a paradox. They could not challenge the AUMF itself for vagueness, as that statute, consistent with historical authorizations of military force, grants authority to the President and does not state any standard for or prohibition of conduct. But the AUMF includes the government's detention authority, *Hamdi*, 542 U.S. at 518, and for years the government has been applying that authority according to the definitional framework that it has explained to the courts. According to plaintiffs' theory, by codifying that definitional framework—and thus providing *more* notice to the public about what the government may do— Congress has created an issue of vagueness, which is rooted in the due-process concept of *lack* of notice. *See Holder*, 130 S. Ct. at 2719; *Williams*, 553 U.S. at 304. Thus if the AUMF stood alone, the government could continue to apply the Executive's definitional framework, but once Congress endorses that framework it becomes unconstitutional. That internally contradictory position cannot prevail.

### b. Section 1021 Is Not Impermissibly Vague

In any event, properly construed, section 1021 is not unconstitutionally vague. "The strong

---

[28]   Joint Res. of Dec. 11, 1941, ch. 564, 55 Stat. 796 ("the President is hereby authorized and directed to employ the entire naval and military forces of the United States and the resources of the Government to carry on war against the Government of Germany").

presumptive validity that attaches to an Act of Congress has led [the Supreme] Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963); *accord FEC v. Nat'l Right To Work Comm.*, 459 U.S. 197, 211 (1982) (statute's terms "may leave room for uncertainty at [its] periphery"); *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers,* 413 U.S. 548, 578-79 (1973). Words are incapable of "mathematical certainty," and no law is required to achieve "meticulous specificity," which would come at the cost of "flexibility and reasonable breadth." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) (quotation marks omitted); *accord Betancourt v. Bloomberg*, 448 F.3d 547, 552 (2d Cir. 2006). Thus, even when criminal prosecutions are at issue, a statute is only unconstitutionally vague when "'men of common intelligence must necessarily guess at its meaning and differ as to its application.'" *Farrell v. Burke*, 449 F.3d 470, 485 (2d Cir. 2006) (quoting *Connally v. General Construction Co.,* 269 U.S. 385, 391 (1926)). Phrases far less definite than "substantially support" or "associated forces" have been held to be "imprecise . . . but . . . surely not 'incomprehensible,'" and thus to survive vagueness review. *United States v. Clark*, 582 F.3d 607, 614 & n.11 (5th Cir. 2009) (quoting *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971), and listing phrases).[29]

In assessing a vagueness challenge, "[t]he particular context is all important." *American Commc'ns Ass'n v. Douds*, 339 U.S. 382, 412 (1950). "There is little doubt that imagination can conjure hypothetical cases in which the meaning of [broad] terms will be in nice question. The

---

[29]   *Clark* upheld "immoral purpose," and (citing the list in *Jordan v. DeGeorge*, 341 U.S. 223, 231 n.15 (1951)), noted other phrases held not to be vague: "restraint of trade," "crime involving moral turpitude," "in excess of the number of employees needed by such licensee to perform actual services," "any offensive, derisive or annoying word," "connected with or related to the national defense," "psychopathic personality," "willfully overvalues any security," "fair and open competition," "reasonable variations shall be permitted," "unreasonable waste of natural gas," "political purposes," "range usually occupied by any cattle grower."

applicable standard, however, is not one of wholly consistent academic definition of abstract terms. It is, rather, the practical criterion of fair notice to those to whom the statute is directed." *Id.* Thus, a statute must be construed as a whole, and in light of "narrowing context" and "settled legal meanings" to ensure that it does not call for "untethered, subjective judgments." *Holder*, 130 S. Ct. at 2720 (quotation marks omitted).

Read as a whole and taken in context, section 1021 plainly satisfies constitutional requirements. As explained above, it is tied to the military action against al-Qaeda and Taliban forces authorized by the AUMF, affirming the legality of certain detention (including of those whom *Hamdi* recognized could be detained) and stating a definitional framework respecting the government's detention authority established by the AUMF. All the terms of the provision are informed by this context, and, as previously explained, principles of the law of war provide the specific interpretive context to the phrase "substantially supported" and others used in section 1021. *Supra* Background Parts B, C. Indeed, in the context of a statute affirming the detention authority contained in an authorization of military force, one of the dictionary definitions of "support" previously offered by plaintiffs jumps out as obviously most relevant: "ASSIST, HELP <bombers *supported* the ground troops>." http://www.merriam-webster.com/ dictionary/support (quoted in Pls.' Apr. 16, 2012, Mem. 23). Even though that definition of "support" lends itself easily to the military example given, but has nothing to do with expression, plaintiffs somehow contend that "support" must mean speech independent of al-Qaeda, the Taliban, or associated forces. Pls.' Post-Hrg. Mem. 23. Common sense and the context of the statute require otherwise.

