USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: September 12, 2012

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
:
CHRISTOPHER HEDGES, DANIEL ELLSBERG,      :
JENNIFER BOLEN, NOAM CHOMSKY, ALEXA       :
O'BRIEN, US DAY OF RAGE, KAI WARGALLA,    :     12 Civ. 331 (KBF)
HON. BRIGITTA JONSDOTTIR M.P.,            :
:     OPINION AND ORDER
                            Plaintiffs,   :
:
            -v-                           :
:
BARACK OBAMA, individually and as         :
representative of the UNITED STATES OF    :
AMERICA; LEON PANETTA, individually       :
and in his capacity as the executive     :
and representative of the DEPARTMENT      :
OF DEFENSE, JOHN MCCAIN, JOHN BOEHNER,    :
HARRY REID, NANCY PELOSI, MITCH           :
MCCONNELL, ERIC CANTOR as                 :
representatives of the UNITED STATES      :
OF AMERICA,                               :
:
                            Defendants.   :
----------------------------------------X

KATHERINE B. FORREST, District Judge:

On May 16, 2012, this Court preliminarily enjoined

enforcement of § 1021(b) of the National Defense Authorization

Act for Fiscal Year 2012, Pub. L. No. 112-81, 125 Stat. 1298

(Dec. 31, 2011)("the NDAA").  See Hedges v. Obama, No. 12 Civ.

331, 2012 WL 1721124 (S.D.N.Y. May 16, 2012) (order granting

preliminary injunction) (the "May 16 Opinion").  On June 6,

2012, in response to a footnote contained in the Government's[1]

---

[1] "The Government" as used herein refers to those defendants in this action
that are properly before the Court.  See Hedges, 2012 WL 1721124, at *12.

motion for reconsideration suggesting an unduly narrow interpretation of that ruling, this Court issued a summary order stating that the injunction was intended to--and did apply to-- any and all enforcement of § 1021(b)(2), not simply to plaintiffs in this lawsuit.[2]  See Hedges v. Obama, No. 12 Civ. 331, 2012 WL 2044565, at *1 (S.D.N.Y. June 6, 2012) (summary order).  On June 8, 2012, the parties agreed that neither side would seek to add to the evidentiary record presented in support of the preliminary injunction and that they would proceed directly to a hearing on plaintiffs' request for a permanent injunction.  (See Order (June 8, 2012) (Dkt. No. 43) at 1.) Accordingly, the parties submitted additional legal memoranda but no additional factual materials.

On August 7, 2012, the Court held oral argument on the request for a permanent injunction (the "August hearing").  At the commencement of that argument, the Court confirmed that the parties agreed that the evidentiary record developed at the March 29, 2012, preliminary injunction hearing (the "March hearing") would constitute the trial record for this matter. Hr'g Tr. of Oral Argument on Permanent Inj., Aug. 7, 2012 (Dkt.

---

[2] During a June 7, 2012, conference call with the Court, the parties were provided with the opportunity to seek a decision on the motion for reconsideration or to proceed directly to a hearing on a permanent injunction.  The parties agreed to proceed directly to a permanent injunction.  Accordingly, the Court denied the motion for reconsideration as moot.  (See June 8 Order (Dkt. No. 43) at 1.)

No. 59) ("Tr. II") at 3.  The Court bases its findings of fact
on that record.

For the reasons set forth below, this Court grants
plaintiffs' motion and permanently enjoins enforcement of
§ 1021(b)(2) of the NDAA (referred to herein as "§ 1021(b)(2)").

I.   SUMMARY OF OPINION

Plaintiffs are a group of writers, journalists, and
activists whose work regularly requires them to engage in
writing, speech, and associational activities protected by the
First Amendment.  They have testified credibly to having an
actual and reasonable fear that their activities will subject
them to indefinite military detention pursuant to § 1021(b)(2).

At the March hearing, the Government was unable to provide
this Court with any assurance that plaintiffs' activities (about
which the Government had known--and indeed about which the
Government had previously deposed those individuals) would not
in fact subject plaintiffs to military detention pursuant to
§ 1021(b)(2).  Following the March hearing (and the Court's May
16 Opinion on the preliminary injunction), the Government
fundamentally changed its position.

In its May 25, 2012, motion for reconsideration, the
Government put forth the qualified position that plaintiffs'
particular activities, as described at the hearing, if described
accurately, if they were independent, and without more, would

not subject plaintiffs to military detention under § 1021.  The
Government did not--and does not--generally agree or anywhere
argue that activities protected by the First Amendment could not
subject an individual to indefinite military detention under
§ 1021(b)(2).  The First Amendment of the U.S. Constitution
provides for greater protection:  it prohibits Congress from
passing any law abridging speech and associational rights.  To
the extent that § 1021(b)(2) purports to encompass protected
First Amendment activities, it is unconstitutionally overbroad.

A key question throughout these proceedings has been,
however, precisely what the statute means--what and whose
activities it is meant to cover.  That is no small question
bandied about amongst lawyers and a judge steeped in arcane
questions of constitutional law; it is a question of defining an
individual's core liberties.  The due process rights guaranteed
by the Fifth Amendment require that an individual understand
what conduct might subject him or her to criminal or civil
penalties.  Here, the stakes get no higher: indefinite military
detention--potential detention during a war on terrorism that is
not expected to end in the foreseeable future, if ever.  The
Constitution requires specificity--and that specificity is
absent from § 1021(b)(2).

Understanding the scope of § 1021(b)(2) requires defining
key terms.  At the March hearing, the Government was unable to

provide definitions for those terms.  The Government had prior notice of precisely which terms were at issue based upon allegations in the complaint, declarations, depositions, the briefing and oral argument.  In particular, plaintiffs commenced this lawsuit asserting--and they continue to assert--that the phrases "associated forces," "substantially supported," and "directly supported" all are vague.  Indeed, even after this Court's May 16 Opinion in which the Court preliminarily found a likelihood of success on the merits of plaintiffs' vagueness/due process challenge, the Government nevertheless did not provide particular definitions.  Notably, the Government spent only one page of its 49-page memorandum in support of a final judgment denying a permanent injunction (the "pre-trial memorandum") addressing the meaning of those terms.  (See Gov't's Mem. of Law in Support of Final J. Denying a Permanent Inj. and Dismissing this Action (Dkt. No. 53) ("Gov't Trial Mem.").)  The Government's terse arguments do not resolve the Court's concerns.  The statute's vagueness falls short of what due process requires.

The Government presents a variety of arguments which, if accepted, would allow the Court to avoid answering the constitutional questions raised in this action.  As discussed below, however, the Court rejects each.

First, the Government argues that this Court should not permanently enjoin § 1021(b)(2) on the basis that plaintiffs lack standing.  At the March hearing, plaintiffs testified credibly to their specific past activities and concerns.  At that hearing, the Court repeatedly asked the Government whether those particular past activities could subject plaintiffs to indefinite military detention; the Government refused to answer. Hr'g Tr. of Oral Argument on Prelim. Inj., Mar. 29, 2012 (Dkt. No. 34) ("Tr. I") at 236, 239, 245.

Article III of the Constitution, allowing federal courts to entertain only actual cases and controversies, requires that a plaintiff have standing to pursue a claim.  Plaintiffs here, then, must show that they have a reasonable fear that their actions could subject them to detention under § 1021(b)(2).[3]  The Court recited the Government's position--or lack thereof--in its May 16 Opinion.  Following that Opinion, the Government changed its position.  The Government stated its "new" position in two different ways.  First, it expressed its position rather broadly:  "[T]he conduct alleged by plaintiffs is not, as a matter of law, within the scope of the detention authority affirmed by section 1021."  (Gov't's Mem. of Law in Support of

---

[3] There are additional required elements for standing which the Court addresses below.

its Mot. for Recons. (Dkt. No. 38) ("Recons. Mem.") at 2.)   Two
pages later, the Government stated its full, qualified position:

> As a matter of law, individuals who engage in the
> <u>independent</u> journalistic activities or <u>independent</u>
> public advocacy described in plaintiffs' affidavits
> and testimony, <u>without more</u>, are not subject to law of
> war detention as affirmed by section 1021(a)-(c),
> <u>solely</u> on the basis of such independent journalistic
> activities or independent public advocacy.   Put
> simply, plaintiffs' descriptions in this litigation of
> their activities, <u>if accurate</u>, do not implicate the
> military detention authority affirmed in section 1021.

(<u>Id.</u> at 4 (emphases added) (footnote omitted).)   The Government
reaffirmed that position in its pre-trial memorandum.   (<u>See</u>
Gov't Trial Mem. at 20.)   Arguing that belatedly providing this
qualified statement eliminates plaintiffs' standing
misunderstands controlling law:   Standing is determined as of
the outset of a case.

The Government's new position also ignores the posture in
which it affirmatively placed itself--and plaintiffs--as a
result of its shifting view.   At the March hearing, plaintiffs
testified credibly that they were engaged in, and would continue
to engage in (without the threat of indefinite military
detention), activities they feared would subject them to
detention under § 1021.   The Government had an opportunity, both
then, and at the depositions it took of each of the testifying
plaintiffs, to explore the nature of plaintiffs' activities, and
to test whether plaintiffs' fears were actual and reasonable.

Given that opportunity, the Court must--and does--take seriously the Government's position at the March hearing.  In other words, the Government did not offer a position at the March hearing sufficient to rebut plaintiffs' credible testimony as to their reasonable fear of detention under § 1021(b)(2) and thus, its newly espoused position cannot erase what it said previously. Plaintiffs have standing.[4]

Second, the Government implicitly argues that its new position renders this action moot.[5]  It does not.  The Government has explicitly stated that its position is applicable with respect to only those activities to which the plaintiffs testified at the March hearing.  Thus, any protected First Amendment activities in which plaintiffs have engaged since then might subject them to indefinite military detention.  The plaintiffs--writers, journalists, activists--testified credibly that they are continuing, and would continue without the fear of detention, these activities.  An actual case or controversy remains.

---

[4] The Government's belated change of position--i.e., that it would not use § 1021(b)(2) as to these plaintiffs, for the specific activities described at the hearing, if done independently, if described accurately, and without more--must also be taken seriously.  This last position raises additional concerns, and requires additional definitional structure discussed further below.

[5] Although the Government does not specifically refer to its challenge as one of "mootness" (see Gov't Trial Mem. at 23-24), as a matter of law the argument that its new litigation position "eliminates plaintiffs' standing" (id. at 24) amounts to a mootness challenge.

Third, the Government argues that even in the absence of its proffered assurance, plaintiffs cannot have standing since § 1021 is simply a reaffirmation of the 2001 Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001) (the "AUMF")--and since plaintiffs were never detained under the AUMF in the ten years since its passage, they cannot have a reasonable fear that they will be detained under § 1021(b)(2) now.  The Court rejects that argument.

The AUMF and § 1021 have significant differences, discussed below.  Those differences can be traced to the legislative history and case law surrounding the AUMF.  Section 1021 appears to be a legislative attempt at an ex post facto "fix":  to provide the President (in 2012) with broader detention authority than was provided in the AUMF in 2001 and to try to ratify past detentions which may have occurred under an overly-broad interpretation of the AUMF.  That attempt at a "fix" is obscured by language in the new statute (e.g., "reaffirmation") that makes it appear as if this broader detention authority had always been part of the original grant.  It had not.

Based on what is known about the history of the executive branch's use of detention authority (via reported cases and statements by the Government), sometime between September 18, 2001 (the date of the AUMF) and December 31, 2011 (the date of the NDAA)--without congressional authorization--the executive

branch unilaterally extended its interpretation of its military detention authority to a scope resembling what was passed into law as § 1021(b)(2).  Detentions have been challenged via habeas petitions.  Courts have warned the Government about the limits of congressional authorization for detention authority (with respect to the AUMF), and that the "laws of war"--to which the Government has repeatedly referred in its opposition to the Guantanamo habeas petitions as providing a basis for detention-- was not and should not be part of domestic law.

In March 2009, the Government presented its view of its detention authority under the AUMF--explicitly referring to that view as a "refinement" and limiting its application to then-current Guantanamo detainees.  That position bears clear similarities to § 1021(b)(2).  In contrast to those statements, in this proceeding the Government argues that its interpretation has always been consistent and has always included the various elements now found in § 1021(b)(2).  Indeed the Government argues that no future administration could interpret § 1021(b)(2) or the AUMF differently because the two are so clearly the same.  That frankly makes no sense, particularly in light of the Government's inability at the March and August hearings to define certain terms in--or the scope of--

§ 1021(b)(2).[6]  Accordingly, the Government cannot point to a lack of detention pursuant to the AUMF as eliminating the reasonable basis for plaintiffs' stated fears regarding § 1021(b)(2).

Fourth, the Government argues that even if plaintiffs have standing, this Court should essentially "stay out of it"--that is, exercise deference to the executive and legislative branches and decline to rule on the statute's constitutionality.  In particular, the Government argues that the fact that the statute relates to military detention during a time of war both justifies § 1021(b)(2) breadth and requires judicial deference. The Court rejects that argument as well.

The Court is mindful of the extraordinary importance of the Government's efforts to safeguard the country from terrorism. In light of the high stakes of those efforts as well as the executive branch's expertise, courts undoubtedly owe the political branches a great deal of deference in the area of national security.  See Holder v. Humanitarian Law Project, 130 S. Ct. 2705, 2711 (2010).  Moreover, these same considerations counsel particular attention to the Court's obligation to avoid unnecessary constitutional questions in this context.  Cf. Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 347 (1936)

---

[6] Put another way, one would reasonably assume that if the AUMF was interpreted consistently with the language of § 1021(b)(2), by 2012 the Government would be able to clearly define its terms and scope.  It cannot.

(Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of.").  Nevertheless, the Constitution places affirmative limits on the power of the Executive to act, and these limits apply in times of peace as well as times of war.  See, e.g., Ex parte Milligan, 72 U.S. (4 Wall.) 2, 125-26 (1866).  Heedlessly to refuse to hear constitutional challenges to the Executive's conduct in the name of deference would be to abdicate this Court's responsibility to safeguard the rights it has sworn to uphold.

And this Court gives appropriate and due deference to the executive and legislative branches--and understands the limits of its own (and their) role(s).  But due deference does not eliminate the judicial obligation to rule on properly presented constitutional questions.  Courts must safeguard core constitutional rights.  A long line of Supreme Court precedent adheres to that fundamental principle in unequivocal language. Although it is true that there are scattered cases--primarily decided during World War II--in which the Supreme Court sanctioned undue deference to the executive and legislative branches on constitutional questions, those cases are generally now considered an embarrassment (e.g., Korematsu v. United States, 323 U.S. 214 (1944) (upholding the internment of

Japanese Americans based on wartime security concerns)), or
referred to by current members of the Supreme Court (for
instance, Justice Scalia) as "wrong" (e.g., Ex parte Quirin, 317
U.S. 1 (1942) (allowing for the military detention and execution
of an American citizen detained on U.S. soil)).  Presented, as
this Court is, with unavoidable constitutional questions, it
declines to step aside.

     The Government also argues that, at most, the Court's role
should be limited to a post-detention habeas review.  See Tr. II
at 118.  That argument is without merit and, indeed, dangerous.
Habeas petitions (which take years to be resolved following
initial detention) are reviewed under a "preponderance of the
evidence" standard (versus the criminal standard of "beyond a
reasonable doubt") by a single judge in a civil proceeding, not
a jury of twelve citizens in a criminal proceeding which can
only return a guilty verdict if unanimous.  If only habeas
review is available to those detained under § 1021(b)(2), even
U.S. citizens on U.S. soil, core constitutional rights available
in criminal matters would simply be eliminated.  No court can
accept this proposition and adhere truthfully to its oath.

     In conclusion, this Court preliminarily found that
plaintiffs showed a likelihood of success on the merits with
respect to their claims that § 1021(b)(2) is overbroad as well
as impermissibly vague.  The Government has presented neither

evidence nor persuasive legal argument that changes the Court's preliminary rulings.  The case law this Court cited in its May 16 Opinion remains good law.  The factual record and case law now presents this Court with a matter ready for final resolution.  The Court finds that § 1021(b)(2) is facially unconstitutional: it impermissibly impinges on guaranteed First Amendment rights and lacks sufficient definitional structure and protections to meet the requirements of due process.

At the August hearing, the Government stated that preliminary enjoining § 1021(b)(2) had not altered its detention practices in any way since in its view, the executive branch maintains identical detention authority under the AUMF.  See Tr. II at 138.  As set forth herein, however, that position is unsupported by the AUMF itself, has been rejected by other courts (including the Supreme Court), and is rejected by this Court.

If, following issuance of this permanent injunctive relief, the Government detains individuals under theories of "substantially or directly supporting" associated forces, as set forth in § 1021(b)(2), and a contempt action is brought before this Court, the Government will bear a heavy burden indeed.[7]

---

[7] It is clear, as discussed below, that the Military Commission Acts of 2006 and 2009, Pub. L. No. 109-366, 120 Stat. 2600 (2006); Pub. L. No. 111-84, 123 Stat. 2190 (2009) (collectively, the "MCA") refer to proceedings for alien enemy belligerents who have substantially supported the Taliban, al-Qaeda, or

## II.  FINDINGS OF FACT

Five plaintiffs provided evidentiary materials in support of their positions in this action: Christopher Hedges, Alexa O'Brien, Jennifer Ann Bolen, Kai Wargalla and the Honorable Brigitta Jonsdottir.[8]  Plaintiffs Hedges, O'Brien, Wargalla and Jonsdottir testified live at the March hearing.[9]  The Government did not submit any evidence in support of its positions.  It did not call a single witness, submit a single declaration, or offer a single document at any point during these proceedings.