Nor is "substantially support" a phrase tied to "wholly subjective judgments" or one that gives unfettered discretion to the government. *Holder*, 130 S. Ct. 2720. Plaintiffs, echoing the Court, point to the "narrowing definitions" the Supreme Court cited in upholding the material-

support statute in *Holder*. Pls.' Trial Br. 23 (citing 130 S. Ct. at 2720); PI Order 56-57. But as in this case, "narrowing context" may serve the same function. 130 S. Ct. at 2720. Moreover, while statutory definitions mitigated possible vagueness in *Holder*, nowhere did the Court say that such a definitional section is necessary for a statute to be saved from constitutional challenge. And in fact, the Supreme Court has repeatedly upheld statutes against vagueness challenges despite the absence of a definitional provision,[30] contrary to this Court's view that that aspect is "standard." PI Order 4.[31] The question in a vagueness challenge is whether the statute as a whole provides the requisite notice, not the precise statutory structure Congress uses to do so. Read as a whole and in context, section 1021 cannot reasonably be seen as vague, and survives plaintiffs' constitutional challenge.

## C. Plaintiffs Cannot Show Their Entitlement to Injunctive Relief

The Court need not reach the standards for equitable relief, as plaintiffs lack standing and there is no merit to their substantive claims. *See Winter v. NRDC*, 555 U.S. 7, 32-33 (2008) ("[t]he standard … for a permanent injunction … [requires] actual success [on the merits]"). But even so, plaintiffs cannot establish their entitlement to a permanent injunction—"a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2761 (2010); *accord Grange*, 552 U.S. at 458. A plaintiff seeking a permanent injunction "'must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships

---

[30]   *E.g.*, *Skilling v. United States*, 130 S. Ct. 2896, 2933 (2010); *Williams*, 553 U.S. at 304-07; *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 500-02 (1982); *United States v. Vuitch*, 402 U.S. 62, 71-72 (1971); *Jordan v. De George*, 341 U.S. 223 (1951); *Nash v. United States*, 229 U.S. 373 (1913).

[31]   The Court also stated that section 1022 of the NDAA has a "lengthy definitional provision[]." PI Order 56. That is not the case; section 1022 has no more of a definitional provision than section 1021 does.

between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'" *Monsanto*, 130 S. Ct. at 2756 (quoting *eBay Inc. v. MercExchange*, L.L.C., 547 U.S. 388, 391 (2006)). In addition, "[i]t is not enough for a court considering a request for injunctive relief to ask whether there is a good reason why an injunction should *not* issue; rather, a court must determine that an injunction *should* issue . . . ." *Monsanto*, 130 S. Ct. at 2757 (emphasis in original).

### 1. Plaintiffs Cannot Establish Irreparable Harm

First, plaintiffs cannot meet their burden of establishing irreparable injury for the same reasons they cannot show standing. As discussed above, plaintiffs have not established that they have a reasonable fear of detention under section 1021 and, thus, that they will sustain irreparable harm absent an injunction. Although the loss of First Amendment freedom is itself an irreparable injury, plaintiffs still must demonstrate that that loss has occurred, *Salinger v. Colting*, 607 F.3d 68, 81-82 (2d Cir. 2010), a task in which they have failed.

### 2. The Equities and the Public Interest Require That the Injunction Be Denied

Nor have plaintiffs demonstrated that a balancing of the equities supports their requested injunction. Plaintiffs offer no argument with respect to such balancing of the equities other than to assert that because the effect of the injunction will be "nil," the government will suffer no harm from that injunction. Pls.' Trial Br. 24. This approach, however, turns the appropriate standard on its head, for the Supreme Court has explained that "[i]t is not enough for a court considering a request for injunctive relief to ask whether there is a good reason why an injunction should *not* issue; rather, a court must determine that an injunction *should* issue . . . ." *Monsanto*, 130 S. Ct. at 2757 (emphasis in original). For all the reasons explained above, plaintiffs have not established that they have a reasonable fear that section 1021 will be applied against them and, thus, that any appropriate equity supports the injunction they seek.