The Court finds the testimony of each plaintiff credible. With respect to the witnesses who testified live, the Court was able to evaluate their demeanor and ask clarifying questions. The Government cross-examined each of the witnesses who testified live (having also previously deposed him or her). None of the witnesses wavered in his or her testimony; each was sincere and direct.  Each provided specific and detailed information regarding his or her writings, speech, and/or associational activities that have been affected--and that he or she asserts are continuing to be affected--by his or her fear of

---

associated forces.  The MCA is a different statutory scheme altogether from the AUMF and § 1021; the MCA does not itself authorize detention.

[8] "Plaintiffs," as used in this Opinion, refers to the five plaintiffs that testified at the March preliminary injunction hearing.  It does not include Daniel Ellsberg, Jennifer Bolen, or Noam Chomsky.

[9] By agreement of the parties, Jonsdottir testified by declaration; the Government waived cross-examination.  Her declaration was read into the record at the hearing by Naomi Wolf.  Tr. I at 147-55.

detention pursuant to § 1021(b)(2).  The Court adopts the factual findings set forth in its May 16, 2012 Opinion, <u>see Hedges</u>, 2012 WL 1721124, at *6-15, and repeats here only those facts necessary for context.  The Court also supplements those factual findings based on information from the March hearing and admitted documentary evidence not recited in the May 16 Opinion.  The Court's factual findings are as follows:

A.  <u>Christopher Hedges</u>

Christopher Hedges has been a foreign correspondent and journalist for more than 20 years.  Tr. I at 156.  During that time, he has published numerous articles and books on topics such as al-Qaeda, Mohammad Atta, and the Paris bombing plot; he is a Pulitzer Prize winner.  <u>Id.</u> at 157-58.  His most recent book was published in June 2012.[10]  He intends to continue to work as a journalist.  <u>See, e.g.</u>, <u>id.</u> at 173.

Hedges' writing and journalistic activities have taken him to the Middle East, the Balkans, Africa, and Latin America.  <u>Id.</u> at 157.  His work has involved interviewing al-Qaeda members who were later detained.  <u>Id.</u> at 158.  He has reported on 17 groups contained on a list of known terrorist organizations prepared by the U.S. Department of State.  (<u>See</u> Court Ex. 9 (Country Reports

---

[10] <u>Days of Destruction, Days of Revolt</u>, co-authored by Hedges and Joe Sacco, was published after the March hearing.  The Court takes judicial notice of that publication.

on Terrorism, Report of the U.S. State Dep't, Ch. 6 ("Terrorist Groups"))(Aug. 2010) at 1.)

Among the groups on which Hedges has reported (most of which are on the State Department list of terrorist organizations) are: the Abu Nidal Organization, the al-Aqsa Martyrs Brigade, the Armed Islamic Group, Al-Jihad, the Gama'a al-Islamiya, Hamas, Hizballah, Kahane Chai, the Kongra-Gel (a/k/a "KGK" or "PKK"), the Mujahedin-e Khalq Organization ("MEK"), the Palestine Liberation Front, the Palestine Islamic Jihad, the Popular Front for the Liberation of Palestine (including also the Central Command) ("PFLP"), al-Qaeda, Revolutionary People's Party/Front, and the Salafist Group for Call and Combat.  (Court Ex. 9 at 12); see also Tr. I at 169. In his career as a journalist and writer, Hedges has spent time with members of those groups; he has interviewed their leadership as well as the rank-and-file.  Tr. I at 170.  In connection with his reporting on Hamas, Hedges has met with its leadership, stayed in their homes, and socialized with them. Id. at 172.  He testified that some of the organizations on which he has reported are considered to be in hostilities with coalition partners of the United States.  Id. at 166, 169.  The PKK is only one example.  Id. at 169. Other groups Hedges has covered, such as the PFLP, have carried out acts of terrorism against U.S. targets.  Id. at 170.

As part of his investigative work, he has been embedded with certain organizations on the State Department's Terrorist List.  For instance, in connection with his coverage of the PKK, he travelled with PKK armed units in southeastern Turkey and northern Iraq.  Id.  He was with an armed unit of the PKK in northern Iraq when Turkish war planes attacked it.  Id. at 171.

Hedges's work has involved investigating, associating with and reporting on al-Qaeda.  After September 11, 2001, he was based in Paris and covered al-Qaeda in all countries in Europe with the exception of Germany (he does not speak German, but does speak Spanish, French and Arabic).  Id. at 157.  He did "reconstructs": following terrorist attacks, he "would spend weeks on the ground piecing together everything that had gone into [the] attack and all of the movements of those who were involved in [the] attacks."  Id. at 157-58.  He did a "reconstruct" relating to Mohammad Atta, one of the participants in the attacks on September 11, 2001.  Id. at 158.  Hedges testified that he "retraced every step Mohammad Atta took."  Id.

Hedges covered al-Qaeda's attempted bombing of the Paris Embassy.  Id.  He also covered al-Qaeda's suicide bombing attack on the synagogue in Djerba, Tunisia, as well as Richard Reed, an al-Qaeda member who attempted to use a shoe bomb to blow up an airplane.  Id.

Hedges has recently spoken at events in Belgium and France, and could encounter people associated with groups that are "hostile to the U.S. government." Id. at 174.

Hedges testified that because he speaks a number of languages (including, as stated, Arabic), he has been approached by publications, such as Harper's Magazine, the Nation and others to return to the Middle East as a correspondent. Id. at 172-73. He testified that he has a realistic expectation that his work will bring him back to the Middle East. Id. at 173.

Hedges testified that his work is known in the Middle East and read widely there. Id. at 159. His works have appeared on Islamic and jihadist websites. Id.

Hedges read news articles regarding § 1021 prior to its implementation. Id. at 160. He testified that he has read § 1021 but does not understand the definition of certain terms including "associated forces," "engaged in hostilities," or "substantially supported." Id. at 161-62. He testified that he has read the AUMF, that he understands it and that, in his view, it is not coextensive with § 1021. Id. at 164-65.

Hedges testified that his oral and written speech as well as associational activities have been chilled by § 1021: he does not understand what conduct is covered by § 1021(b)(2), but does understand that the penalty of running afoul of it could be indefinite military detention. See, e.g., id. at 174, 177, 186.

He anticipated having to change his associational activities at speeches he was giving as a result of § 1021.  Id. at 174. Hedges testified that prior to the passage of § 1021, he never feared his activities could subject him to indefinite military detention by the United States.  Id. at 206.

At the March hearing, the Court asked whether Hedges' activities could subject him to detention under § 1021; the Government stated that it was not prepared to address that question.  Id. at 245.  When asked a similar question at the August hearing, five months later, the Government remained unwilling to state whether any of plaintiffs' (including Hedges's) protected First Amendment future activities could subject him or her to detention under § 1021.  Tr. II at 142.[11]

This Court finds that Hedges has a reasonable fear of detention pursuant to § 1021(b)(2).

B.   Alexa O'Brien

Alexa O'Brien was the founder of U.S. Day of Rage and has also written numerous articles.  Tr. I at 40-42.  She identifies her career as a "content strategist."  Id. at 38.

O'Brien is also a contributor and editor of the news website, WL Central.  Id. at 40-41.  WL Central has a number of international news journalists who contribute content.  Id. at

---

[11] There is no evidence in the record that plaintiffs engage in any relevant activities other than those protected by the First Amendment.

40.  O'Brien has published more than 50 articles on WL Central since January 2011.  Id. at 41.  She has published articles on WL Central relating to WikiLeaks's release of U.S. State Department cables, the Joint Task Force memoranda for Guantanamo Bay, and the revolutions in Egypt, Bahrain, Yemen, and Iran. Id.  She has also has written blogs relating to those events, articles on the legal proceedings for Bradley Manning and Julian Assange relating to WikiLeaks, and has published a series of articles based on interviews of individuals who have been detained at Guantanamo Bay or who were prison guards there. (Court Ex. 3 (series of published articles authored by O'Brien)); Tr. I at 41.

    O'Brien testified that in February 2012, she learned that an individual employed by a private security firm had allegedly been asked to tie U.S. Day of Rage to Islamic fundamentalist movements.  Tr. I at 43.  She received a copy of an email which indicated that there had been communications in this regard dating back to August 2011.  Id.  The email exchange was located on the WikiLeaks website and was between individuals named Thomas Kopecky and Fred Burton.  Id. at 45.  Based on first-hand knowledge, O'Brien testified that she is aware that Burton is a former security official previously employed by the U.S. State Department.  Id. at 45-46.

O'Brien testified credibly that she also received twitter
messages from a private security contractor called Provide
Security.  Id. at 47.  One of the messages indicated that U.S.
Day of Rage had been found on an Islamic jihadist website.  Id.
at 48.  The message stated: "Now you are really in over your
head with this.  Muslims from an Afghanistan jihad site have
jumped in."[12]

O'Brien also testified that in September 2011 she was
contacted by someone she knew to be a federal agent, but to whom
she guaranteed confidentiality of source.  Id. at 52.  She
testified that that individual had seen a memorandum from the
Department of Homeland Security ("DHS") addressed to law
enforcement across the nation (a) regarding the fact that DHS
planned to infiltrate U.S. Day of Rage and (b) linking U.S. Day
of Rage to a loosely knit "organization," called "Anonymous,"
that O'Brien knew to be associated with cyber-terrorism.  Id. at
51-54.[13]  O'Brien later met with a journalist who told her that
he had seen either the same memo to which the federal agent had
referred or one with similar content.  Id. at 69.  O'Brien
testified that in August 2011 she learned of an article
suggesting that information about U.S. Day of Rage had been

---

[12] The messages that O'Brien received were marked as Court Exhibit 4, admitted
to show the reasonableness of O'Brien's fearful state of mind regarding being
subject to § 1021, and not for the truth of the matter asserted.

[13] The Government did not object to this testimony.  See Tr. I at 51-54.

posted on Shamuk and Al-Jihad, two al-Qaeda recruitment sites.
Id. at 59.

O'Brien testified that she read § 1021, but does not
understand what certain of its terms mean and whether they would
encompass her activities.  Id. at 74.  In particular, she
pointed to the terms "associated forces" and "substantially
support" as lacking definition.  See id.  She stated:

> I think it's best to use an example [of] someone like
> Sami Al-Hajj, who is a Sudanese Al Jazeera cameraman,
> who was later released from Guantanamo Bay and now
> works for Al Jazeera. Again, "substantially
> supported," what does that mean?  In a war on terror
> where intelligence collection and the information-
> sharing environment are competing with the press for
> collection of information, it's very similar
> activities of collect[ing], talking with people,
> getting information.  It's very hard when Secretary
> Clinton talks about the information war that we are in
> to understand what "substantially support" means in
> relationship to journalists.

Id.

O'Brien testified that she knows people who have been or
are subject to military detention and that she is concerned that
Section 1021 could subject her to military detention.  Id. at
74-80.  After reading § 1021(b)(2), she decided to withhold from
publication several articles she had written due to her concern
that they could subject her to detention under the statute.  Id.
at 72 ("Court: Are you saying that there is a causal
relationship between the passage of [§ 1021] and your
withholding both of these articles?  The Witness: Absolutely.").

O'Brien testified that pursuant to a request made under the Freedom of Information Act, an organization called TruthOut.org had obtained a memorandum from the Department of Homeland Security, which states "National Cybersecurity and Communications Integration Center Bulletin.  Details on 'Anonymous,' upcoming U.S. operations 17 September 2011 Occupy Wall Street, 'U.S. Day of Rage.'"  Id. at 109-10.[14]

At the March hearing, when the Government was specifically questioned by the Court regarding whether O'Brien's activities could subject her to detention under § 1021(b)(2), the Government stated it would not answer the question:

> The Court: ... [A]re those articles [holding up Court Ex. 3] going to subject M. O'Brien to risk under § 1021? . . .
>
> [Government]:  Again, I'm not authorized to make specific representations as to particular people. I'm saying that "associated forces" cannot extend to groups that are not armed groups at all.
>
> The Court: So we don't know about the articles, it depends?
>
> [Government]:  Maybe they are an armed group.

Id. at 236.

At the August hearing, the Government stated that it could not represent one way or the other whether future activities by

---

[14] The Court admitted the document obtained pursuant to that request under the general hearsay exception contained in Fed. R. Evid. 807 as having sufficient indicia of reliability.  The Court invited counsel for the Government to notify the Court if, after the hearing, they determined that the document was not authentic.  The Court has not received such a communication and therefore accepts the document as authentic.  See Tr. I at 109-11.

plaintiffs, including O'Brien, would subject them to detention under § 1021.  See, e.g., Tr. II at 142.

This Court finds that O'Brien has a reasonable fear of detention pursuant to § 1021(b)(2).

C.   Kai Wargalla

Kai Wargalla is an organizer and activist based in London. Tr. I at 116.  She is Deputy Director of the organization "Revolution Truth,"[15] and she also founded "Occupy London" and "Justice for Assange UK."  Id. at 116-18.[16]

Revolution Truth engages in international speech activities accessible in the United States through a website that has forums at which individuals speak on various topics.[17]  See id. at 117, 124.  Wargalla stated that she saw a bulletin in which the London Police listed the Occupy London group as among terrorist or extremist groups.  Id. at 120-21.

Wargalla testified that she is also aware that several politicians have referred to WikiLeaks as a terrorist organization and that there is a grand jury hearing evidence with respect to activities by WikiLeaks.  Id. at 139.

---

[15] Revolution Truth is an organization that conducts panel discussions on a variety of topics including WikiLeaks.  See Tr. I at 117; see also revolutiontruth.org.  The Court can take judicial notice of the fact that content is available on a website; the Court does not refer to the website for the truth of any of its contents.  See 23-34 94th St. Grocery Corp. v. New York City Bd. of Health, 685 F.3d 174, 183 n.7 (2d Cir. 2012) (taking judicial notice of the fact of content published on a website).

[16] Justice for Assange is an organization whose efforts are dedicated to supporting Julian Assange, founder of WikiLeaks.  See Justice4assange.com.
[17] See revolutiontruth.org.

Wargalla testified that she has read § 1021 and finds several of the statute's terms concerning with respect to her activities.  Id. at 121-22.  She expressed concern regarding the definition of "covered persons" generally and the phrase "substantially supported" specifically.  Id.  She testified that the phrase "substantially supported" "could mean anything really, from having someone on a panel discussion, from conducting campaigns . . ., to organizing rallies and demonstrations."  Id. at 131.

Wargalla testified that her concerns regarding the scope of § 1021 has already chilled her speech-related activities.  She testified that § 1021 has led to changes in certain of the expressive and associational activities of Revolution Truth. For instance, Revolution Truth has considered not inviting members of certain organizations to participate in its forums due to concerns regarding § 1021.  Id. at 124-25.  Wargalla identified Hamas as one organization Revolution Truth would likely not have participate in forums due to concerns about § 1021.  Id. at 124-126.

At the August hearing, the Government stated that it could not represent that Wargalla's future activities would not subject her to detention under § 1021.  See, e.g., Tr. II at 142.

This Court finds that Wargalla has a reasonable fear of detention pursuant to § 1021(b)(2).

D.   Hon. Brigitta Jonsdottir

The Honorable Brigitta Jonsdottir is a member of parliament in Iceland.  Tr. I at 147-48.  She is an activist and a spokesperson for a number of groups including WikiLeaks.  Id. at 148.  As part of her work in connection with WikiLeaks, she assisted in producing a film entitled "Collateral Murder," released in 2010.  Id.  This film alleges that Americans and others have committed war crimes in connection with their participation in the war in Iraq.  Id. at 149.

Jonsdottir stated that she is aware that several U.S. politicians have classified WikiLeaks as a terrorist organization.  Id. at 149.  She believes that Bradley Manning, associated with WikiLeaks, has been charged with aiding terrorists.  Id. at 150.  She has received a subpoena from a U.S. grand jury for content from her Twitter account.  Id. at 152.

She has organized activities opposing the war in Iraq.  Id. at 148.  She has been given legal advice by members of Iceland's Ministry of Foreign Affairs that she should not travel to the United States.  Id. at 152-53.

Jonsdottir stated that she is concerned that her activities with respect to WikiLeaks may subject her to detention under

§ 1021--particularly because her work might be construed as giving "'substantial support' to 'terrorists and/or associated forces.'"  Id. at 154.

At the March hearing, the Court asked whether Jonsdottir's activities could subject her to detention under § 1021.  The Government responded, "Again, I can't make representations on specifics. I don't know what she has been up to. I don't know what is going on there."  Id. at 239.

At the August hearing, the Government stated that Jonsdottir's past activities as specifically set forth in her declaration would not subject her to detention under § 1021; however, the Government would not make representations regarding anything else that she had done or with respect to her future First Amendment activities.  See, e.g., Tr. II at 142.

This Court finds that Jonsdottir has a reasonable fear of detention pursuant to § 1021(b)(2).

E.   The Government

The Government did not present any witnesses or seek to admit any documents in connection with the March hearing.  The Government did depose--and then cross-examine at the March hearing--those plaintiffs who testified live.  The Court does not find that this cross-examination undermined any of the witness' essential points.