On the other hand, there is a significant public interest in not enjoining a duly enacted and presumptively constitutional statute concerning a military detention standard that has been upheld by other courts.

Moreover, in this case, which involves the Constitution's separation of powers in the context of national defense and security, it is particularly inappropriate to issue an injunction. Even in an ordinary case that does not involve war powers during an ongoing armed conflict, the power to issue an injunction is always discretionary, and requires careful consideration of the public consequences of an injunction. *eBay*, 547 U.S. at 391; *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982). In national security and military matters, courts are properly reluctant to exercise that equitable discretion. *Holder*, 130 S. Ct. at 2727 (reluctance due, in part, to the "lack of competence on the part of the courts" in regard to matters of national security (quotation marks omitted)). And constitutional concerns become particularly acute where the injunction would entail "judicial intrusion into the Executive's ability to conduct military operations abroad." *Munaf v. Geren*, 553 U.S. 674, 700 (2008); *accord Winter*, 555 U.S. at 24-25. Indeed, "it would be an abuse of . . . discretion to provide discretionary relief" regarding military operations approved by "the President [and] the Secretary of Defense." *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208 (D.C. Cir. 1985) (Scalia, J.).[32]

More generally, based on separation-of-powers principles, the courts have recognized that an injunction running against the President would be extraordinary, and have questioned whether such an order would ever be appropriate regarding the President's "performance of his official duties." *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866); *accord Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992) (plurality) (the "grant of injunctive relief against the President himself is extraordinary, and should have raised judicial eyebrows," and

---

[32]   For the same reasons, the declaratory relief sought by plaintiffs should be denied.

generally courts lack jurisdiction to enjoin President); *id.* at 825-29 (Scalia, J., concurring and concurring in judgment) (discussing "unbroken historical tradition . . . implicit in separation of powers" against enjoining President). The reasons for denying injunctive relief against the President are all the more compelling where, as here, a plaintiff seeks relief against the President as Commander-in-Chief under the Constitution. Injunctive relief is also inappropriate against the Secretary of Defense in this case, where Executive Branch officers assist the President in carrying out powers and responsibilities vested in the President by the Constitution, as is true of the Commander-in-Chief power, and "their acts are his acts." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 166 (1803); *see also* 10 U.S.C. § 113(b) (Secretary is "principal assistant to the President" in defense matters, whose authority is "[s]ubject to the direction of the President"); *id.* § 162(b) ("Unless otherwise directed by the President, the chain of command to a unified or specified combatant command runs—(1) from the President to the Secretary of Defense; and (2) from the Secretary of Defense to the commander of the combatant command."). While in other contexts an injunction might run against an Executive Branch officer responsible for assistance of the President, *see Franklin*, 505 U.S. at 803, no such injunction is appropriate with respect to future military operations, including detention.

Plaintiffs contend that the President's power is "left unimpaired" by an injunction against section 1021 (and more generally, that there will be no "interference with any material security function") due to the existence of other authorities, specifically NDAA § 1022, the AUMF, and the material-support criminal statute. Pls.' Trial Br. 24-25 & n.20.[33] That argument says nothing about the infringement on separation of powers. But more fundamentally, it is not for plaintiffs—or this Court—to determine which authorities are necessary or appropriate for the

---

[33]    Section 1022 covers a narrower group of potential detainees; the material-support statute has nothing to do with law-of-war detention; and plaintiffs' repetition of their concession that the identical authority to section 1021 under the AUMF means that an injunction has no effect demonstrates their lack of standing under the redressability requirement, as explained above.

conduct of an ongoing war.

### 3. An Injunction, If Issued, Should Be Limited in Scope

While for all the reasons above, judgment should enter for the government, should the Court disagree and issue an injunction, its scope should be confined to enjoin application of the "substantially supported" language in section 1021(b)(2), as against the plaintiffs alone, and (as with the preliminary injunction) expressly permitting the application of the detention authority under the AUMF.