At the March hearing, the Government was unable to
represent that the specific activities in which plaintiffs had
engaged would not subject them to indefinite military detention
under § 1021.  See, e.g., Tr. I 223, 226, 229-30.  The
Government changed its position several weeks later in a motion
for reconsideration of the May 16 Opinion.  In its memorandum
submitted in support of that motion (which was subsequently
denied as moot in light of the parties' agreement to proceed
directly to a hearing on a permanent injunction), the Government
changed its position entirely--from its prior assertion that it
would not state whether plaintiffs' activities could subject
them to detention under § 1021 to a qualified one:  "the conduct
alleged by plaintiffs is not, as a matter of law, within the
scope of the detention authority affirmed by section 1021."
(Recons. Mem. at 2.)  It then set further qualified parameters
of its position:

> As a matter of law, individuals who engage in the
> independent journalistic activities or independent
> public advocacy described in plaintiffs' affidavits
> and testimony, without more, are not subject to law of
> war detention as affirmed by section 1021(a)-(c),
> solely on the basis of such independent journalistic
> activities or independent public advocacy.  Put
> simply, plaintiffs' descriptions in this litigation of
> their activities, if accurate, do not implicate the
> military detention authority affirmed in section 1021.

(Id. at 4 (footnote omitted).)  In its pre-trial memorandum, the Government reiterated that position.  (See Gov't Trial Mem. at 20.)

The Government did not put forth a witness to explain the difference between its first, March position and its second (set forth in its May reconsideration brief and reiterated in its June pre-trial memorandum).  Nor did it provide the Court with a reason that this second position is the binding one, or why the new position does not leave plaintiffs at the mercy of "noblesse oblige."  See U.S. v. Stevens, 130 S. Ct. 1577, 1591 (2010).  There is no guarantee that the position will not--or cannot--change again.  In other words, the Government's new position--without any guarantees of its firmness--cannot rebut the standing that plaintiffs established at the March hearing.

In addition, at the March hearing the Government was unable to offer definitions for the phrases "substantially support" or "directly support."  Tr. I at 223-226.  In particular, when the Court asked for one example of what "substantially support" means, the Government stated, "I'm not in a position to give one specific example."  Id. at 226.  When asked about the phrase "directly support," the Government stated, "I have not thought through exactly and we have not come to a position on 'direct support' and what that means."  Id. at 229-30.  In its pre-trial

memoranda, the Government also did not provide any definitional examples for those terms.[18]

What evidence could the Government have offered in this matter?  Are its positions necessarily based only on legal argument not susceptible to "proof"?  Certainly not.  The Government's positions included mixed questions of law and fact. With due regard for the Government's legitimate authority to exercise prosecutorial discretion and the Government's need for secrecy in matters of true national security, there were nonetheless several types of evidence the Government could have offered.

First, in opposing plaintiffs' standing the Government could have offered that no one has in fact been detained for any activities protected by the First Amendment (if such evidence existed).  Based upon credibility, a single statement may not have required further elaboration that would have tread into areas of national security.  (Even so, of course, there are well-established ways of dealing with such matters in judicial proceedings.)

The Government also could have presented evidence regarding the decision-making process for § 1021(b)(2) enforcement

---

[18] In its pre-trial memorandum, the Government did refer to the dictionary definition of the word "support," but did so not to offer an applicable framework for understanding the scope of the statute, but rather to refute plaintiffs' position that support can and does include activities protected by the First Amendment.  (See Gov't Trial Mem. at 42.)

determinations--namely, the type of checks and balances that may exist to ensure consistent and non-arbitrary enforcement.  The Government could have offered a witness on law enforcement's need for the breadth of § 1021 based upon factual scenarios that have occurred, but as to which secrecy is not required.  The Government could have offered a witness who could have testified as to examples of how law enforcement has actually interpreted (if anyone has) the words "substantially support," "directly support," or "associated forces."  Any of that evidence may have provided an evidentiary basis for what are instead simply legal arguments or ipse dixit that plaintiffs' fears of detention were unreasonable.

The Court is not suggesting the Government bears the burden of proof on standing; it does not.  It could, however, have chosen to provide an evidentiary basis for its defense.  Just as with any litigant, the Government's position would have been strengthened had it offered facts supportive of its assertions.  As a result of the Government's strategic trial choice, the Court is left with a one-sided evidentiary record.  The Court will not--indeed, it cannot--"assume" what the Government's evidence would have been.[19]

---

[19] The Government argues that plaintiffs "cannot point to a single example of the military's detaining anyone for engaging in conduct even remotely similar to the type of expressive activities they allege could lead to detention." (Gov't Trial Mem. at 2.)  That position is patently unfair.  Plaintiffs cannot, any more than the Court, possibly know the reasons for the military

III. THE EVOLUTION OF THE AUMF AND § 1021

This proceeding directly implicates both the AUMF, signed into law on September 18, 2001, and § 1021(b)(2) of the NDAA because the Government's central challenge to plaintiffs' standing is that their fears of detention cannot be reasonable since § 1021(b)(2) is simply a reaffirmation of the AUMF.  In other words, the Government contends § 1021 does nothing new. (See, e.g., Gov't Trial Mem. at 6-7); Tr. II at 82-84. Repeatedly throughout this litigation, the Government has argued that the AUMF is coextensive with § 1021(b)(2).  The Court preliminarily rejected that position in its May 16 Opinion, and does so again now.

Passed in September 2001, the AUMF states,

The President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

AUMF § 2(a) (emphasis added).

---

detention of all of those who have been detained (the facts regarding some subset of detainees can be gleaned from habeas petitions; but it is impossible to know the bases on which the majority have been detained). There is no requirement for openness in that regard--no list to which one can refer, and the Government chose not to put in any evidence to prove this point.  In fact, when the Court asked the Government whether anyone had been detained under § 1021(b)(2) for activities protected by the First Amendment, counsel conceded that for the most part, he did not know.  See Tr. II at 91-92.

The text of § 1021 clearly both restates the original AUMF detention authorization, and expands its coverage to persons other than those originally intended.  It also directly incorporates, for the first time, the law of war.  Sections 1021(a) and (b)(1) state:

> (a) IN GENERAL.-- Congress affirms that the authority of the President to use all necessary and appropriate force pursuant to the Authorization for Use of Military Force (Public Law 107-40; 50 U.S.C. 1541 note) includes the authority for the Armed Forces of the United States to detain covered persons (as defined in subsection (b)) pending disposition under the law of war.

> (b) COVERED PERSONS. -- A covered person under this section is any person as follows:

>> (1) A person who planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored those responsible for those attacks.

NDAA §§ 1021(a)-(b)(1).

The Government's position that the AUMF and § 1021(b)(2) are coextensive is wrong as a matter of law and fact.  By relying so heavily on that argument, the Government itself has chosen to require judicial determination of the question of whether the AUMF and § 1021(b)(2) are in fact the same or different; the "reasonableness" of plaintiffs' fears of detention now turns in large part on the answer to that question.  The Court recognizes that such a determination could create interpretive tensions relating to the AUMF, and the Court

would have avoided directly reaching the issue had the
Government's position not required it to do so.

The statutes are, in fact, strikingly different in language
and, as a result, scope.  Careful tracing of the AUMF and case
law discussing the President's detention authority under the
AUMF demonstrate an evolutionary process:  the AUMF set forth
detention authority tied directly and only to September 11,
2001; at some point (and this Court does not know when), without
additional Congressional authorization, the executive branch
began to interpret its detention authority more broadly.  It is
unclear whether anyone has been detained under this broader
interpretation.  At least two courts--including the Supreme
Court--have rejected the broader iteration of detention
authority (similar to that now set forth in § 1021(b)(2)) under
the original language of the AUMF.[20]  See, e.g., Hamdi v.
Rumsfeld, 542 U.S. 507, 523, 526 (2004)[21] ("[O]ur opinion finds
legislative authority to detain under the AUMF once it is
sufficiently clear that the individual is, in fact, an enemy
combatant"; "Under the definition of enemy combatant that we
accept today as falling within the scope of Congress'
authorization, Hamdi would need to be 'part of or supporting
forces hostile to the United States or coalition partners' and

---

[20] In those cases, the Government set forth its position in its respective
oppositions to habeas petitions filed by Guantanamo detainees.

[21] Hamdi's seizure was undisputedly in a combat zone.  542 U.S. at 510.

'engaged in armed conflict against the United States' to justify
his detention in the United States for the duration of the
relevant conflict." (emphasis added)); Hamlily v. Obama, 616 F.
Supp. 2d 63, 69 (D.D.C. 2009) ("[T]he Court rejects the concept
of 'substantial support' as an independent basis for detention.
Likewise, the Court finds that 'directly support[ing]
hostilities' is not a proper basis for detention.  In short, the
Court can find no authority in domestic law or the law of war,
nor can the government point to any, to justify the concept of
'support' as a valid ground for detention. . . . Detention based
on substantial or direct support of the Taliban, al Qaeda or
associated forces, without more, is simply not supported by
domestic law or the law of war."); cf. Gherebi v. Obama, 609 F.
Supp. 2d 43, 46, 53, 61-67 (D.D.C. 2009), abrogated by Uthman v.
Obama, 637 F.3d 400 (D.C. Cir. 2011) (limiting the scope of
detention authority while finding detention appropriate in the
case at bar); id. at 46 ("The scope of the detention authority
claimed by the President in armed conflict authorized by the
AUMF began to take shape within months of the passing of the
joint resolution [i.e., the AUMF]"); id. at 53 (referring to the
March 2009 Memorandum as "modifying [the Government's] standard
for detaining individuals like petitioner." (emphasis added));
id. at 68-69 ("sympathizers, propagandists, and financiers who
have no involvement with this 'command structure,' while perhaps

members of the enemy organization in an abstract sense, cannot
be considered part of the enemy's 'armed forces' and therefore
cannot be detained militarily unless they take a direct part in
the hostilities. . . . The key question is whether an individual
'receive[s] and execute[s] orders' from the enemy forces combat
apparatus."); id. at 70 (referring to the Government's refusal
to define the qualifier "substantial" in relation to "support").

In rejecting the Government's view of its sweeping
detention authority, the Supreme Court stated in Hamdi:

> [A]s critical as the Government's interest may be in
> detaining those who actually pose an immediate threat
> to the national security of the United States during
> ongoing international conflict, history and common
> sense teach us that an unchecked system of detention
> carries the potential to become a means for oppression
> and abuse of others who do not present that sort of a
> threat.

542 U.S. at 530 (citing Milligan, 71 U.S. at 125).  The Court
continued:  "[W]e live in a society in which '[m]ere public
intolerance or animosity cannot constitutionally justify the
deprivation of a person's physical liberty.'"  Id. at 531
(citing O'Connor v. Donaldson, 422 U.S. 563, 575 (1975)). The
Supreme Court made it clear that its view of the AUMF related to
detention on the field of battle.  Id.  At the August hearing,
however, the Government took the position that detention under
the AUMF and § 1021(b)(2) requires neither presence on a
battlefield nor the carrying of arms.  See Tr. II at 93-95.

Even without looking at § 1021(b)(2), § 1021 adds a new element not previously set forth in the AUMF (although the Government has argued that it is implicit in the AUMF): the addition of the "law of war" language.  Section 1021 <u>explicitly</u> incorporates disposition under the law of war:

> (c) DISPOSITION UNDER THE LAW OF WAR.  The disposition of a person under the law of war as described in subsection (a) may include the following:

>> (1) Detention under the law of war without trial until the end of hostilities authorized by the [AUMF].

> . . .

> (d) CONSTRUCTION.  Nothing in this section is intended to limit or expand the authority of the President or the scope of the [AUMF].

NDAA § 1021(c)-(d).  Such clear embodiment of vague "law of war" principles, <u>see</u> <u>Al-Bihani v. Obama</u>, 590 F.3d 866, 871 (D.C. Cir. 2010), has never heretofore been included in a statute relating to military detention authority after September 11, 2001.  It is clear that the AUMF does not mention the law of war, though.[22] What does the law of war add?

Here again, a review of recent case law reveals a likely answer: the Government proffered the "law of war" in support of

---

[22] As set forth herein, the limiting phrase "law of war" lacks precise meaning.  Most frequently, it refers to rules of conduct during wartime (such as the Geneva Convention's treatment of prisoners of war).  It does not confer any detention authority.  It appears that the Government uses the phrase to mean something quite different and akin to "what the President can do in war time, because it's war time."  If so, and this would be the only basis to refer to the law of war for expansive interpretation of detention <u>authority</u>, then the argument really relates to the parameters of Article II powers.

an expansive interpretation of detention authority under the AUMF, which was rejected by multiple courts.  See, e.g., Al-Bihani, 590 F.3d at 871; Gherebi, 609 F. Supp. 2d at 53.  As stated below, courts made it clear that the laws of war had in fact never been made part of a domestic statute, and therefore could not be part of the AUMF.  However, the Government needed an anchor for its already expansive interpretation of the AUMF.  Specifically, in Al-Bihani, the Circuit Court for the District of Columbia rejected an argument, made by the Government in opposing another Guantanamo habeas petition, that the laws of war were incorporated into the President's detention authority.  See Al-Bihani, 590 F.3d at 871.

In Al-Bihani, the D.C. Circuit stated that the Government's arguments regarding its detention authority:

> rely heavily on the premise that the war powers granted by the AUMF and other statutes are limited by the international laws of war. That premise is mistaken.  There is no indication in the AUMF, the Detainee Treatment Act of 2005, Pub. L. No. 109-148, div.A, tit. X, 119 Stat. 2739, 2741-43, or the [Military Commission Act of 2006 or 2009], that Congress intended the international laws of war to act as extra-textual limiting principles for the President's war powers under the AUMF.

Id.  The Court of Appeals made its position quite clear: "The international laws of war as a whole have not been implemented domestically by Congress and are therefore not a source of authority for the U.S. courts."  Id.

The D.C. Circuit further stated:  "[T]he international laws of war are not a fixed code.  Their dictates and application to actual events are by nature contestable and fluid."  Id.  Thus, "their lack of controlling force and firm definition render their use both inapposite and inadvisable when courts seek to determine the limits of the President's war powers."  Id.[23] Thus, clear reference to the "law of war" in § 1021(b)(2) is an attempt to solve legislatively the issue referred to in Al-Bihani.  Based upon the Court's review of the AUMF and the NDAA, as well as other relevant statutes, and controlling law, calling § 1021 a "reaffirmation" implies a type of retroactive fix to what was by then a developed problem of executive branch usage encountering judicial resistance.

In 2009, in the context of litigating a number of habeas petitions, the United States District Court for the District of Columbia requested that the Government submit a statement of its interpretation regarding the scope of its detention authority.

---

[23] In Al-Bihani, petitioner had carried arms and supplied food for an al-Qaeda affiliated organization.  590 F.3d at 872-73.  The court found support for the petitioner's detention under the "purposefully and materially supported" language of the MCAs of 2006 and 2009.  Id. at 873.  Pursuant to the 2009 MCA, an "unprivileged enemy belligerent" is defined as an individual who (1) "has engaged in hostilities against the United States or its coalition partners," (2) "has purposefully and materially supported hostilities against the United States or its coalition partners," or (3) "was a part of al-Qaeda at the time of the alleged offense under this chapter."  10 U.S.C. § 948a(7).  The 2009 MCA specifies that "[a]ny alien unprivileged enemy belligerent is subject to trial by military commission."  10 U.S.C. § 948c.  Although al-Bihani was detained prior to the passage of the 2006 MCA, the Court declined to ground his detention in the AUMF (based on the overly-broad interpretation of the Government's detention authority) and instead referred to the MCA (though the MCA does not provide for separate detention authority).  Al-Bihani, 590 F.3d at 869-73.

Per that request, in March 2009, the Government submitted a document which, in the first sentence, states it is "refining" its position "with respect to its authority to detain those persons who are <u>now</u> being held at Guantanamo Bay." (See Resp't's Mem. Re: the Gov't's Detention Authority Relative to Detainees Held at Guantanamo Bay, at 1, <u>In re Guantanamo Bay Detainee Litig.</u>, Misc. No. 08-442 (D.D.C. Mar. 13, 2009) (the "March 2009 Memorandum") (emphasis added).)

In the March 2009 Memorandum, the Government based its position on its detention authority under the AUMF as "necessarily informed by principles of the law of war." (<u>Id.</u> at 1.) As the Government itself acknowledged:

> This body of law, however, is less well-codified with respect to our current, novel type of armed conflict against armed groups such as al-Qaida and the Taliban. Principles <u>derived from</u> law-of-war rules governing international armed conflicts, therefore, must inform the interpretation of the detention authority Congress has authorized for the current armed conflict. Accordingly, under the AUMF, the President has authority to detain persons who he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, and persons who harbored those responsible for the September 11 attacks. The President also has the authority under the AUMF to detain in this armed conflict those persons whose relationship to al-Qaida or the Taliban would, <u>in appropriately analogous circumstances in a traditional international armed conflict</u>, render them detainable.

(<u>Id.</u> at 1 (emphases added).)

In this memorandum, the Government also explicitly stated that its position "is limited to the authority upon which the Government is relying to detain the persons now being held at Guantanamo Bay.  It is not, at this point, meant to define the contours of authority for military operations generally, or detention in other contexts." (Id. at 2 (emphasis added).)  Put another way, in March 2009 the Government was not taking the position that the AUMF was coextensive in all circumstances with the type of detention authority resembling that set forth now in § 1021(b)(2).[24]

As the D.C. Circuit recognized in Al-Bihani, the law of war has never been, and should not be, part of the domestic laws in the United States.  Al-Bihani, 590 F.3d at 871.  The law of war is vague by necessity--it needs flexibility.  Id.  It is therefore ill-suited to domestic application and it would be ill-advised to make it a part of domestic law.  See id.