Plaintiffs have not challenged the language of section 1021(b)(2) that deems those who are "part of . . . al-Qaeda, the Taliban, or associated forces" to be "covered persons." Indeed, plaintiffs have expressly disavowed making any such challenge. Tr. 282 ("We don't dispute that one who is a part of and engages in hostilities can be [detained]."). When asked to identify the root of their fear, plaintiffs focused on the "substantially support" language, *id.*; *see also id.* 74, 130, 134, 162-63; not one plaintiff mentioned the "part of" language. Moreover, as plaintiffs recognize, the D.C. Circuit has repeatedly upheld detentions in the habeas cases under the same "part of" language that now appears in section 1021. Pls.' Trial Br. 9. Accordingly, any injunction would have to leave the "part of" language intact. *See* June 6, 2012, Order 2 (declining to enjoin portions of section 1021 as to which plaintiffs did not seek relief).

Any injunction must also be confined to these particular plaintiffs. It is well established that courts generally should not "provide relief to nonparties when a narrower remedy will fully protect the litigants." *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 477-78 (1995); *accord Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (injunctive relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs"); *Waldman Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994) ("injunctive relief should be narrowly tailored to fit specific legal violations"). This principle also applies to

facial challenges. *Virginia Society for Human Life, Inc. v. FEC*, 263 F.3d 379, 390, 392-94 (4th Cir. 2001); *accord Monsanto*, 130 S. Ct. at 2760 (claimants who "do not represent a class . . . [can]not seek to enjoin . . . an [act] on the ground that it might cause harm to other parties"); *Meinhold v. U.S. Dep't of Defense*, 34 F.3d 1469, 1480 (9th Cir. 1994). The reluctance to issue nationwide injunctions is based on, among other things, the fact that such injunctions have the effect of stalling development of the law by "precluding other [courts and other] circuits from ruling on the constitutionality of [challenged provisions]." *Virginia Society*, 263 F.3d at 393.[34]

Here, preventing the government from enforcing section 1021 against other parties would not provide additional relief to plaintiffs, but would potentially interfere with the rulings and jurisdiction of the D.C. Circuit. Courts generally do not award relief beyond the parties, as to do so would "'substantially thwart the development of important questions of law by freezing the first final decision rendered on [this] particular issue,'" and potentially "deprive the Supreme Court of the benefit of decisions from several courts of appeals." *Id.* (quoting *United States v. Mendoza*, 464 U.S. 154, 160 (1984). Moreover, issuing a broader injunction would be particularly inappropriate in this case, where the Court has already recognized that section "1021 is not aimed at expressive conduct of the type [at issue here]," and "clearly appears to have some potentially constitutional applications to nonspeech activities." Tr. 10, 259-60.

Finally, to the extent this Court were to issue an injunction, it should make clear—as it did

---

[34]   This Court sought to distinguish *Virginia Society* by pointing out that "'[n]ationwide injunctions are appropriate if necessary to afford relief to the prevailing party.'" June 6, 2012, Order 7 (quoting *Virginia Society*, 263 F.3d at 393)). But, as stated above, a nationwide injunction would provide no additional relief to plaintiffs, and so is not necessary. Nor is *Meinhold* (brought under the equal protection component of the due process clause) distinguishable on the ground that it is not a "due process or First Amendment case[]." June 6, 2012, Order 5. The court in *Meinhold* held that the Navy regulation at issue was unconstitutional to the extent it was applied against *anyone* in the challenged manner, but nevertheless vacated the nationwide injunction, observing that "[t]his is not a class action," and "[a]n injunction should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." 34 F.3d at 1478-80 (quotation marks omitted). *Meinhold* is thus directly on point.

in the preliminary injunction order, PI Order 65—that the injunction does not affect the government's authority under the AUMF. Plaintiffs have not challenged the AUMF, and have argued that an injunction would *not* affect the government's authority under the AUMF. Pls.' Trial Br. 24-25 ("the effect of the injunction on the government's powers," including its powers under the AUMF, "must necessarily be 'nil'"). Accordingly, any injunction should make clear that the government's detention authority under the AUMF is unaffected.

## Conclusion

For the reasons stated above, and on the complete record before the Court, judgment should be entered for the government, and this action should be dismissed.

Dated:    New York, New York                    Respectfully submitted,
            July 23, 2012

                                     PREET BHARARA
                                     United States Attorney for the
                                     Southern District of New York

                  By:    /s/ Benjamin H. Torrance
                                     BENJAMIN H. TORRANCE
                                     CHRISTOPHER B. HARWOOD
                                     Assistant United States Attorneys
                                     86 Chambers Street
                                     New York, New York 10007
                                     Telephone: 212.637.2703, .2728
                                     Fax: 212.637.2702
                                     E-mail: benjamin.torrance@usdoj.gov
                                                 christopher.harwood@usdoj.gov