In the face of cases ruling that the law of war does not provide for the expansive detention authority the Government

---

[24] The Declaration of Attorney General Eric H. Holder, Jr. submitted in support of the March 2009 memorandum stated that the "Government is submitting herewith an explanation of its detention authority upon which it intends to rely in this litigation, notwithstanding its continuing intensive efforts to develop fully its prospective detention policies." (Decl. of Atty. Gen. Eric H. Holder, Jr., ¶ 2, In re: Guantanamo Bay Detainee Litig., Misc. No. 08-442 (Dkt. No. 201-1) (D.D.C. Mar. 13, 2009) (emphasis added).) He also states that in connection with reviews of the status of Guantanamo detainees, "the Executive Branch has refined the Government's position with respect to the detention authority to be asserted in this litigation . . . ." (id. ¶ 10 (emphasis added)); and "[t]he Task Force will continue to deliberate regarding these issues as part of their work" (id. ¶ 11 (emphasis added)).

envisions, the inclusion of the "law of war" in § 1021 appears
to have been intended as a legislative gap-filler, a "fix."

Section 1021(b)(2) differs from the AUMF in another,
independent way.  At the August hearing, the Government conceded
that § 1021(b)(2) does not require that a "Covered Person's"
actions be--in any way--connected to the attacks of September
11, 2001, or that a "Covered Person" be on the field of battle
or even carrying arms.  See Tr. II at 93-95.  Section 1021(b)(2)
defines "Covered Persons" as:

> (2)    A person who was a part of or substantially supported
>        al-Qaeda, the Taliban, or associated forces that are
>        engaged in hostilities against the United States or
>        its coalition partners, including any person who has
>        committed a belligerent act or has directly supported
>        such hostilities in aid of such enemy forces.

NDAA § 1021(b)(2).  This provision contains concepts well beyond
a direct involvement in the attacks of September 11, 2001--or
even harboring those responsible for those attacks, as
contemplated in the AUMF.  It adds significant scope in its use
of the phrases "substantially supported," "associated forces
that are engaged in hostilities against the United States or its
coalition partners," and "directly supported"--none of which are
defined in their own right, as discussed throughout this
Opinion.

During the August hearing, this Court asked the Government:

The Court: You would agree with me that 1021(b)(2)
does not require that an individual have – I will

43

quote the language – planned, authorized, committed or aided terrorist attacks that occurred on September 11, 2001?

[Government]:  The individual need not have done that. That's correct.

The Court:  Okay.  And the individual need not have harbored such organizations or persons?

Government: That's correct.

Tr. II at 106; see also id. at 108-09.

Section 1021 is, therefore, significantly different in scope and language from the AUMF.  The expansion of detention authority to include persons unconnected to the events of September 11, 2001, unconnected to any battlefield or to the carrying of arms, is, for the first time, codified in § 1021. The same is true for the codification of the disposition of the law of war in § 1021.

The discussion of the two statutes' differences further undergirds this Court's factual findings that each plaintiff who testified has a reasonable fear that § 1021(b)(2), which in fact provides broader scope for detention, could be used to detain him or her.  The fact that a plaintiff was not previously detained pursuant to the AUMF has no relevance to his or her current state of mind regarding § 1021(b)(2), nor does it provide guidance as to what executive branch practice with respect to § 1021(b)(2) is likely to be.

Implicit in the Government's argument that plaintiffs' fears regarding § 1021 are unreasonable is that the Government has, in fact, been acting consistently over time by interpreting the AUMF as expansively as the language of § 1021.  Since there was no congressional authorization for such broad detention authority prior to the passage of § 1021, since on its face the AUMF does not encompass detention for individuals other than those directly linked to the events of September 11, 2001, and since the reasons for individual detention decisions are not publicly reported, it is entirely reasonable and logical for plaintiffs to have understood that § 1021 presents a new scope for military detention.

IV.  OTHER RELEVANT STATUTES

A.   The Government's Arsenal of Prosecution Tools

The AUMF and § 1021(b)(2) are only two of many statutes that provide the executive branch with tools to combat terrorism in its myriad forms.  When the AUMF is read according to its plain terms and criminal statutes considered, it reasonably appears that the Government has the tools it needs to detain those engaged in terrorist activities and that have not been found to run afoul of constitutional protections.

In particular, there are laws that provide for arrest of individuals engaged in "material support" of terrorist organizations, including 18 U.S.C. §§ 2339A-2339B.  Section

2339A, originally passed in 1994, and modified on numerous occasions between then and December 2009, prohibits the "knowing" provision of material support or resources to a foreign terrorist organization.  Id. § 2339A(a).  An individual charged and found guilty under the statute is subject to a fine and a term of imprisonment of up to (but not more than) 15 years (if death results from the activity, then a life term may be imposed).  Id.  This statute has been refined several times over the years and now contains a comprehensive statutory scheme that defines key terms (such as what constitutes "material support"). See id. § 2339A(b)(1).  As a criminal statute, those prosecuted pursuant to it are entitled to full due process under the Constitution--and the statute itself provides for additional process.  See id. § 2339B.

Notably (in light of the Government's position in this case, which uses the word "independent" to modify its statements regarding plaintiffs' activities), a portion of 18 U.S.C. §§ 2339A-2339B relates to the "Provision of Personnel": "Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control."  18 U.S.C. § 2339B(h). The statute also has an explicit "saving clause" which states: "Nothing in this section shall be construed or applied so as to

abridge the exercise of the rights guaranteed under the First Amendment of the Constitution of the United States."  Id. § 2339B(i).

   In 1998, a group of organizations brought suit, asserting that the original version of § 2339B unconstitutionally rendered criminal protected First Amendment conduct, and also violated the due process clause of the Fifth Amendment.  See Holder, 130 S. Ct. at 2714.  Despite the amendments to the statute over the years--which added specific definitions of key terms and the saving clause described above, the lawsuit continued.  When the suit reached the Supreme Court, Chief Justice Roberts held that this "material support" statute was "constitutional as applied to the particular activities plaintiffs have told us they wish to pursue.  We do not, however, address the resolution of more difficult cases that may arise under the statute in the future." Id. at 2712.  That holding was based, in part, on the fact that the statute's extensive definitional framework eliminated the plaintiffs' vagueness concerns.  See id. at 2741.  The Court expressly allowed a preenforcement challenge in light of the possible penalties the plaintiffs could face.  Id. at 2717.

   18 U.S.C. §§ 2339A-2339B has been used to charge more than 150 persons.  Holder, 130 S. Ct. at 2717.  For example, on May 24, 2012, Minh Quang Pham was indicted under 18 U.S.C. § 2339A(b)(1) for providing material support to a foreign

terrorist organization.   The specific overt act charged against Pham is working with a U.S. citizen to create online propaganda for al-Qaeda, in furtherance of the conspiracy.   Sealed Indictment ¶ 3(c), United States v. Pham, No. 12 Cr. 423 (AJN) (S.D.N.Y. May 24, 2012).[25]

In addition to 18 U.S.C. § 2339A-2339B, there are numerous criminal statutes available to prosecute and bring to justice those who commit illegal acts furthering war or acts of terrorism against the United States or its interests, including 18 U.S.C. § 2381 (the modern treason statute); 18 U.S.C. § 32 (destruction of aircraft or aircraft facilities); 18 U.S.C. § 2332a (use of weapons of mass destruction); 18 U.S.C. § 2332b (acts of terrorism transcending national boundaries); 18 U.S.C. § 2382 (misprision of treason); 18 U.S.C. § 2383 (rebellion or insurrection); 18 U.S.C. § 2384 (seditious conspiracy); 18 U.S.C. § 2390 (enlistment to serve in armed hostility against the United States); and 50 U.S.C. § 1705(c) (prohibiting making or receiving of any contribution of goods or services to terrorists).[26]

B.   The Non-Detention Act

Section 1021(b)(2) and the AUMF must be read against the backdrop of the 1971 passage of the Non-Detention Act, 18 U.S.C.

---

[25] The Indictment was unsealed on August 23, 2012.
[26] Individuals prosecuted under such criminal statutes are, of course, afforded the full array of constitutional rights attendant to criminal proceedings.

§ 4001.  That act provides: "No citizen shall be imprisoned or otherwise detained by the United States except pursuant to an act of Congress."  18 U.S.C. § 4001(a).  That statute goes to the question, oft-repeated in Guantanamo habeas challenges, of whether the AUMF's scope captures the various circumstances under which individuals have been detained.  Based upon the Government's assertion that the AUMF and § 1021(b)(2) are "the same," the answer to that question has great import for this action.  The point for present purposes is whether plaintiffs reasonably believed (and still believe) that § 1021(b)(2) authorizes new and broader detention authority.

Although in Hamdi a majority of the Supreme Court found that the AUMF did provide for detention authority, such authority was clearly circumscribed: "[O]ur opinion only finds legislative authority to detain under the AUMF once it is sufficiently clear that the individual is, in fact, an enemy combatant . . ."  Hamdi, 542 U.S. at 523.  The Court continued,

> Under the definition of enemy combatant that we accept today as falling within the scope of Congress' authorization, Hamdi would need to be 'part of or supporting forces hostile to the United States or coalition partners' and 'engaged in armed conflict against the United States' to justify his detention in the United States for the duration of the relevant conflict.

Id. at 526 (emphases added).

In his lengthy dissent in Hamdi, Justice Scalia (joined by Justice Stevens) disagreed that the AUMF should be read even that expansively.  Justice Scalia's dissent is supportive of plaintiffs' assertion in this litigation--that the AUMF does not go as far as the Government urges this Court to find.  The majority in Hamdi of course found sufficient authority for the petitioner's--that is not the point here.  The majority was not comparing the AUMF to § 1021(b)(2).  Moreover, the fact that a Supreme Court Justice himself agrees that there are limits to the detention authority granted by the AUMF speaks to the reasonableness of plaintiffs' state of mind.  Such reasonableness supports their standing in this proceeding.  Accordingly, the Court describes at some length Justice Scalia's position.

In support of his position, he wrote that the AUMF risked unconstitutionality if expanded beyond certain limited bounds. See id. at 573-77 (Scalia, J., dissenting).  Justice Scalia set forth a variety of statutes that already provided for the arrest and prosecution of American citizens.  As he stated: "Citizens aiding the enemy have been treated as traitors subject to criminal process."  Id. at 559.

Justice Scalia then traced the history of such authority back to its origins in 1350 under England's Statute of Treasons; he cited a number of cases on which American citizens had been

charged and tried in Article III courts (with the due process
rights guaranteed by the Constitution) for acts of war against
the United States even when their noncitizen co-conspirators
were not.  Id. at 559-60.  Relying upon several early 19th
century cases in which courts held that the law of war did not
allow for military detention of an American citizen in the
United States when the courts are open, see id. at 565-68
(citing Milligan, 71 U.S. at 128-29; Smith v. Shaw, 12 Johns.
*257 (N.Y. 1815); In re Stacy, 10 Johns. *328 (N.Y. 1813)),
Justice Scalia stated: "The proposition that the Executive lacks
indefinite wartime detention authority over citizens is
consistent with the Founders' general mistrust of military power
permanently at the Executive's disposal," id. at 568.  That
reason suggests that the AUMF (and thus, by Congress'
"reaffirmation" of it, in § 1021) is an inappropriate basis for
detaining American citizens anywhere or non-citizens for acts
occurring on American soil.

     Justice Scalia's dissent dealt explicitly with the argument
that the Government has here reasserted--i.e., that the Supreme
Court's decision in Quirin approved indefinite imprisonment of a
citizen within the territorial jurisdiction of the federal
courts.  Hamdi, 542 U.S. at 569 (Scalia, J., dissenting).  In
Quirin, the Court upheld trial by military commission of eight
saboteurs, one of whom was an American citizen.  As Justice

Scalia stated, "The case was not the Court's finest hour."
Hamdi, 542 U.S. at 569 (Scalia, J., dissenting).  It issued a
decision one day after oral argument (a week before the
executions were carried out), and the Court only explained its
rationale in a decision issued several months later.  Id. at
569.  In Quirin, however, there was no doubt that petitioners
were members of enemy forces--they were 'admitted' enemy
invaders.  Id. at 571 (quoting Quirin, 317 U.S. at 47).  Justice
Scalia, with Justice Stevens joining, believed that Hamdi should
be prosecuted in an Article III court.  Id. at 573.  The
Government here relies heavily on Quirin.  The same rationale
that Justice Scalia used to reject its applicability in Hamdi
applies here.[27]

Given that Congress has provided the executive branch with
ample authority to criminally prosecute those engaged in a wide
swath of terroristic or war-making behavior, and the lack of
support for an expansive reading of the AUMF, plaintiffs' belief
that § 1021(b)(2) provides for a new, expanded scope for
military detention is reasonable.

V.   STANDING AND MOOTNESS

---

[27] The majority in Hamdi cites Quirin approvingly.  As set forth below, the
facts of that case are inapposite to those before this Court.  This Court
references Justice Scalia's criticism of Quirin as further support for the
fact that plaintiffs, who are not Supreme Court Justices, could similarly
reasonably believe that the AUMF (even against the backdrop of Quirin) does
not provide a sweeping basis for broad domestic detention authority by the
Executive.

Pursuant to Article III of the Constitution, federal courts may only entertain actual cases or controversies.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  That requirement has two components: the threshold question of whether the plaintiffs who have brought an action have standing, see id. at 561, and whether over the course of the litigation the matter has been rendered moot, see Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. Inc., 528 U.S. 167, 189 (2000).

A.   Principles of Standing and Analysis

Plaintiffs bear the burden of establishing standing for each claim asserted.  See Daimler-Chrysler Corp. v. Cuno, 547 U.S. 332, 342 (2006); Lujan, 504 U.S. at 561.  Standing is determined as of the outset of the litigation.  Lujan, 504 U.S. at 569 n.4; Mink v. Suthers, 482 F.3d 1244, 1253 (10th Cir. 2007); Mental Hygiene Legal Serv. v. Cuomo, 785 F. Supp. 2d 205, 215 (S.D.N.Y. 2011).

The Supreme Court has set out three "irreducible constitutional minimum" requirements for standing: (1) each plaintiff must have suffered an injury in fact of a legally protected interest; this means that injury must be actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the conduct complained of and plaintiff's injury, and (3) it must be likely, as opposed to

53

speculative, that the injury can be redressed by a favorable decision.  Lujan, 504 U.S. at 561.

The Supreme Court has long been clear that a hypothetical threat is not enough to confer standing.  See Boyle v. Landry, 401 U.S. 77, 80-81 (1971) (no standing where plaintiffs had "made a search of state statutes and city ordinances with a view to picking out certain ones that they thought might possibly be used by the authorities as devices for bad-faith prosecutions against them"); United Mine Workers of Am. v. Mitchell, 330 U.S. 75, 90 (1947) (declining to find standing where the threat was found to be hypothetical).

The Supreme Court has also instructed that there is an exception to the requirement of injury-in-fact where infringement of First Amendment rights are at issue.  Virginia v. Am. Booksellers Ass'n, Inc., 484 U.S. 383, 393 (1988).[28]  The Court found that if the plaintiffs were correct in their interpretation of the statute, their speech would be chilled, or they would risk criminal prosecution.  Id.  "[T]he alleged danger of this statute is, in large measure, one of self-censorship; a harm that can be realized even without an

---

[28] In American Booksellers, the statute at issue required a "knowing display" of certain materials.  484 U.S. at 383.  The lower court found that 95 percent of the conduct of the booksellers would not be affected by the statute; a finding of a five percent impact was sufficient for its facial invalidation.  Moreover, in that case, the evidence adduced at the preliminary injunction hearing also constituted the evidence for the trial on the merits.  Id. at 389.

actual prosecution." Id. The Court held, "in the First
Amendment context, 'litigants . . . are permitted to challenge a
statute not because their own rights of free expression are
violated, but because of a judicial prediction or assumption
that the statute's very existence may cause others not before
the court to refrain from constitutionally protected speech or
expression.'" Id. at 392-93 (quoting Sec'y of State of Md. v.
J.H. Munson Co., 467 U.S. 947, 956-57 (1984) (quoting Broadrick
v. Oklahoma, 413 U.S. 601, 612 (1973))); see also Vt. Right to
Life Comm., Inc. v. Sorrell, 221 F.3d 376, 382 (2d Cir. 2000)
(finding standing, and citing American Booksellers for the
proposition that the alleged danger of the statute is
self-censorship).

     The Government cites a number of cases in opposition to
plaintiffs' standing. None are apposite. In Laird v. Tatum,
408 U.S. 1 (1972) (cited in Gov't Trial Mem. at 27), the Supreme
Court declined to find standing for individuals who claimed that
their activities were being chilled by the mere existence of a
statute which allowed a governmental body to conduct
investigative work. Id. at 13-14. The Court distinguished that
situation from the type at issue here where the statute sets
forth specific penalties to be imposed on individuals--
indefinite military detention. Thus, unlike in Laird, here
there is no need for the fruits of the statute to be used for

some later purpose; the fruit of the exercise of § 1021 is indefinite detention.

Los Angeles v. Lyons, 461 U.S. 95 (1983) (cited in Gov't Trial Mem. at 18-19) is also inapposite.  In Lyons, the issue was whether an individual who had been placed in a chokehold by the police could seek broad injunctive relief against a policy allowing for such chokeholds.  Id. at 101.  The Court found standing lacking because no facts suggested that the plaintiff had any expectation of ever being placed in a chokehold by the police again--i.e., the plaintiff did not face a realistic threat of recurrence.

Here, of course, plaintiffs are engaged--and the facts as found by this Court make it clear they would continue to engage (without the fear of detention)--in the testified-to First Amendment activities.  This Court has found as a fact that plaintiffs' writings, speeches, and associational activities are by no means at an end.  This Court has also found that those activities have already been chilled.  On these facts, the Supreme Court's holding in Lyons is simply inapplicable.

The Government also cites Daimler-Chrysler for the proposition that facts supporting standing must appear affirmatively in the record.  (See Gov't Trial Mem. at 18, 26.) In Daimler-Chrysler, disgruntled residents of Toledo, Ohio brought a lawsuit alleging injury based on tax breaks given to

56

Daimler-Chrysler.  The Supreme Court found standing lacking for
those state-taxpayer plaintiffs on the same grounds that it
repeatedly denies standing to federal taxpayers challenging a
particular expenditure of federal funds--i.e., "interest in the
moneys of the Treasury . . . is shared with millions of others;
is comparatively minute and indeterminable; and the effect upon
future taxation . . . so remote, fluctuating and uncertain, that
no basis is afforded for an appeal to the preventive powers of a
court of equity."  Daimler-Chrysler, 547 U.S. at 343 (quoting
Mass. v. Mellon, 262 U.S. 447, 486 (1923)).

     Here, the Court held an evidentiary hearing and has made
findings of fact: the plaintiffs specified the actual work they
have done and intend to do; they testified credibly as to their
fear and lack of understanding of § 1021(b)(2); and the
Government at that hearing would not state that they would not
be detained for these activities.  In other words, there are no
factual similarities between Daimler-Chrysler and the case
before this Court.

          1.   Preenforcement Challenges

     The Supreme Court has recognized that preenforcement
challenges can be appropriate in the context of statutes that
impose criminal penalties, Holder, 130 S. Ct. at 2717, as well
as in the context of the First Amendment, Am. Booksellers, 484
U.S. at 393.  Section 1021(b)(2) implicates both.

In the context of a criminal statute, plaintiffs must, however, face a credible threat of prosecution.  See Holder, 130 S. Ct. at 2717; Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979)("When contesting the constitutionality of a criminal statute, 'it is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights.'" (citing Steffel v. Thompson, 415 U.S. 452, 459 (1974)); see also Doe v. Bolton, 410 U.S. 179, 188 (1973).  If prosecution is not "remotely possible," then a plaintiff lacks standing.  Babbitt, 442 U.S. at 299 (quoting Younger v. Harris, 401 U.S. 37, 42 (1971)).

In Amnesty International USA v. Clapper, 638 F.3d 118 (2d Cir. 2011), cert. granted, 132 S. Ct. 2431 (2012), the Second Circuit allowed a preenforcement challenge where the plaintiffs alleged a prospective injury to First Amendment rights, and showed an actual and well-founded fear of injury--not that the injury had already occurred.  Id. at 131, 135.  In support of such a finding the Second Circuit stated: "[T]he fact that the Government has authorized the potentially harmful conduct means that the plaintiffs can reasonably assume that government

officials will actually engage in that conduct by carrying out the authorized [injury]." Id. at 138.[29]

Similarly, in Vermont Right to Life, the Second Circuit found that where a plaintiff has alleged an intention to engage in a course of conduct "arguably affected" with a constitutional interest, but proscribed by a statute, and a credible threat of prosecution exists, the plaintiff should not be made to wait until he or she has been prosecuted to seek redress. 221 F.3d at 382. There, the organization bringing the challenge would have been subject to a civil rather than criminal charge. The court found that distinction to be of "no moment" given the constitutional issues involved. Id. at 382 ("The fear of civil penalties can be as inhibiting of speech as can trepidation in the face of threatened criminal prosecution."); see also Va. Soc'y for Human Life, Inc. v. Fed. Election Comm'n, 263 F.3d 379, 390 (4th Cir. 2001) (preenforcement challenge allowed when the presence of the regulation resulted in the plaintiffs changing their conduct).

2.  Facial Challenges

Whether or not a facial challenge is permissible implicates plaintiffs' standing. Under Lujan, it is clear that traditional

---

[29] As this Court found in its May 16 Opinion, § 1021(b)(2) is equivalent to a criminal statute--without the due process protections afforded by one. See Hedges, 2012 WL 1721124, at *18. There is no conceivable doubt that the possibility of being placed in indefinite military detention is the equivalent of a criminal penalty. Indeed, perhaps in many circumstances, worse.

rules of standing require that a plaintiff have injury in fact.
A facial challenge seeks to invalidate a statute in all of its
applications--going beyond those which a particular plaintiff
would him or herself have standing to bring.  Stevens, 130 S.
Ct. at 1587.

In a case decided one year after Lujan, Alexander v. United
States, 509 U.S. 544 (1993), the Supreme Court reiterated the
long-standing principle that when a plaintiff is challenging a
statute as overbroad and impinging on First Amendment rights,
facial challenges are permissible.  Id. at 555.  That enables a
plaintiff to challenge the statute in its entirety.  Stevens,
130 S. Ct. at 1587 (in a facial challenge in the context of the
First Amendment protections of speech, a law may be invalidated
as overbroad if a substantial number of its applications are
deemed unconstitutional, judged in relation to the statute's
"plainly legitimate sweep").

Alexander and Stevens follow the Supreme Court's earlier
holdings of, inter alia, City of Chicago v. Morales, 527 U.S. 41
(1999), and Broadrick v. Oklahoma, 413 U.S. 601 (1973).  In
Morales, the Court found that because the statute was challenged
on First Amendment grounds, it implicated the doctrine of "jus
tertii" or third-party standing.  In the context of the First
Amendment, the Court also held that a plaintiff is not required
to show that there are no legitimate applications of the

statute.  Morales, 527 U.S. at 55.  In Broadrick, the Court
stated that because the First Amendment needs "breathing space,"
the traditional rules of standing are relaxed when the challenge
relates to speech.  413 U.S. at 611.  "Litigants, therefore, are
permitted to challenge a statute not because their own rights of
free expressions are violated, but because of a judicial
prediction or assumption that the statute's very existence may
cause others not before the court to refrain from
constitutionally protected speech or expression."  Id. at 617.

### 3.   Commitments regarding Conduct

A number of courts have found that a commitment that a
statute will not be enforced against a particular plaintiff does
not eliminate standing.  See, e.g., Stevens, 130 S. Ct. at 1591
(finding a statute facially invalid on First Amendment grounds,
and refusing to "uphold an unconstitutional statute merely
because the Government promised to use it responsibly"); Am.
Booksellers, 484 U.S. at 393 ("[T]he State has not suggested
that the newly enacted law will not be enforced, and we see no
reason to assume otherwise."); Vt. Right to Life, 221 F.3d at
383 ("The State also argues that VRLC's fear of suit could not
possibly be well-founded because the State has no intention of
suing [plaintiff] VRLC for its activities.  While that may be
so, there is nothing that prevents the State from changing its

mind."); [30] <u>Mental Hygiene Legal Serv.</u>, 785 F. Supp. 2d at 220 (finding standing because although law enforcement officials said they would not enforce the statute against the plaintiffs, nothing prevented future law enforcement officials from taking a contrary position).

In <u>Stevens</u>, Chief Justice Roberts wrote that "the First Amendment protects us against the Government; it does not leave us at the mercy of <u>noblesse oblige</u>." 130 S. Ct. at 1591. In <u>Stevens</u>, the Government had committed that it would apply the statute at issue more narrowly than it might be read. Rather than accepting such assurances that plaintiffs need not be concerned, the Supreme Court found the Government's position an implicit acknowledgment of the potential constitutional problems of a more natural reading. <u>Id.</u>

    4.  <u>Analysis</u>

This Court has found that the facts support each plaintiff's standing to bring a preenforcement, facial challenge with respect to § 1021(b)(2). This Court has analyzed separately each plaintiff's standing regarding his or her First and Fifth Amendment challenge and finds each plaintiff has standing with respect to each claim.

---

[30] In an analogous situation, courts have held that even voluntary cessation of illegal conduct has not eliminated standing. <u>See</u> <u>Linton v. Comm'r of Health & Env't</u>, 30 F.3d 55, 57 (6th Cir. 1994) ("It is well-established that voluntary termination of unlawful conduct will not automatically remove the opposing party's standing.").

a.   <u>Injury</u>

With regard to their First Amendment challenge, at the March hearing each plaintiff testified credibly that, specifically due to concerns about § 1021(b)(2), he or she has already experienced a chilling of his or her written or oral speech or associational activities.  The Court's findings as set forth above, and more briefly summarized here, demonstrate actual chilling has occurred.  Hedges testified that he changed speeches he planned to make, avoided certain associations, and was concerned about articles or writing he expected to undertake.  O'Brien testified that she was withholding articles from publication; Wargalla testified that her organization had to contemplate changing participants in an online conference; Jonsdottir stated she has declined speaking engagements.  <u>See</u> Part II, <u>supra</u>.  In addition, each plaintiff testified credibly to ongoing concerns regarding expected future First Amendment activities.  <u>See</u> Part II, <u>supra</u>.  Such chilling of speech constitutes actual injury.  Indeed, it is precisely the type of chilling that the Supreme Court has found as a basis for standing--including to bring a facial challenge.  <u>See</u> <u>Broadrick</u>, 413 U.S. at 630.

With respect to their Fifth Amendment challenge, each plaintiff testified credibly that he or she had read the statute and did not understand its scope and, in particular, whether

his/her activities would fall within that scope.  See Part II, supra.  Without such definitional scope, and in the face of the Government's inability to provide definitions for the key terms at issue or define the scope of § 1021(b)(2) and unwillingness to state in March that plaintiffs' activities could not subject them to detention, there are adequate grounds to find plaintiffs' vagueness concerns valid.[31]

Finally, preenforcement challenges are permissible in just such contexts.  Here, based on credible testimony, this Court has found that each plaintiff has engaged in activities in which he or she is associating with, writing about, or speaking about or to al-Qaeda, the Taliban, or other organizations which have committed (or are associated with organizations that have committed) terrorist acts against the United States.  The words of § 1021(b)(2) can be read to encompass such activities.  These plaintiffs need not wait until they have been detained and imprisoned to bring a challenge--the penalty is simply too severe to have to wait.  See, e.g., Holder, 130 S. Ct. at 2717; Babbitt, 422 U.S. at 298; Vt. Right to Life, 221 F.3d at 382.

---

[31] The Government argues that the Court's questions improperly shift the burden of establishing standing from plaintiffs to the Government.  The Court posed those questions to the Government after plaintiffs had testified credibly regarding their reasonable fear of prosecution under § 1021(b)(2).  The questions were asked to provide the Government with an opportunity to rebut plaintiffs' reasonable fear--i.e., the Court had, subsequent to plaintiffs' testimony, determined that plaintiffs' fear of detention under § 1021(b)(2) was reasonable, unless the Government could rebut such a showing.  Those questions were the Court providing the Government with just such an opportunity; in no way was the Court alleviating plaintiffs of their burden.

The Government's statement--this Court cannot call it a "commitment" in light of its qualified language--regarding the unlikelihood of enforcement for certain specified acts does not eliminate plaintiffs' standing as to either claim.

First, the fact that the Government has taken two different positions (one in which the Government refused to make any commitment) undercuts the viability of the later (qualified) statement.  Second, standing attaches at the outset of a case., Lujan, 504 U.S. at 569 n.4, meaning that the later statement comes too late.  Third, the Supreme Court has made it clear in both the First and Fifth Amendment contexts, a plaintiff need not rely upon "noblesse oblige"--hoping that enforcement will not occur, or that one law enforcement official's interpretation will be the same as another's.  See Stevens, 130 S. Ct. at 1591; FCC v. Fox Television Stations, Inc., 132 S. Ct. at 2317.

Plaintiffs meet the requirements for demonstrating the necessary injury or impact on their conduct for standing.

>           b.   Causation

Each plaintiff testified credibly that § 1021(b)(2) has caused a chilling of First Amendment activities and an actual fear of detention due to the vagueness of § 1021(b)(2)'s scope. See Part II, supra.  There can therefore be no doubt as to whether Lujan's second required element has been met.  It has been.

c.   Redressability

The Government argues that plaintiffs lack standing because any injury supposedly deriving from § 1021(b)(2) cannot be redressed by the constitutional challenge since the Government has precisely the same detention authority under the AUMF. (Gov't Trial Mem. at 30-31.)  That is not so.

The argument is premised on the erroneous assertion (as the Court has discussed more fully above) that § 1021 and the AUMF are the same.  They are not.  In particular, § 1021(b)(2)--the very provision which plaintiffs seek to enjoin--provides for a much broader scope of military detention than provided for in the AUMF.

It is unavailing that the Government asserts that it has, without congressional authorization, unilaterally expanded the AUMF's detention scope by virtue of its own interpretation.  The Supreme Court previously has rejected that very argument.  See Hamdi, 542 U.S. at 516-18.  Simply by asserting that § 1021 is a reaffirmation of the AUMF does not make it so when its scope is plainly broader.  Accordingly, enjoining § 1021(b)(2), a new statute with uniquely broad scope, necessarily would redress plaintiffs' injuries.

Plaintiffs meet all the required elements to establish standing.

B.   Principles of Mootness and Analysis

To have an actual case or controversy pursuant to Article II, a case must also be "real and live, not feigned, academic or conjectural." Russman v. Bd. of Educ., 260 F.3d 114, 118 (2d Cir. 2001). This Court addresses whether the Government's newly articulated position (i.e., that § 1021(b)(2) does not apply if the conduct of plaintiffs is independent as described, and described accurately, and no more than what has been described) renders this action moot.[32]

When the issues between parties are no longer live, or have become merely conjectural, the case may be moot. See Powell v. McCormack, 395 U.S. 486, 489 (1969). There are certainly instances where an originally justiciable action has been rendered moot during the course of litigation. However, a case is not moot when there is a reasonable expectation that the alleged violation may recur. See Murphy v. Hunt, 455 U.S. 478, 482 (1982); United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953).

This case is not moot. First, at the March hearing, the Government declined to state that any of plaintiffs' conduct would not be encompassed by § 1021(b)(2). See Hedges, 2012 WL 1721124, at *14-15 (citing Tr. I). In its motion for

---

[32] The party seeking to have a case dismissed as moot bears a heavy burden. United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953).

reconsideration, the Government's position changed first to a broad statement--"the conduct alleged by plaintiffs is not, as a matter of law, within the scope of the detention authority affirmed by section 1021" (Recons. Mem. at 2)--and then to a more complicated, qualified statement (set forth above but worth reciting again here):

> As a matter of law, individuals who engage in the independent journalistic activities or independent public advocacy described in plaintiffs' affidavits and testimony, without more, are not subject to law of war detention as affirmed by section 1021(a)-(c), solely on the basis of such independent journalistic activities or independent public advocacy.  Put simply, plaintiffs' descriptions in this litigation of their activities, if accurate, do not implicate the military detention authority affirmed in section 1021.

(Recons. Mem. at 4.)  This qualified statement, reiterated in the Government's pre-trial memorandum (Gov't Trial Mem. at 20), is a multi-part, carefully constructed exception to the Government's view of detainable conduct.  The parts consist of the following elements, each of which is not itself defined and each of which narrows the assurance:  (1) independent (2) journalistic activities; or (3) independent, (4) public advocacy, (5) described in plaintiffs' affidavits and testimony, (6) without more, (7) are not subject to the law of war detention as affirmed by section 1021(a)-(c), solely on the basis of such conduct.  That language is followed by the additional statement that plaintiffs' descriptions (a) in this

litigation of their activities, (b) if accurate, (c) do not
implicate military detention.

The totality of those qualifications hardly provides
plaintiffs reasonable assurance that there is no likelihood of
detention under § 1021.  Indeed, the opposite is true.
Confronted initially by the Government's position that it would
not state whether plaintiffs' known activities could subject
them to detention under § 1021, plaintiffs had a legitimate
concern.  This Court so found as a matter of fact based upon
plaintiffs' trial testimony.  It was, as this Court previously
stated in its May 16 Opinion, a surprising position for the
Government to have taken--but take that position it did, and it
must now own it.

The Government's qualified position is hardly reassuring.
It follows a much clearer position of, essentially, "we can't
tell you if a plaintiff will be detained for these specific,
actual activities."  This Court and (presumably) plaintiffs
reasonably assume that the Government's first and second
positions were crafted carefully, and that the presence of
qualifiers in the second has real (if uncertain) meaning.

The clearest statement the Government could have provided
it did not.  At the very outset of this case, the Government
could have moved for dismissal (e.g., with an early motion for
summary judgment) based upon an affidavit of someone with

69

authority who could have stated that protected First Amendment activities occurring by Americans on American soil are not subject to § 1021(b)(2).  This would have made plaintiffs' burden much more difficult.[33]  No such statement was made.

Shifting positions are intolerable when indefinite military detention is the price that a person could have to pay for his/her, or law enforcement's, erroneous judgment as to what may be covered.[34]

VI.  THE JUDICIARY'S ROLE IN STATUTORY REVIEW

This case presents a justiciable case or controversy under Article III of the Constitution.  The Court now turns to its determination with respect to the merits and the question of appropriate relief.  Set out below is an overview of how the Court proceeds through various interlocking arguments.

Plaintiffs assert that § 1021(b)(2) violates their constitutional rights pursuant to the First, Fifth and Fourteenth Amendments.  The Government admonishes the Court to

---

[33] Three plaintiffs are not American citizens (O'Brien, Wargalla, and Jonsdottir).  However, their First Amendment activities do occur on U.S. soil, including via the Internet or travel to speeches.

[34] There is an exception to the general mootness doctrine that provides a separate basis for declining to find this case moot--i.e., when an action is capable of repetition but is likely to evade review.  See Murphy, 455 U.S. at 482.  It is indisputable that any future Attorney General--or even the current one--may decide to change enforcement practices.  The fact that such a "change of mind" could be coupled with indefinite military detention militates against a finding of mootness.  The Court has found as a factual matter that these plaintiffs have engaged in activities about which the Government originally could give no assurances--and that they will continue to engage in similar activities in the future.  The Government has explicitly declined to provide any assurances regarding any of plaintiffs' future activities.

avoid reaching the constitutional questions even if plaintiffs have standing.  The Government argues that the judiciary should play no role here--or, at most, an ex post facto one in which it reviews habeas petitions challenging detention determinations. The Court deals with this "quasi-abstention" issue first, then moves on to the merits of the constitutional questions raised and whether permanent injunctive relief is appropriate.

A.   The Court as Guardian of the Constitution

It is certainly true that courts should, if possible, avoid reaching constitutional questions.  See Califano v. Yamasaki, 442 U.S. 682, 692 (1979).  This Court takes that principle seriously and has proceeded here only after careful consideration as to whether constitutional avoidance is possible.  It is not.

The Court is also mindful of its oath.  When squarely presented with an unavoidable constitutional question, courts are obliged to answer it.  That principle traces its history back to the earliest years of this Country's independent and constitutional existence.  Federalist Paper No. 78 states:

> No legislative act, therefore, contrary to the Constitution, can be valid. To deny this would be to affirm that the deputy is greater than his principal; that the servant is above his master; that the representatives of the people are superior to the people themselves.
>
> . . .

> Nor does this conclusion by any means suppose a
> superiority of the judicial to the legislative power.
> It only supposes that the power of the people is
> superior to both; and that where the will of the
> legislature, declared in its statutes, stands in
> opposition to that of the people, declared in the
> Constitution, the judges ought to be governed by the
> latter rather than the former.

The Federalist No. 78 (A. Hamilton).

Chief Justice Marshall affirmed that principle in case law.

See Marbury v. Madison, 1 Cranch 137, 177, 2 L. Ed. 60 (1803)

("[T]he constitution controls any legislative act repugnant to

it. . . . It is emphatically the province and duty of the

judicial department to say what the law is.").  He stated:

> So if a law be in opposition to the constitution; if
> both the law and the constitution apply to a
> particular case, so that the court must either decide
> that case conformably to the law, disregarding the
> constitution; or conformably to the constitution
> disregarding the law; the court must determine which
> of these conflicting rules governs the case. This is
> the very essence of judicial duty.
>
> . . .
>
> Those then who controvert the principle that the
> constitution is to be considered, in court, as a
> paramount law, are reduced to the necessity of
> maintaining that courts must close their eyes on the
> constitution, and see only the law.
>
> This doctrine would subvert the very foundation of all
> written constitutions . . .  It would be giving the
> legislature a practical and real omnipotence . . .
>
> The judicial power of the United States is extended to
> all cases arising under the constitution.

Id. at 178.

There is no doubt, however, that, as John Marshall argued in 1800, "[t]he President is the sole organ of the nation in its external relations, and its sole representative with foreign nations."  Annals, 6th Cong., col. 613 (1800).  Even the President's powers are, however, exercised in subordination to the applicable provisions of the Constitution.  United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 320 (1936).

When it comes to separation of powers, and the courts' ability to intervene in constitutional questions, the Government has previously argued that this doctrine should preclude the judiciary from ruling on the constitutionality of certain statutes.  The Supreme Court has rejected that argument.  For instance, in Elrod v. Burns, 427 U.S. 347, 353 (1976), the Government argued that the Court should not address the statute at issue based on principles of the separation of powers.  The Supreme Court stated:

> More fundamentally, however, the answer to petitioners' objection is that there can be no impairment of executive power, whether on the state or federal level, where actions pursuant to that power are impermissible under the Constitution.  Where there is no power, there can be no impairment of power.

427 U.S. at 353.

Similarly, in Hamdi, the Supreme Court stated:

> [W]e necessarily reject the Government's assertion that separation of powers principles mandate a heavily circumscribed role for the courts in such circumstances.  Indeed, the position that the courts

must forgo any examination of the individual case and focus exclusively on the legality of the broader detention scheme cannot be mandated by any reasonable view of the separation of powers, as this approach serves only to condense power into a single branch of government. We have long since made clear that a state of war is not a blank check for the President when it comes to the rights of the Nation's citizens.

542 U.S. at 535-36.

 A court, as here, presented with an unavoidable constitutional question, is obligated to rule upon it.

B.   Judicial Review of Military Statutes

The Government also argues that this Court should decline to address the constitutional questions raised by § 1021(b)(2) particularly because of the President's role and authority in "foreign affairs."[35]  (See Gov't Trial Mem. at 1 (arguing that this context "should cause extreme hesitation" and "require the most exacting scrutiny to ensure that if the judicial power is to be exercised in such a far-reaching manner it is clearly within the Court's jurisdiction to do so"), 11 ("Due respect for a coequal branch of government requires that Congress be taken at its word."), 32 ("courts must 'recognize that the Constitution itself requires such deference to congressional choice' in those areas due to separation of powers and the 'lack of competence' on the part of the courts"), 37 ("As a threshold

---

[35] The Government's argument regarding the President's role in foreign affairs is particularly inapposite in the context of a statute in which a critical question is the legitimacy of its applicability to, inter alia, activities by Americans or on American soil.

matter, a military-force authorization--or a statute like
section 1021, restating and rearticulating part of such a force
authorization--is not a proper subject of vagueness analysis"),
45 ("in this case, which involves the Constitution's separation
of powers in the context of national defense and security, it is
particularly inappropriate to issue an injunction."; "[B]ased on
separation of powers principles, the courts have recognized that
an injunction running against the President would be
extraordinary"), 46 ("The reasons for denying injunctive relief
against the President are all the more compelling where, as
here, a plaintiff seeks relief against the President as
Commander-in-Chief under the Constitution"; "But more
fundamentally, it is not for plaintiffs--or this Court--to
determine which authorities are necessary or appropriate for the
conduct of an ongoing war.").)

At the August hearing, the Government stated quite clearly
that the only role that the Court should have with respect to
reviewing the scope of § 1021 is in the context of post-
detention habeas reviews.  Tr. II at 118.  That is an
unacceptable position.

First, as set forth above, when properly presented with an
unavoidable constitutional question, this Court has an
obligation to answer that question.

Second, it is unreasonable to expect a habeas review that can take many years to resolve, to provide adequate relief for those detained.  That must be particularly true when detention arises from or relates to the exercise of protected First Amendment rights, and when an individual may not have understood (due to the statute's lack of definitional structure) that his or her conduct could subject him or her to detention.  Some of the recent Guantanamo habeas reviews have taken more than ten years.[36]  If a court finds a detention unconstitutional, that is far too long to wait.  While awaiting determination on their civil habeas review, the detained individual is deprived of his or her liberty and, no matter what the official designation, he or she is a prisoner.  Suggesting that post-habeas review provides sufficient relief is remarkable when even the Government's qualified position regarding plaintiffs' activities implicitly concedes that § 1021(b)(2) has been or may well be used to detain someone for conduct protected by the First Amendment.  Any period of detention (let alone years) for what could be an unconstitutional exercise of authority, finds no basis in the Constitution.

Third, although the Government has cited a number of authorities for the proposition that it would be extraordinary

---

[36] See, e.g., Al-Bihani, 590 F.3d at 869 (acknowledging the petitioner's 2001 detention), cert. denied, 131 S. Ct. 1814 (2011).

for this Court to enjoin an act of the President, those cases
are inapposite.  (See Gov't Trial Mem. at 45-46.)  This Court
does not disagree with the principle that the President has
primacy in foreign affairs.  That is entirely different from
using the fact that the United States may be engaged in armed
conflict overseas to subject American citizens or others acting
on American soil to indefinite military detention.  There is no
support for such an extension of Article II authority.  The
cases cited by the Government relate to the President's
performance of official duties, such as the counting of
representatives as set forth in Article I, § 2, cl. 3 of the
Constitution.  See, e.g., Franklin v. Massachusetts, 505 U.S.
788 (1992).

       Section 1021(b)(2) does not present a similar factual
situation.  Instead, § 1021(b)(2) provides for indefinite
military detention of anyone--including U.S. citizens--without
trial.[37]  It is simply not the case that by prefacing this
statute with the provision "Congress affirms . . . the authority
of the President . . . to detain covered persons . . .," it is
outside of the purview of judicial review.  If that were the

---

[37] At the time that he signed the NDAA into law, President Obama issued a
signing statement with respect to § 1021 in which he stated that he would not
subject American citizens to indefinite military detention "without trial."
This is a carefully worded statement--it is not saying that the President
will not detain American citizens under § 1021--or what type of trial (with
what rights) that individual might have.  In any event, nothing prevents him
from changing his mind since "signing statements" are not law; and a new
administration could certainly take a different position.

case, it would reveal an extraordinary loophole through which the legislative and executive branches could create immunity from judicial oversight simply by having Congress provide broad, undefined authorization.  Under that theory, courts would be unable to review acts taken as a result of such authorization or the authorization itself.  And, under that theory, referring to a unilaterally broadened authority as a "reaffirmation" would effectively ratify actions previously taken; this exercise of legislative or executive authority finds no basis in the Constitution.

Contrary to the assertions of the Government, in ruling on the constitutional questions before it, this Court is doing nothing either extraordinary or unprecedented.  There is a long history of courts ensuring that constitutional rights are protected, even in a military context.

In Ex parte Merryman, 17 F. Cas. 144 (C.C. Md. 1861), the Supreme Court made clear that the President does not have the power to arrest; that the liberty of the citizen is not conferred on the President to do with what he will; and that no argument will be entertained that it must be otherwise for the good of the government.  Id. at 149 ("And if the high power over the liberty of the citizen now claimed, was intended to be conferred on the president, it would undoubtedly be found in plain words in [Art. II of the Constitution]; but there is not a

78

word in it that can furnish the slightest ground to justify the exercise of that power."). The Court continued,

> Nor can any argument be drawn from the nature of sovereignty, or the necessity of government, for self-defense in times of tumult or danger. The government of the United States is one of delegated and limited powers; it derives its existence and authority altogether from the Constitution; and neither of its branches, executive, legislative or judicial, can exercise any of the powers of government beyond those specified and granted.

Id.

In the Brig Amy Warwick, 67 U.S. 635 (1862), the Government had similarly argued that the judiciary should not-- or perhaps could not--rule on certain issues. There, the Supreme Court stated "[counsel for the Government argues] in well-considered rhetoric, his amazement that a judicial tribunal should be called upon to determine whether the political power was authorized to do what it has done." Id. at 645. The Court continued,

> The principle of self-defense is asserted; and all power is claimed for the President. This is to assert that the Constitution contemplated and tacitly provided that the President should be dictator, and all Constitutional Government be at an end, whenever he should think that the 'life of the nation' is in danger . . . It comes to a plea of necessity. The Constitution knows no such word.

Id. at 648.

A few years later, in Milligan, the Supreme Court held: "Neither the President, nor Congress, nor the Judiciary can

disturb any one of the safeguards of civil liberty incorporated into the Constitution, except so far as the right is given to suspend in certain cases the privilege of the writ of habeas corpus." 71 U.S. at 4.  The Court stated, "No book can be found in any library to justify the assertion that military tribunals may try a citizen at a place where the courts are open." Id. at 73.

In Curtiss-Wright, 299 U.S. 304, while acknowledging the President's pre-eminent role in foreign affairs, the Supreme Court also acknowledged that that power does not extend to all domestic affairs.  He cannot, for instance, determine whom to arrest domestically; the scope of the arrest authority is determined by criminal statutes.  Id. at 330-32.  Yet, it is beyond cavil to suggest that criminal statutes are not subject to judicial review.

In Justice Murphy's Korematsu dissent, he reiterated the principle that "[w]hat are the allowable limits of military discretion, and whether or not they have been overstepped in a particular case, are judicial questions." 323 U.S. at 234 (citing Sterling v. Constantin, 287 U.S. 378, 401 (1932)). Justice Jackson also dissented in Korematsu, stating, "I should hold that a civil court cannot be made to enforce an order which violates constitutional limitations even if it is a reasonable exercise of military authority.  The courts can exercise only

the judicial power, can apply only law, and must abide by the Constitution, or they cease to be civil courts and become instruments of military policy." Id. at 247.

As stated above, in its pre-trial memorandum the Government relies heavily on the case which Justice Scalia has rightly criticized as "not the Court's finest hour"--Quirin. The Government argues that Quirin establishes the constitutionality of military detention and punishment of U.S. citizens on U.S. soil. (See, e.g., Gov't Trial Mem. at 33-34.)

It is certainly true that a United States citizen was among the Germans who landed in Third Reich uniforms on the beaches of Long Island, New York, with the intention of proceeding to New York City and detonating explosive devices. Quirin, 317 U.S. at 7-8. However, those facts are a far cry from the broad sweep of First Amendment rights into § 1021(b)(2). Although this Court rejects the principles of Quirin on the same basis as that so well-articulated by Justice Scalia, it is bound to follow this case as Supreme Court precedent if it is applicable to the question before this Court. It is not.

As stated, the facts are inapposite. There, the Germans, who landed in (at least partial) uniform (which they then buried on the beach) brought the World War II battlefield to New York soil; they were armed with destructive devices and following orders of a country with which the United States was at war.

81

<u>Quirin</u> is <u>not</u> a case in which an American, not in uniform, carrying arms, or reporting to a foreign government, was taken from his home in the United States, and detained by the military, for writing or having written works speaking favorably about enemy forces, or for raising questions regarding the legitimacy of American military actions.  It is those activities which § 1021(b)(2) captures (so far as one can decipher from the Government's position).  <u>Quirin</u> is inapposite here.

The Government is wrong to ground a wide-sweeping ability of the executive branch to subject anyone at all to military detention in <u>Quirin</u>.  That argument eliminates Constitutional guarantees (under many provisions of the Constitution) in one fell swoop; it ignores as irrelevant all of the language, past and present, regarding limits on executive authority to arrest and--as applied to First Amendment activities--would privilege such detention ability above the prohibition that "Congress shall pass no law . . . abridging the freedom of speech."  The Government's reading of <u>Quirin</u> is therefore both wrong and dangerous and this Court rejects it.

VII. THE FIRST AMENDMENT

    A.   <u>Section 1021(b)(2) Is An Impermissible Content-Based Restriction</u>

First Amendment rights are guaranteed by the Constitution and cannot be legislated away.  U.S. Const. amend. I ("Congress

shall make no law . . . abridging the freedom of speech."); see also Stevens, 130 S. Ct. at 1584; Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 567 (2001) ("There is no de minimis exception for a speech restriction that lacks sufficient tailoring or justification."); United States v. Playboy Entm't Grp., Inc., 529 U.S. 803, 812 (2000) (laws designed or intended to suppress or restrict expression of specific speakers contradict basic First Amendment principles).

There is no doubt that the First Amendment protects the spoken and written word as well as the right of free association.  DeJonge v. State of Oregon, 299 U.S. 353, 365 (1937) (peaceable assembly for lawful discussion cannot be made a crime); see also New York Times v. United States, 403 U.S. 713, 724 (1971) ("Open debate and discussion of public issues are vital to our national health.  On public questions, there should be 'uninhibited, robust and wide-open' debate." (citation omitted)); Watts v. United States, 394 U.S. 705, 708 (1969); United States v. Robel, 389 U.S. 258, 263 (1967).

"'As a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" United States v. Alvarez, 132 S. Ct. 2537, 2542 (2012) (citing Ashcroft v. American Civil Liberties Union, 535 U.S. 564, 573 (2002)).  In the recent Alvarez decision, the Supreme Court held

that content-based restrictions of speech are presumed invalid and that the government bears the burden of showing their constitutionality.  Id.  A question for this Court is whether § 1021(b)(2), with its undefined breadth capturing both speech and non-speech activities, actually falls within the category of a content-based restriction.  "[T]he principal inquiry in determining content neutrality is whether the government has adopted a regulation of speech because of agreement or disagreement with the message it conveys."  Turner Board. Sys., Inc. v. Fed. Commc'ns Comm., 512 U.S. 622, 642 (1994) (quotation marks and alterations omitted).

As this Court stated in its May 16 Opinion, § 1021(b)(2) does have a legitimate, non-First Amendment aspect: catching and brining to justice real terrorists.  However, its breadth also captures a substantial amount of protected speech and associational activities.  The Government's qualified position regarding plaintiffs' activities demonstrates that the scope of the statute is intended to be broad enough to capture some First Amendment activities.  Otherwise, why not have a "saving clause" as in 18 U.S.C. §§ 2339A/B?  Why not have said plainly, "No First Amendment activities are captured within § 1021?"  Why, instead, have made such a qualified statement regarding what are clearly First Amendment activities?  That is, that they will not be subject to § 1021(b)(2) so long as those activities are as

they have described them, if accurate, without more, and independent?  And, why make it clear that such statement does not apply to any (even similar) future activities?

Section 1021(b)(2) is not a traditionally content-based restriction; encompassing content is not its only purpose or achievement.  However, covering content is at least one purpose--and in so covering it "compel[s] speakers to utter or distribute speech bearing a particular message."  See Turner Broad. Sys., Inc., 512 U.S. at 642.  In other words, § 1021(b)(2) has a content-directed aspect.  Accordingly, the Court finds that § 1021(b)(2) is subject to strict scrutiny. Id.[38]

To pass this "most exacting scrutiny," Turner Broad. Sys., Inc., 512 U.S. at 642, § 1021(b)(2) must be "justified by a compelling government interest" and "narrowly drawn to serve that interest."  Brown v. Ent'mt Merchants Ass'n, 131 S. Ct. 2729, 2738 (2011).  Although there may be a very compelling government interest--here, the exercise of detention authority in the war on terror for the protection of the United States--as set forth below, the Court finds that § 1021(b)(2) is not narrowly tailored in any way.  The imposition of indefinite

---

[38] Even if the Court were to find that § 1021(b)(2) is not directed at speech, it still would find that speech is captured on the fringe of § 1021(b)(2) and thus, "imposes burdens on speech" that are "greater than [that which] is essential to the furtherance" of a governmental interest.  Turner, 512 U.S. at 642, 662 (quotation marks omitted).

military detention, without the procedural safeguards of precise definition of what can subject an individual to such detention (see Part IX infra (discussing plaintiffs' Fifth Amendment challenge to § 1021(b)(2)'s vagueness) cannot be said to be narrowly tailored.  Accordingly, the statute does not pass muster under the First Amendment itself and is unconstitutional for that reason alone.

B.   Plaintiffs Have Made A Valid Facial Challenge

Plaintiffs have made a facial challenge to the constitutionality of § 1021(b)(2) on the basis that it violates core rights guaranteed by the First Amendment.  This Court agrees that the statute impermissibly encroaches on the First Amendment and that a facial challenge is appropriate in these particular factual circumstances.

As found as fact by this Court, plaintiffs are writers, journalists, and activists whose work falls within the protections of the First Amendment.  There has been no claim by the Government in this case that any of plaintiffs' work falls into one of the very narrow exceptions of protected speech-- i.e., speech which incites violence, or is obscene, defamatory, or integrally related to criminal behavior.  See, e.g., Alvarez, 132 S. Ct. at 2544; Stevens, 130 S. Ct. at 1584; Simon & Schuster, Inc. v. Members of the New York State Crime Victims Bd., 502 U.S. 105, 127 (1991); Roth v. United States, 354 U.S.

476 (1957); <u>Beauharnais v. Illinois</u>, 343 U.S. 250, 254-55
(1952); <u>Brandenburg v. Ohio</u>, 395 U.S. 444, 447-48 (1969);
<u>Giboney v. Empire Storage & Ice Co.</u>, 336 U.S. 490, 498 (1949);
<u>Chaplinsky v. New Hampshire</u>, 315 U.S. 568, 57172 (1942).  Thus,
while it is certainly the case that not all speech or
associational activities are necessarily protected by the First
Amendment, the Court here finds as a matter of fact that
plaintiffs' speech and associational activities are within
protected categories (<u>e.g.</u>, none is obscene, defamatory, seeks
to incite violence, or is otherwise integral to a criminal act).

The Government has been on notice of the specifics of
plaintiffs' claims since receipt of the verified complaint.
Based on the procedures required by this Court, prior to the
March hearing, plaintiffs submitted sworn declarations setting
forth the basis for their concerns; the Government then had an
opportunity to depose any plaintiff who intended to testify at
trial.  The Government also had an opportunity to cross-examine
plaintiffs at the March hearing.  Bluntly stated, nothing was
left to the imagination: the Government was on notice of each of
the speech and associational activities in which each plaintiff
engaged.

The Government knew that Hedges was a writer and journalist
whose work took him to the Middle East and that in connection
with his work he associates with members of the Taliban, al-

Qaeda and other groups on the State Department's Terrorist List;
it knew about the type of articles written by O'Brien that,
inter alia, have commented on aspects of military detention in
Guantanamo; it knew about the associational activities of
Wargalla, and that her organization has been on a list of
terrorist or extremist groups; and it knew about Jonsdottir's
participation with WikiLeaks, her anti-(Iraq) war activism, and
production of an anti-(Iraq) war film.

Based on this extensive and detailed prior notice, the
Court takes seriously the Government's position at the March
hearing that it could not provide any assurance that such
activities would not subject any plaintiff to detention under
§ 1021(b)(2).  See Hedges, 2012 WL 1721124, at *14-15 (citing
Tr. I).  That the Government subsequently changed its position
to a qualified one does not erase the essential point made:
First Amendment activities are not outside of § 1021.[39]

The Government's initial position vis-à-vis plaintiffs--and
indeed its qualified, second position--is consistent with the
fact that the Government quite carefully avoids arguing that
§ 1021(b)(2) does not encompass activities protected by the
First Amendment.  Indeed, read in this light, the qualifications
of plaintiffs' activities "as described," "if accurate,"

---

[39] Plaintiffs also assert claims under the Fourteenth Amendment, which makes
the First and Fifth Amendment applicable to the states.  That amendment does
not actually provide plaintiffs a separate claim with separate elements.

assuming they are "independent," and "without more," indicate that protected speech and associational activities are within § 1021(b)(2)'s scope, but provide these plaintiffs with a "limited pass."  Not once in any of its submissions in this action or at either the March or August hearings has the Government said, "First Amendment activities are not covered and could never be encompassed by § 1021(b)(2)."

Instead, the Government's arguments against plaintiffs' overbreadth claim are crafted in terms of whether a <u>facial</u> challenge is appropriate because of the extent to which the statute has a legitimate sweep.  (Gov't Trial Mem. at 33-35.) The Government argues that in the Court's May 16 Opinion, this Court did not properly weigh the legitimate sweep of the statute against any infringement on First Amendment rights. (<u>Id.</u> at 35.) The Government attempts to elide the implicit and extraordinary concession that First Amendment conduct is captured by § 1021 by referring back to its qualified position (that these plaintiffs, for the independent activities they have described, if accurately described, without more, would not be subject to detention under § 1021).  (<u>See</u> Gov't Trial Mem. at 20.)  At the August hearing, however, the Government made clear that that assurance was not prospective--even as to protected First Amendment activities--and went only so far as it went--which is

quite narrow indeed.  As set forth below, the Government's
arguments fail.

In Stevens, the Government similarly argued, "Whether a
given category of speech enjoys First Amendment protection
depends upon a categorical balancing of the value of that speech
against its societal costs."  130 S. Ct. at 1585.  Justice
Roberts wrote,

> As a free-floating test for First Amendment coverage,
> that sentence is startling and dangerous.  The First
> Amendment's guarantee of free speech does not extend
> only to categories of speech that survive an ad hoc
> balancing of relative social costs and benefits. The
> First Amendment reflects a judgment by the American
> people that the benefits of its restrictions on the
> Government outweigh the costs. Our Constitution
> forecloses any attempt to revise that judgment simply
> on the basis that some speech is not worth it.

Id.; accord Alvarez, 132 S. Ct. at 2543-44.

In the recent Alvarez decision, the Supreme Court similarly
rejected such an argument:

> Permitting the government to decree this speech to be
> a criminal offense . . . would endorse government
> authority to compile a list of subjects about which
> false statements are punishable.  That governmental
> power has no clear limiting principle.  Our
> constitutional tradition stands against the idea that
> we need Oceania's Ministry of Truth.

Id. at 2547 (citation omitted).  "The mere potential for the
exercise of that power casts a chill, a chill the First
Amendment cannot permit if free speech, thought and discourse

are to remain a foundation of our freedom." Id. at 2548. The
Court then expounded,

> The First Amendment itself ensures the right to
> respond to speech we do not like. . . . Society has
> the right and civic duty to engage in open, dynamic
> and rational discourse. These ends are not well
> served when the government seeks to orchestrate public
> discussion through content-based mandates.

Id. at 2550. Justice Kennedy noted that prior decisions cannot
be taken as establishing a "freewheeling authority to declare
new categories of speech outside the scope of the First
Amendment." Id. at 2547 (citing Stevens, 130 S. Ct. at 1586).

In speech cases, this Court must ask whether a "substantial
number of [a statute's] applications" are unconstitutional,
judged in relation to the statute's plainly legitimate sweep.
Stevens, 130 S. Ct. at 1587 (citing Washington State Grange v.
Washington State Republican Party, 552 U.S. 442, 449 n.6
(2008)). The Government argues that this Court's May 16 Opinion
found that § 1021 has a plainly legitimate sweep. (Gov't Trial
Mem. at 33.) That is correct with respect to the portion of §
1021 directed at prosecuting and detaining those involved in the
attacks on September 11, 2001, and where § 1021(b)(2) can be
read to cover members of al-Qaeda fighting U.S. forces on a
battlefield outside of U.S. territory. However, the Government
errs in its argument that this legitimate sweep ends plaintiffs'
facial challenge. (Gov't Trial Mem. at 34.)

The determinative question for this Court is the one posed in Stevens, as stated above--whether § 1021(b)(2)'s "plainly legitimate sweep" is outweighed by its "substantial number of" unconstitutional applications.  Stevens, 130 S. Ct. at 1587; see also U.S. v. Williams, 553 U.S. 285, 293 (2008).  How is a court to make such a measurement?

In Stevens, the Supreme Court acknowledged that a court cannot undertake the analysis without "first knowing" what the statute covers.  Id. at 1587 (citing Williams, 553 U.S. at 293).  Despite the Government's assurances that the statute at issue was not aimed at the conduct the Supreme Court focused on (hunting), the Court nonetheless found that the statute had an "alarming breadth."  Id. at 1588.  So too here.  As the Second Circuit recently stated in Commack Self-Service Kosher Meats v. Hooker, 680 F.3d 194 (2d Cir. 2012), "When a statute is capable of reaching expression sheltered by the First Amendment," a greater degree of specificity is required so that parties may know what actions may fall within the parameters of a statute. Id. at 213.  Section 1021(b)(2) is devoid of the required specificity.

In addition, in Robel, the Supreme Court affirmed a finding that a section of the Subversive Activities Control Act impermissibly tread on First Amendment rights.  The Court reiterated the principle that "precision of regulation must be

the touchstone in an area so closely touching our most precious freedoms."  389 U.S. at 265 (citation omitted).  In Robel, the Court noted that it was not unmindful of congressional concern over the danger of sabotage in national defense industries, but noted that Congress needed to have a more narrowly drawn statute.  "The Constitution and the basic position of First Amendment rights in our democratic fabric demand nothing less." Id. at 267-68.

Further, courts should look at such restrictive regulations with exacting scrutiny and ask whether it is "actually necessary" to achieve its interests.  Alvarez, 132 S. Ct. at 2549.  Here, § 1021(b)(2) does not meet that standard.  As set forth above, there is no reason § 1021 could not have a definitional framework that excludes protected conduct. Moreover, there are a variety of criminal statutes that capture speech or associational activities which are involved in criminal activities.  There is no reason for § 1021(b)(2) to encroach on protected First Amendment rights.

The Government points to Williams in support of its contention that § 1021(b)(2) is facially valid.  (See Gov't Trial Mem. at 34-35.)  In Williams, the Supreme Court upheld a facial challenge to a criminal child pornography statute.  The statute was challenged as overbroad under the First Amendment and impermissibly vague under the Fifth.  In finding the statute

constitutional, the Supreme Court relied on the fact that simply the ability to conceive of <u>some</u> impermissible applications was insufficient to establish that the statute was overbroad.  553 U.S. at 303.  Here, unlike in <u>Williams</u>, there is a trial record setting forth specific First Amendment conduct that the Government initially would not say was outside of § 1021's scope--but later said, perhaps the conduct would be outside of its scope, but only if such activities met certain qualifications.  Plaintiffs' activities are known.  This is not a situation as that in <u>Williams</u> requiring imagination or speculation.

Section 1021 must be measured against the backdrop of the other, numerous statutes which are targeted more directly at criminal conduct associated with terrorist activity, and of the fact that the AUMF continues in force and effect.  None of those other statutes have been found to have encompassed protected speech.

Notably, 18 U.S.C. § 2339B, the criminal statute discussed above (and in <u>Holder</u>) aimed at proscribing "material support" of terrorists, has a First Amendment saving clause.  Section 1021 does not.  There is a "catch-all" clause at the end of the statute:  "Nothing in this section is intended to limit or expand the authority of the President or the scope of the [AUMF]."  NDAA § 1021(d).  What does § 1021(d) really

accomplish?  Nothing of significance.  The premise of

§ 1021(b)(2) is wrong--and, therefore, its logic (including

§ 1021(d)) misses.  The title of § 1021 suggests that it is a

"reaffirmation" of the AUMF.  As stated earlier and throughout

this Opinion, it is not.  To the extent Congress understood that

the Executive's unilateral expansion of the interpretation of

the AUMF fit within the original authorization granted to the

President, it was mistaken.

Thus, if § 1021(b)(2) is actually intended to do anything

at all new, its sweep in regards to First Amendment rights is

substantial, and is substantial in relation to whatever new

activity is captured by § 1021(b)(2).  The Government's

reluctance to define the scope of § 1021 leaves a one-sided

evidentiary record in favor of plaintiffs as well as an

ineluctable outcome for this Court.  In other words, the Court

finds that § 1021(b)(2) is new.  There is a logical flaw in

stating an intention not to expand authority when Congress has

set forth what is, in fact, new and broad authority.  See

Stevens, 130 S. Ct. at 1590 (finding a saving clause inadequate

when it required an unrealistically broad reading of the

clause).[40]

---

[40] The closest § 1021 comes to having a "saving clause" is § 1021(e):
"Nothing in this section shall be construed to affect existing law or
authorities relating to the detention of United States citizens, lawful
resident aliens of the United States, or any other persons who are captures
or arrested in the United States."  NDAA § 1021(e) (emphasis added).  That

It is all the more difficult for plaintiffs, citizens generally, or this Court to feel confident in a determination as to § 1021(b)(2)'s scope when so many of its terms remain undefined.  This Court discusses the terms "substantially supported," "associated forces," and "directly supported" below.  Their vagueness presents constitutional concerns pursuant to the Fifth Amendment, but also supports plaintiffs' arguments here with respect to the First Amendment: if a plaintiff does not know what "substantially support" means, could a news article taken as favorable to the Taliban, and garnering support for the Taliban, be considered to have "substantially supported" the Taliban?  How about a YouTube video?  Where is the line between what the Government would consider "journalistic reporting" and "propaganda"?  What does "independent" mean?  Would being paid by Al-Jazeera to do a series of articles run afoul of § 1021(b)(2)?  Who will make such determinations?  Will there be an office established to read articles, watch videos, and evaluate speeches in order to make judgments along a spectrum of where the support is "modest" or "substantial"?  What if the article is written in New York City and sent over the Internet?  Can the Government then choose whether to pursue the writer under § 1021(b)(2) and impose indefinite military detention, or

---

saving clause, however, relates only to detention, specifically.  Had Congress omitted the language emphasized above, the Court would not be entertaining this action as the "saving clause" would then encompass the First Amendment.

can it choose to prosecute under 18 U.S.C. §§ 2339A-2339B with full constitutional guarantees?[41]   These questions demonstrate only a few of the real problems with a statute that captures some amount of undefined activities protected by the First Amendment.   See Bd. of Airport Comm'rs of the City of L.A. v. Jews for Jesus, Inc., 482 U.S. 569 (1987)(affirming facial invalidation of a statute that reached a substantial amount of protected speech); Schaumberg v. Citizens for a Better Env't, 444 U.S. 620 (1980)(affirming a facial invalidation of a statute on First Amendment grounds).

The type and amount of speech and associational activities in which plaintiffs engage are varied. The Government has not stated that such conduct--which, by analogy, covers any writing, journalistic and associational activities that involve al-Qaeda, the Taliban or whomever is deemed "associated forces"--does not fall within § 1021(b)(2).   Accordingly, this Court finds that a substantial amount of conduct relative to the statute's legitimate sweep is captured.   This is not a mathematically precise exercise, nor could it be given the lack of § 1021(b)(2)'s definitional structure.

---

[41] The Court notes that although 18 U.S.C. § 2339A contains a First Amendment saving clause, the recent indictment handed down in this District against Minh Quang Pham is based upon the transmission of "propaganda."   Indictment, United States v. Pham, 12 Civ. 423 (S.D.N.Y. May 24, 2012)

IX.  THE FIFTH AMENDMENT AND DUE PROCESS

Earlier this year, the Supreme Court reiterated that a "fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  See Fed. Commc'ns Comm. v. Fox Television Stations, Inc., 132 S. Ct. 2307, 2317 (2012).  People of common intelligence must not have to guess at the meaning of a statute that may subject them to penalties.  Id. (citing Connally v. Gen. Constr. Co., 269 U.S. 385, 391 (1926)).  "This requirement in clarity in regulation is essential to the protections provided by the due process clause of the Fifth Amendment."  Id. (citing Williams, 553 U.S. at 304).

If the vagueness of a statute leaves a person of ordinary intelligence in doubt, as to what conduct falls within or is excluded from its scope, it is impermissibly vague.  Id.  Such statutes also may allow or require predictable subjective judgments by law enforcement authorities as to when to enforce and when not.  Id.  The question is not whether a statute makes it difficult to prove an incriminating fact, but whether there is doubt as to what fact must be proved.  Id.

In Fox, the Supreme Court stated, "Just as in the First Amendment context, the due process protections against vague statutes prevent parties from being at the mercy of noblesse oblige."  132 S. Ct. at 2318 (citing Stevens, 130 S. Ct. at

98

1591).  The degree of vagueness that the Constitution tolerates depends in part on the nature of the enactment.  See Rothenberg v. Daus, No. 10-4411-cv, 2012 WL 1970438, at *2 (2d Cir. July 27, 2012)(citing Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498 (1982)).

Plaintiffs have asserted that they do not understand the terms "substantially supported," "directly supported," or "associated forces."  The Court finds that plaintiffs who testified are individuals of at least of common intelligence.  The Court finds credible their testimony that they do not understand what these undefined words mean in the statute.

The reasonableness of this position is self-evident.  When the Government was asked by the Court what the words "substantially supported" mean, it was unable to provide a definition; the same was true for "directly supported."[42]  There can be no doubt, then, these terms are vague.  The Government did offer that "associated forces" should be defined according to the law of war, though the Court notes that in the March 2009 Memorandum the Government conceded that even in the war on terror, the laws of war are not well-defined.  (See March 2009 Mem. at 1 ("This body of law, however, is less well-codified

---

[42] This deficit was particularly odd in light of the Government's contention that § 1021(b)(2) has been part of the AUMF for a decade; one would think that if that were so, then definitions would be readily available.

with respect to our current, novel type of armed conflict against armed groups such as al-Qaida and the Taliban.").)

In response to plaintiffs' Fifth Amendment challenge, the Government argues two seemingly contradictory points: (1) that military detention statutes are necessarily vague and are therefore not susceptible to a vagueness analysis (Gov't Trial Mem. at 37), but also (2) that "properly construed," the statute is not impermissibly vague (id. at 40).

In formulating its argument that § 1021 is not susceptible to a vagueness challenge, the Government essentially concedes the statute's vagueness: "[a]uthorizations of military force (which encompass detention authority, [citation omitted]) are always, and necessarily, stated in general terms." (Gov't Trial Mem. at 37-38.) In support of that position the Government cites a variety of statutes that were used to authorize the use of force against Vietnam, Germany (1917), Japan (1941), Spain (1898), Mexico (1812) and Britain (1812). (Id. at 38 n. 24.) These statutes, of course, were authorizations for this country to engage in war or open hostilities with foreign governments (or organized foreign entities seeking recognition as the "government"); not one of those statutes authorized indefinite military detention of U.S. citizens for conduct that could occur in their own home in New York City, Washington, D.C., Toledo, Los Angeles--anywhere in this land.

As discussed above, in comparing § 1021(b)(2) to the AUMF, it is incorrect to suggest that § 1021(b)(2) is a simple reaffirmation of the AUMF.  It does more: it has a broader scope and directly refers to the law of war as an interpretive background.  Section 1021(b)(2), which describes a category of "covered person" who can be detained, does not exclude American citizens, and is not limited to individuals on the field of battle or who bear arms.  It is unlike the military force authorization statutes the Government cites in its pre-trial memorandum.

To the extent that § 1021(b)(2) purports to confer authority to detain American citizens for activities occurring purely on American soil, it necessarily becomes akin to a criminal statute, and therefore susceptible to a vagueness analysis.  Constitutional guarantees require that criminal statutes carry an array of due process protections.  If it did not, then § 1021 must be interpreted as follows: Congress has declared that the U.S. is involved in a war on terror that reaches into territorial boundaries of the United States, the President is authorized to use all necessary force against anyone he deems involved in activities supporting enemy combatants, and therefore criminal laws and due process are suspended for any acts falling within the broad purview of what might constitute "substantially" or "directly supporting"

terrorist organizations.  If this is what Congress in fact intended by § 1021(b)(2), no doubt it goes too far.  Although § 1021(b)(2) does not, strictly speaking, suspend the writ of habeas corpus, it eliminates all other constitutionally-required due process (indeed, leaving only the writ).

The Government argues that the types of concerns that give rise to vagueness challenges cannot be squared with military-force authorization: § 1021 is designed to prevent those engaged in hostilities against the United States from returning to the field of battle, it does not proscribe particular criminal conduct.  (Gov't Trial Mem. at 39.)  This argument dangerously elevates form over substance.

There can be no doubt that § 1021 provides that if an individual "substantially supports" the Taliban, he or she can be detained indefinitely.  That certainly sets forth a penalty for conduct that is, accordingly, proscribed by virtue of the penalty of indefinite military detention without trial.  In any event, if all that § 1021(b)(2) is doing is stating that although it does not proscribe conduct, it can be the basis for a citizen's indefinite military detention, then it makes no sense to argue that a citizen cannot challenge that statute on vagueness grounds.  A citizen has just as much interest--indeed, perhaps more--in understanding what conduct could subject him or her to indefinite military detention without a trial as he or

she does in understanding the parameters of a traditional
criminal statute that carries a statutory maximum term of
imprisonment and cannot be enforced in the absence of full
criminal due process rights.

In Hamdi, the Supreme Court made its position perfectly
clear: "We reaffirm today the fundamental nature of a citizen's
right to be free from involuntary confinement by his own
government without due process of law."  542 U.S. at 531.  The
Court confirmed that if a citizen has actually fought with the
enemy and is detained on the battlefield, the law of war and
realities of combat may render military detention necessary and
appropriate.  Id.  The Court stated:

> Striking the proper constitutional balance here is of
> great importance to the Nation during this period of
> ongoing combat. But it is equally vital that our
> calculus not give short shrift to the values that this
> country holds dear or to the privilege that is
> American citizenship. It is during our most
> challenging and uncertain moments that our Nation's
> commitment to due process is most severely tested; and
> it is in those times that we must preserve our
> commitment at home to the principles for which we
> fight abroad.

Id. at 532 (citations omitted).  In Robel, the Supreme Court
stated a similar principle: "It would indeed be ironic if, in
the name of national defense, we would sanction the subversion
of one of those liberties . . . which makes the defense of the
Nation worthwhile."  389 U.S. at 264.

At the August hearing, the Government argued that this Court's role with respect to § 1021(b)(2) should be limited to consideration of a detainee's petition for release pursuant to a writ of habeas corpus.  That argument is premised upon an extraordinary proposition: that American citizens detained pursuant to § 1021 are not entitled to the presumption of innocence and requirement that guilt be proven beyond a reasonable doubt.  In other words, relegating a court simply to a habeas review means that the detainee has been divested of fundamental due process rights.  This becomes clear with reference to the fact that the Government's burden of proof with respect to habeas petitions is "preponderance of the evidence," not "beyond a reasonable doubt" as required for criminal convictions.  See, e.g., Almerfedi v. Obama, 654 F. 3d 1, 5 (D.C. Cir. 2011)(preponderance of the evidence standard applies to habeas petitions);[43] see also Al-Odah v. U.S., 611 F.3d 8, 13-14 (D.C. Cir. 2010) (preponderance of the evidence standard

---

[43] In Almerfedi, after a seven year detention, the United States District Court for the District of Columbia (Judge Friedman), found that the Government had not proven that it was more probable than not that Almerfedi purposefully part of or materially supported the Taliban or al-Qaeda; the Court of Appeals reversed. See Almerfedi, 654 F.3d at 8 n.2.  Almerfedi was alleged to be an al-Qaeda "facilitator" who frequented al-Qaeda guesthouses in Iran and helped fighters infiltrate Afghanistan.  The district court found the Government's evidence in support of these allegations insufficient based on a preponderance of the evidence.  The Court of Appeals reversed--finding that the district court had made an error in its legal application of the preponderance standard by weighing evidence piece by piece rather than as a whole, and reversed with directions to deny the petition.  On June 11, 2012, the Supreme Court denied certiorari.  Almerfedi v. Obama, No. 11-683, 2012 WL 2076354 (June 11, 2012).

is constitutional in evaluating a habeas petition from a
Guantanamo detainee).  A "preponderance standard" simply asks
whether a fact is more likely than not--51 percent likely--
versus beyond a reasonable doubt.

This Court rejects the Government's suggestion that
American citizens can be placed in military detention
indefinitely, for acts they could not predict might subject them
to detention, and have as their sole remedy a habeas petition
adjudicated by a single decision-maker (a judge versus a jury),
by a "preponderance of the evidence" standard.  That scenario
dispenses with a number of guaranteed rights.

In its pre-trial memorandum, the Government spends only one
page of a 49-page memorandum defending the language of
§ 1021(b)(2).  (Gov't Trial Mem. at 41-42.)  The Government
fails adequately to address why there is no requirement for
knowing conduct, to provide any specificity as to what
substantial support means and how that might compare, for
instance, to material support as defined in 18 U.S.C. §§ 2339A-
2339B.  It never addresses the phrase "directly support" and it
never addresses the fact that "associated forces" is a moving
target.[44]

---

[44] On the one hand, in its pre-trial memorandum the Government argues that
§ 1021(b)(2) is "tied to military action against al-Qaeda and Taliban forces
authorized by the AUMF."  (Gov't Trial Mem. at 42.)  However, this argument
is carefully crafted and does not exclude the concept of associated forces

At the March hearing and in prior memoranda submitted in this matter, the Government had argued that the terms "substantially supported," "directly supported," and "associated forces" had all been previously defined in case law.  This argument is absent from the Government's pre-trial memorandum (though it may be implicit in its statement that § 1021 should be read "in context").  (See Gov't Trial Mem. at 42.)  In fact, the terms as used in § 1021(b)(2) have not been previously defined in case law; no case provides a solid reference point for the Government's position.

First, the Government conceded at the March hearing that there is no case that dealt with what "directly supported" means.  Tr. I at 216.  That language first appears in the March 2009 Memorandum.

Second, no court has defined "substantial support."  There are cases in which detention pursuant to an allegation of "material[] support" is at issue.  See, e.g., Al-Bihani, 590 F.3d at 873.  In Al-Bihani, the D.C. Circuit specifically rejected the wholesale importation of the "laws of war" into domestic law.  It found, however, that the 2006 and 2009 MCAs provided for military detention of those individuals who "purposefully and materially supported" enemy belligerents of

_____

constituting groups the executive branch "believes" may be tied to al-Qaeda or the Taliban.

the United States or its coalition partners (the MCAs are not, however, statutes authorizing the use of military force).  At the August hearing in this action, the Government stated that the MCA plays no role in the case before this Court.  This Court agrees: the phrase "materially supported" as used in Al-Bihani does not shed light on the interpretation of "substantial support," as used in § 1021(b)(2).  Moreover, even in the MCA there is a requirement that the "material support" be purposeful.  Notably, § 1021(b)(2) does not require that the conduct which could subject an individual to detention be "knowing" or "purposeful."

Finally, in terms of "associated forces," at the March hearing, the Government referred repeatedly to that term being defined by the laws of war.  See Tr. I at 216-17.  Of course, as the Supreme Court said in Hamdi, the laws of war are not and should not be part of the domestic laws of the United States. In addition, however, "associated forces" is an undefined, moving target, subject to change and subjective judgment.  It would be very straightforward for Congress to alleviate this vagueness by tethering the term to a definition of (for instance) specific organizations.

Accordingly, the respective meanings of the terms at issue are unknown; the scope of § 1021(b)(2) is therefore vague; but the penalty of running afoul of it is severe.  Section

1021(b)(2) is, therefore, impermissibly vague under the Fifth Amendment.

X.    PERMANENT INJUCTIVE RELIEF

Section § 1021(b)(2) violates rights guaranteed by the First, Fifth, and Fourteenth Amendments of the United States Constitution.  The Court turns finally to the question of appropriate relief.  Plaintiffs have sought only injunctive relief.

In its May 16 Opinion, this Court preliminarily enjoined enforcement of § 1021(b)(2) and invited Congress to amend the statute to rectify its infirmities.  See Hedges, 2012 WL 1721124, at *2, *27, *28.  To date, Congress has not passed any amendments.

The Supreme Court has set out a four-part test for a determination as to the appropriateness of permanent injunctive relief: plaintiffs must demonstrate (1) that they have or imminently will suffer irreparable injury, (2) that monetary damages will not redress the injury, (3) that, considering the balance of hardships between the plaintiffs and Government, injunctive relief is warranted, and (4) that the public interest would not be disserved by the issuance of an injunction.  See Monsanto Co. v. Geertson Seed Farms, 130 S. Ct. 2743, 2756 (2010); eBay Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006).  Plaintiffs meet each of those factors.

In this case, there is a factual record developed at a full evidentiary hearing upon which the Court can rely.  As stated above, the Government chose not to submit any evidence whatsoever in support of its position, but relies on legal argument and cross-examination.  The Court's determinations regarding the elements plaintiffs must meet for issuance of a permanent injunction are based on its factual findings.

The factual record demonstrates that plaintiffs have already been harmed and will continue to be harmed by potential enforcement of § 1021(b)(2).  At the trial of this matter, Hedges, O'Brien, Wargalla, and Jonsdottir all testified to facts showing a chilling of their written, oral or associational activities. That is actual injury.  Moreover, each of the plaintiffs expects to continue to engage in the same activities as he or she has in the past.  Thus, whatever strength one can attribute to the assurances the Government provided, those assurances explicitly do not apply to any First Amendment activities that were not stated at the March hearing, that have happened since, or will happen in the future.  Plaintiffs' injury is imminent and ongoing.  The law considers injury to First Amendment rights to constitute irreparable harm.  Elrod, 427 U.S. at 373; Salinger v. Colting, 607 F.3d 68, 81-82 (2010).

In addition, imprisonment without trial and for an indefinite period certainly constitutes irreparable harm.  A

plaintiff need not wait until such detention has occurred to challenge the statute.  See Holder, 130 S. Ct. at 2717.

The second element is also easily met.  Plaintiffs are not suing--nor could they--for monetary damages.  They are suing to prevent indefinite military detention.  Should such detention occur, money damages would never be adequate as a matter of law. Cf. Illinois Migrant Council v. Pilliod, 540 F.2d 1062, 1071 (7th Cir. 1976) (finding that monetary damages were insufficient to compensate the plaintiffs--a class of persons of Mexican ancestry--who had been subject to illegal stops and interrogations by the INS in violation of the Fourth Amendment).

The balance of the hardships also clearly weighs in plaintiffs' favor.  The Government already has ample authorization to pursue those actually involved in the attacks on September 11, 2001, and it has a host of criminal statutes (referred to above) that it can use to prosecute those who engage in a variety of activities that endanger lives or constitute terrorism.  According to the Government, § 1021 is merely a reaffirmation of the AUMF--a position with which the Court disagrees.  If, however, the Government is taken at its word, then enjoining its ability to enforce § 1021(b)(2) removes no tools from the Government's arsenal.  Most importantly, since Congress may pass no law abridging rights guaranteed by the First Amendment, enjoining enforcement of a statute that does

just that cannot deprive Congress or the executive branch of
that which they have no right to have.

The last element relates to the weighing of the public
interest: does the public have a greater interest in
preservation of its First Amendment and due process rights that
are infringed by § 1021(b)(2), or in having the statute
potentially available for use by law enforcement authorities?
Here too, the fact that, according to the Government,
§ 1021(b)(2) adds nothing new to their authority, is decisive.
Enjoining the statute will therefore not endanger the public.
The Government did not put forward any evidence at trial that it
needed the statute for law enforcement efforts; in contrast,
plaintiffs did present evidence that First Amendment rights have
already been harmed and will be harmed by the prospect of
§ 1021(b)(2) being enforced.  The public has a strong and
undoubted interest in the clear preservation of First and Fifth
Amendment rights.

Accordingly, this Court finds that plaintiffs have met the
requirements for issuance of permanent injunctive relief.

XI.  CONCLUSION

For the reasons set forth above, this Court permanently
enjoins enforcement of § 1021(b)(2) in any manner, as to any

person.[45]  The Court invites Congress to examine whether there are amendments that might cure the statute's deficiencies, or whether, in light of existing authorization and existing criminal statutes, § 1021 is needed at all.

This Court has stated its position, as directly presented to it by the Government, that the AUMF and § 1021(b)(2) are not the same; they are not co-extensive.  Military detention based on allegations of "substantially supporting" or "directly supporting" the Taliban, al-Qaeda or associated forces, is not encompassed within the AUMF and is enjoined by this Order regarding § 1021(b)(2).  No detention based upon § 1021(b)(2) can occur.

The Clerk of the Court is directed to terminate this action.

SO ORDERED:

Dated: New York, New York
       September 12, 2012

_____
Katherine B. Forrest
UNITED STATES DISTRICT JUDGE

---

[45] Plaintiffs assert five causes of action (see Verified Am. Compl. ¶¶ 29-44 (Dkt. No. 4-1)), only four of which are addressed by this Opinion. Plaintiffs did not pursue Count II (a Fifth Amendment challenge to rendition of covered persons) and thus that claim is deemed abandoned for purposes of this proceeding.